No. 2014-1716

## UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

**SPX CORP.,**

*Appellant,*

**v.**

**SUDMO HOLDING GMBH,**

*Appellee.*

Appeal from the United States Patent and Trademark Office,
Patent Trial and Appeal Board

## BRIEF FOR APPELLANT SPX CORP.

Alan M. Fisch
John T. Battaglia
Alicia Meros Carney
FISCH SIGLER LLP
5335 Wisconsin Avenue NW
Eighth Floor
Washington, DC 20015
(202) 362-3500

Patrick J. Lee
FISCH SIGLER LLP
96 North Third Street
Suite 260
San Jose, CA 95112
(650) 362-8200

*Attorneys for Appellant SPX Corp.*

October 14, 2014

# CERTIFICATE OF INTEREST

Counsel for Appellant SPX Corp. certifies:

1.     The full name of every party or *amicus* represented by me is:

SPX Corp.

2.     The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

Not Applicable

3.     All parent corporations and any publicly held companies that own 10 percent or more of the stock of the parties or *amicus* represented by me are:

Not Applicable

4.     The names of all law firms and partners or associates that appeared for the party or *amicus* now represented by me in the trial court or agency or are expected to appear in this court are:

Fisch Sigler LLP:  Alan M. Fisch, John T. Battaglia, Alicia Meros Carney, Patrick J. Lee.

Date:  October 14, 2014                    /s/ Alan M. Fisch
                                           Alan M. Fisch

## TABLE OF CONTENTS

CERTIFICATE OF INTEREST ................................................................. i

TABLE OF AUTHORITIES ................................................................. v

USE OF EMPHASIS IN QUOTATIONS ........................................... vii

USE OF ILLUSTRATIVE SCHEMATIC DIAGRAMS ..................... vii

STATEMENT OF RELATED CASES ............................................. viii

JURISDICTIONAL STATEMENT ................................................... ix

PRELIMINARY STATEMENT ......................................................... 1

STATEMENT OF THE ISSUES......................................................... 4

STATEMENT OF THE CASE............................................................ 5

STATEMENT OF FACTS ................................................................. 6

I.      DOUBLE SEAT VALVES GENERALLY ................................. 6

II.     SUDMO'S '376 PATENT................................................................ 8

        A.      Fluid Flow and Overpressure in Double Seat Valves ......... 8

        B.      The '376 Valve's "Flow Barrier Element" and Other Structure.......... 8

        C.      The '376 Valve's Operating States ..................................... 11

                1.      The Valve's Partially Open and Closed Positions.................... 11

                2.      The Valve's Common Open Position and "Axial Seal".......... 12

        D.      The "Axial Seal" Limitation ............................................. 13

        E.      The "Spoked Wheel" Limitation........................................ 15

        F.      The "At Least Movable" Limitation ................................. 16

III.    THE PRIOR ART ........................................................................ 18

        A.      Hosokawa ........................................................................ 18

        B.      Burmester '986 ................................................................. 20

      C.     Burmester '134 ...................................................................21

IV.   THE PTO EXAMINER REJECTED THE '376 CLAIMS-AT-ISSUE........21

V.    THE BOARD REVERSED THE PTO EXAMINER'S REJECTIONS. .......24

      A.    The Board Narrowed the Construction of the Term "Axial Seal."......24

      B.    The Board Added Un-recited Requirements For a Particular Structure or Shape for the "Spoked Wheel" Claims-at-Issue. ............................26

      C.    The Board Required Explicit Disclosure of "Movement" for the Claims' "At Least Movable" Limitation. ............................................28

SUMMARY OF ARGUMENT ...............................................................30

STANDARD OF REVIEW ....................................................................34

ARGUMENT ........................................................................................34

I.     THE PRIOR ART DISCLOSES AN "AXIAL SEAL" UNDER THE BROADEST REASONABLE INTERPRETATION OR THE BOARD'S ERRONEOUS HANDBOOK DEFINITION.................................................34

      A.    The Board Elevated Extrinsic Evidence over the Intrinsic Patent and Thus Impermissibly Narrowed the Term "Axial Seal."......................34

           1.     The Claimed "Axial Seal" Covers Seals Formed by Valve Elements in Connection or "Abutment." ...................................36

           2.     The Board Erroneously Relied on New Extrinsic Evidence To Narrow the Scope of "Axial Seal." ...........................................37

           3.     The Board Ignored the Specification's Disclosures of Axial Seals and the Valve's "Common Open" Position.....................39

           4.     The Board Further Narrowed Its Own Construction of "Seal" to Exclude Seals that Control Leaks. ...........................................40

      B.    Hosokawa Discloses an "Axial Seal." ...............................................41

II.    HOSOKAWA DISCLOSES A "SPOKED WHEEL" UNDER THE BROADEST REASONABLE INTERPRETATION. ...................................44

      A.    The Board Introduced Particular Shape or Structure for "Spoked Wheel" Claims that are Silent about Such Requirements...................44

B.     As the Examiner Recognized, and the Board Held, the Prior Art Discloses and Invalidates Claims Reciting a "Spoked Wheel." .........46

C.     The Board Should Have Found "Spoked Wheel" Claims 60-63 and 65-67 Invalid, Just as it Found Claim 20 Invalid. ...............................48

III.   HOSOKAWA DISCLOSES A FLOW BARRIER ELEMENT THAT IS "AT LEAST MOVABLE." ............................................................................52

A.     The Board Erred in Requiring Actual Movement...............................52

B.     The Hosokawa Reference Discloses a Flow Barrier Element that is "Capable of Movement" and Meets this Limitation. ..........................53

C.     The Board Erred in Presuming that Hosokawa Would Not Operate in its Intended Environment. .................................................................56

CONCLUSION .......................................................................................................58

# TABLE OF AUTHORITIES

## Cases

*Advanced Fiber Techs. Trust v. J&L Fiber Servs.,*
 674 F.3d 1365 (Fed. Cir. 2012) ........................................................36

*Autogiro Co. of Am. v. United States*,
 384 F.2d 391 (Ct. Cl. 1967) ..............................................................45

*Cybor Corp. v. FAS Techs., Inc.*,
 138 F.3d 1448 (Fed. Cir. 1998) ........................................................34

*Facebook, Inc. v. Pragmatus AV, LLC,*
 2013-1350, 2013-1351, 2014 U.S. App. LEXIS 17678 (Fed. Cir. Sept. 23, 2014)
 ................................................................................................ 35, 39

*Hyatt v. Dudas*,
 551 F.3d 1307 (Fed. Cir. 2008) ........................................................49

*In re Comiskey*,
 554 F.3d 967 (Fed. Cir. 2009) ..........................................................49

*In re Enhanced Sec. Research, LLC*,
 739 F.3d 1347 (Fed. Cir. 2014) ........................................................43

*In re Gartside*,
 203 F.3d 1305 (Fed. Cir. 2000) ........................................................34

*In re Suitco Surface, Inc.*,
 603 F.3d 1255 (Fed. Cir. 2010) ........................................................34

*In re Taylor Made Golf Company, Inc.,*
 Case No. 2013-1552, 2014 U.S. App. LEXIS 18983 (Fed. Cir. Sept. 30, 2014)50, 51

*In re Trans Tex. Holdings Corp.*,
 498 F.3d 1290 (Fed. Cir. 2007) ................................................ 34, 39

*KSR Int'l Co. v. Teleflex Inc.*,
 550 U.S. 398 (2007)...........................................................................50

*MBO Labs., Inc. v. Becton, Dickinson & Co.*,
 474 F.3d 1323 (Fed. Cir. 2007) ........................................................35

*Phillips v. AWH Corp.*,
 415 F.3d 1303 (Fed. Cir. 2005) ................................................ passim

*Rexnord Corp. v. Laitram Corp.*,
    274 F.3d 1336 (Fed. Cir. 2001) .......................................................39

*Rexnord Indus., LLC v. Kappos*,
    705 F.3d 1347 (Fed. Cir. 2013) .................................................. 44, 48

*SkinMedica, Inc. v. Histogen Inc.*,
    727 F.3d 1187 (Fed. Cir. 2013) .......................................................35

*Tempo Lighting, Inc. v. Tivoli, LLC*,
    742 F.3d 973 (Fed. Cir. 2014) .........................................................35

*Vederi, LLC v. Google, Inc.*,
    744 F.3d 1376 (Fed. Cir. 2014) .......................................................35

*Versa Corp. v. Ag-Bag Int'l, Ltd.*,
    392 F.3d 1325 (Fed. Cir. 2004) .......................................................45

*Voda v. Cordis Corp.*,
    536 F.3d 1311 (Fed. Cir. 2008) .................................................. 32, 45

## Statutes

28 U.S.C. § 1295(a)(4)(A) ...................................................................... ix

35 U.S.C. § 101 ......................................................................................49

35 U.S.C. § 102(b) ................................................................................43

35 U.S.C. § 103 ......................................................................................27

35 U.S.C. § 141 (pre-AIA)...................................................................... ix

35 U.S.C. § 311 ...................................................................................... ix

35 U.S.C. § 314 (pre-AIA)...................................................................... ix

## Rules

37 C.F.R. § 41.77(b) ............................................................................51

## USE OF EMPHASIS IN QUOTATIONS

All emphasis in quotations and record citations has been added, unless otherwise indicated.

## USE OF ILLUSTRATIVE SCHEMATIC DIAGRAMS

Throughout the brief, SPX has provided illustrative schematic diagrams to assist the Court in understanding the technical and legal issues that are the subject of the parties' disputes on appeal.

## STATEMENT OF RELATED CASES

U.S. Patent No. 7,891,376 was asserted in a civil action for patent infringement by Sudmo Holding GMBH against SPX Corporation in the United States District Court for the District of Delaware on June 22, 2011.[1]  The district court litigation is styled as *Sudmo Holding GMBH v. SPX Corp. et al.*, Case No. 1.11-cv-561 (D. Del.).  The district court litigation is currently stayed pending the outcome of the *Inter Partes* reexaminations.[2]

---

[1] A001090-131.

[2] A001088; A001135-40.

## JURISDICTIONAL STATEMENT

The Patent Trial and Appeal Board ("Board") of the United States Patent and Trademark Office ("PTO" or "Office") had jurisdiction of the *Inter Partes* reexaminations under 35 U.S.C. § 311 and § 314 (pre-AIA). The Board issued a Decision on May 23, 2014. SPX timely filed its Notice of Appeal on June 24, 2014. This Court has jurisdiction under 28 U.S.C. § 1295(a)(4)(A) and 35 U.S.C. § 141 (pre-AIA).

## PRELIMINARY STATEMENT

The PTO's reexamination of the '376 Patent encompassed seven filings by the parties and six office actions and responses by the Examiner. The Examiner concluded that claims 7, 21-31, 33-41, 43-54, 58-63, 65-72, 74-77, and 81 of the Patent are invalid. On appeal, the Board overturned the Examiner's conclusions as to all these claims. The Board's disposal of the Examiner's conclusions as to all 52 claims turned on its new constructions for three key claim terms. Each of these new constructions failed to accord these claim terms their broadest reasonable definition and is thus flawed under this Court's long-standing jurisprudence.

For its constructions of the term "axial seal," the Board relied on a definition in Mark's Standard Handbook for Mechanical Engineers. Neither the parties nor the Examiner had cited this handbook during the reexamination; instead, they had all relied on the intrinsic record to provide meaning for "axial seal." The Board nevertheless elevated this extrinsic definition over the Patent's intrinsic evidence, contrary to this Court's precedents. As a consequence, the Board erroneously narrowed the scope of this term and rejected the Examiner's construction that an axial seal could result from valve elements having a "connection" with each other. Indeed, the Patent's specification discloses having a seal when the valve elements simply "abut" or "come into abutment" with each other. Likewise, the Board required that the axial seal must "prevent leakage." But the specification discloses

- 1 -

seals that control leakage while still recognizing that "leaks" and liquid will pass. The prior art discloses valve elements that meet and invalidate the "axial seal" claims as properly construed by the Examiner.

For its construction of the "spoked wheel" limitation, the Board relied on a Merriam-Webster dictionary definition that neither the parties nor the Examiner had cited during the reexamination.  The Board thus erroneously narrowed this "spoked wheel" term to require a particular structure or shape.  Further, the Board inconsistently applied its own construction to the Patent's claims.  The Board concluded that the prior art discloses and renders obvious the "spoked wheel" limitation in claim 20.  But despite concluding that this "spoked wheel" was known and obvious, the Board failed to reach the same invalidity conclusion for the same "spoked wheel" in claims 60-63 and 65-67.  The Board arrived at this contradictory result even though Sudmo and the Board itself had analyzed and treated these "spoked wheel" claims as all rising or falling on this disputed term.

For its construction of "at least movable," the Board indicated it ultimately required "movement" for the relevant valve element at the relevant time.  This was contrary both to the principle that claim language be afforded its broadest reasonable interpretation in PTO proceedings, and to the Patent's specification. Indeed, the specification describes this valve element as "capable of moving," not that it must actually move.  As the Examiner correctly found, the prior art discloses

having such a valve element that is capable of "slid[ing] freely along" at the relevant time.

In short, the Board's erroneous constructions and applications of these three claim terms constitute reversible error. SPX thus respectfully asks this Court to reverse the Board's decision and reinstate the Examiner's rejections of claims 7, 21-31, 33-41, 43-54, 58-63, 65-72, 74-77, and 81.

## STATEMENT OF THE ISSUES

(1)   The Board overruled the Examiner's invalidity rejections of various '376 Patent claims based on the "axial seal" limitation.  In so doing, the Board rejected and narrowed the Examiner's construction of this term, adopting instead a handbook's definition of "seals."  Neither of the parties nor the Examiner had introduced this extrinsic evidence during the reexamination, and instead understood this term through the intrinsic record.  The Board's handbook-based construction excluded seals formed by valve elements that connect with each other.  But the specification discloses seals formed by valve elements that merely "abut" each other.  And the prior art discloses an axial seal meeting this limitation, as properly defined through the intrinsic evidence.  Did the Board err in reversing the Examiner's invalidity rejections based on the "axial seal" limitation?

(2)   The Board overruled the examiner's invalidity rejections of other '376 claims based on the "spoked wheel" limitation.  In so doing, the Board relied on a dictionary definition to require that the "spokes" for this "spoked wheel" have a particular "rod[]"-like structure or shape. Yet, the claims-at-issue for this rejection are silent about any such particular shape or structure, unlike other "spoked wheel" claims in the Patent that are not at issue.  And the Board itself held that the prior art discloses such a "spoked wheel" and renders obvious a claim reciting that limitation.  Did the Board err in reversing the Examiner's invalidity rejections based on the "spoked wheel" limitation?

(3)   The Board overruled the examiner's invalidity rejections of other '376 claims based on the limitation for a valve "flow barrier element" that is "at least movable." In so doing, the Board indicated it was requiring an element that does actually move at the relevant time.  But the specification discloses that such an element need only be "capable of moving." And the prior art discloses a flow barrier element that is capable of sliding freely along at the relevant time.  Did the Board err in reversing the Examiner's invalidity rejections based on the "at least movable" limitation?

## STATEMENT OF THE CASE

SPX Corp. petitioned in 2011 for an *Inter Partes* reexamination of U.S. Patent No. 7,891,376 ("the '376 Patent").[3] The PTO granted all three of its petitions, finding a reasonable likelihood that SPX would prevail.[4] The PTO thereafter consolidated the reexaminations into one proceeding.[5]

After further evaluating the '376 Patent, the prior art, and the parties' submissions, the Examiner concluded that the claims-at-issue were anticipated and/or obvious. Accordingly, the Examiner issued a Right of Appeal Notice finalizing the claims' rejection and certifying the case for any appeal to the Office's Patent Trial and Appeal Board.[6] Sudmo appealed the following Examiner rejections: (a) claims 7, 20-31, 33-41, 43-54, 58-63, 65-72, 74-77, and 81 were anticipated by the Hosokawa reference; (b) claims 35, 48, 53, and 75 were obvious in light of Hosokawa and Burmester '134; and (c) claim 20 was obvious in light of Burmester '986 and Burmester '134.[7]

---

[3] *See* Petition for Reexamination Control No. 95/001,797, A000079-152; Petition for Reexamination Control No. 95/001,834, A000171-247; Petition for Reexamination Control No. 95/001,873, A000254-369.

[4] A000373; A000384; A000395.

[5] A000408-12.

[6] A000682-702.

[7] A000714. Sudmo did not appeal the Examiner's rejection of the Patent's claims 1, 2, 4-6, 8-14, and 18-19, and the Board did not address them. Thus, those claims remain finally rejected. A000003-04.

On appeal, the Board sustained the Examiner's rejection of claim 20, but reversed the rejections of claims 7, 21-31, 33-41, 43-54, 58-63, 65-72, 74-77, and 81.[8]  SPX timely appealed the Board's rulings to this Court.[9]

## STATEMENT OF FACTS

### I.    DOUBLE SEAT VALVES GENERALLY

The '376 Patent relates to a double seat valve.  A double seat valve has two sealing elements.  The seat is the space or portion of a valve housing that a sealing element abuts to seal off one part of the valve.[10]  Adjusting such a valve's sealing elements can control the flow of fluids running in two pipelines.[11]

Food processing is one industry that uses double seat valves.[12]  In milk production, for example, federal guidelines require that milk-processing pipelines and valves be cleaned with a chemical solution at regular intervals to maintain sanitary conditions.[13]  To maintain these sanitary standards and still keep the production or processing of milk active, two pipelines are often used.  One can be used for milk processing while the other is cleaned by a solution that is introduced

---

[8] A000004.

[9] A000054.

[10] A000048 at 10:12-18.

[11] *See, e.g.*, A000044 at 1:38-46; A000048 at 9:49-51; A000025.

[12] A000044 at 1:35-37.

[13] *See, e.g.*, A000044 at 1:38-51; *id.* at 2:11-14.

into that same system.[14] With a double seat valve connected to these pipelines, dairies can change the valve's settings and thus control the flow of cleaning fluids running in one pipeline, and the milk running in another pipeline.

For example, in a valve's closed position, the valve will keep the two pipelines crossing through it shut off from each other. This precludes the cleaning fluid already flowing in one pipeline from entering into the other pipeline carrying milk.[15] In its common open position, by contrast, the double-seat valve will open its two sets of sealing elements. This allows the pipelines running through that valve to "communicate" with each other.[16] In the valve's "partially open" positions, one of the valve's sealing elements is moved away from its seat and thus opened. This allows cleaning solution to flow through and clean the pipeline and valve.[17]

Double seat valves and their operation in controlling pipelines, leakage, and the flow of cleaning media are well known in the art.[18]

---

[14] *See, e.g.*, A000044 at 2:1-8; *id*. at 1:52-58.

[15] A000044 at 1:40-43.

[16] A000044 at 1:43-46.

[17] A000044 at 1:66-2:8.

[18] A000044 at 1:17-34; *id*. at 2:11-27; *id*. at 2:49-62; A000025.

## II.    SUDMO'S '376 PATENT

### A.    Fluid Flow and Overpressure in Double Seat Valves

The '376 Patent resulted from an application originally filed in Germany in 2007.  It claims a double seat valve.  The '376 Patent describes a problem with valve overpressure that can happen when cleaning fluid introduced into the valve directly contacts the valve's internal sealing structures.[19]  The force of this unimpeded flow can cause a valve's closing element to be lifted from its seat.  This opens the valve and allows cleaning agent to leak into a pipeline.[20]

### B.    The '376 Valve's "Flow Barrier Element" and Other Structure

The '376 Patent addresses this overpressure with an allegedly new "flow barrier element."[21]  The purpose of this flow barrier element is to deflect cleaning media from flowing directly against the valve's closing elements.[22]  The flow barrier element is located between the valve's two closing elements.[23]  The Patent describes this arrangement as a "sandwich."[24]  Figure 2d of the Patent illustrates this arrangement, with the valve in a closed position:[25]

---

[19] *E.g.*, A000044 at 2:29-35.

[20] A000044 at 2:37-48.

[21] *E.g.*, A000045 at 3:8-15, *id.* at 3:30-55.

[22] A000045 at 3:51-56; A000049 at 12:48-55.

[23] *E.g.*, A000051 at 16:46-52; A000049 at 11:41-47.

[24] A000046 at 6:21-24.

[25] A000027 (notations added).



**Figure 2d of '376 Patent**

The valve's housing can have two pipes running through it. For example, it can have one pipeline toward the top of the structure shown above, and one toward the bottom. In this illustration, the valve's first closing element (28) includes a sealing element (32). In the valve's closed position, the sealing element will abut the first closing element seat (34) in order to form a seal near the top of the valve, where the first pipeline would run.[26] Likewise, the second closing element (30) includes a sealing element (36) that, in the closed position, will abut its seat (38) to form a seal near the bottom of the valve, where the second pipeline would run.[27]

The flow barrier element does not have to form a complete seal. The specification states, for example, that this element "does not have to bear against the [valve's] housing in a completely seal-forming fashion here since … it is

---

[26] A000044 at 1:21-23; A000048 at 10:12-18.

[27] A000044 at 1:26-29; A000048 at 10:18-22.

sufficient if the flow barrier element avoids a situation in which the cleaning medium flows against" a valve's closing element.[28]  The Patent also regularly identifies that the flow barrier element is "capable of moving" and can "be moved" by "the pressure of the cleaning medium."[29]

In some embodiments, a spring may exert force on the flow barrier element.[30]  In another embodiment, the flow barrier element is "embodied … as a spoked wheel which has a plurality of spokes with openings lying between them."[31] Despite the flow barrier element, the Patent still "advantageously" allows for leaks to be detected when they occur in at least one of the valve's sealing elements.[32]

---

[28] A000045 at 4:44-49; *see also id*. at 4:30-36 ("flow barrier element" in "simplest case" can be "annular element" that deflects cleaning medium and thus reduces "pressure build up").

[29] A000047 at 7:64-67 (flow barrier element "can even be moved further towards [other closing element], which is simply brought about by the pressure of the cleaning medium"); A000050 at 14:24-27 (flow barrier element "capable of moving"); A000051 at 15:56-60 (flow barrier element "capable of moving" toward other closing element when "pressurized cleaning medium is applied").

[30] A000046 at 6:43-50; A000050 at 13:1-5; *id*. at 14:24-30.

[31] A000051 at 16:46-52; *see also* A000046 at 6:35-37 ("flow barrier element can be embodied as a ring or as a spoked wheel").

[32] A000046 at 5:53-62; *see also* AA000048 at 10:40-47 (describing how '376 valve can "permit a leakage state to be detected when there is a leak in one or both of the [valve's] sealing elements 32, 36"); A000044 at 2:44-48.

### C.    The '376 Valve's Operating States

As with the prior art, the Patent describes its valve as having four positions, one of which—the common open position—bears directly on the issues here:

(1) a partially open position where the valve's first closing element is lifted from its first closing element seat, thus opening that side of the valve, but not the other[33];

(2) a partially open position where the second closing element is lifted from its second closing element seat, thus opening this other side of the valve, but not the other[34];

(3) a common closed position in which both the first and second closing elements abut against their respective seats, thus closing the valve on both sides[35]; and

(4) a common open position in which both the first and second closing elements are lifted from their respective seats thus opening the valve at both sides and allowing the two pipelines to "communicate."[36]

### 1.    The Valve's Partially Open and Closed Positions

The valve's partially open positions allow cleaning medium to be introduced without it directly impinging on a valve's closing elements. This is because the flow barrier element screens that medium, which lessens the pressure it puts on a closing element. Without that pressure, that closing element can stay seated and maintain the seal at that end of the valve.[37] In the valve's closed position, both

---

[33] *E.g.,* A000027 at Fig. 2b.

[34] *E.g.,* A000031 at Fig. 2a.

[35] *E.g.,* A000037 at Fig. 2d.

[36] *E.g.,* A000048-51, Figs. 2c, 5, and 9.

[37] A000049 at 11:26-40.

closing elements stay in their respective seats so that they maintain a seal at both ends of the valve. This keeps the two pipelines closed off from each other.[38]

## 2.    The Valve's Common Open Position and "Axial Seal"

In the valve's common open position, both of the valve's closing elements are lifted from their respective seats so that no seal exists between the top part of the valve and the bottom part. Accordingly, a double seat valve in this position opens up the valve and thereby puts the two pipelines in "communication" with each other.[39] Product fluid may thus flow from one pipeline into the other pipeline.

In this open position, the Patent recites having an "axial seal." The specification states that this axial seal results when the valve's closing elements "come into abutment" with the flow barrier element "in a seal-forming fashion."[40] The specification also recites a "seal axially against said first and second closing elements."[41] The Patent's Figure 2c illustrates the valve in this open position, with its closing elements (28 and 30) abutting the flow barrier element (56) and forming an "axial seal":[42]

---

[38] A000044 at 1:40-43. *See also* A000027 at Fig. 2(d).

[39] A000044 at 1:43-46; A000048 at 10:53-61.

[40] A000050 at 13:50-59; *see also* A000051 at 16:58-65.

[41] A000053 at 19:30-31; *see also* A000046 at 5:34-36.

[42] A000037.



**Figure 2c of '376 Patent**

In addition to these "axial seal" disclosures, the Patent consistently describes seals formed by valve elements that "abut" or "come into abutment" with each other. It also describes seals that end when those elements "move[] out of abutment."[43] And it discloses a range of seals, including seals made of plastic or metal, hermetically sealed seals, and seals that allow liquid to pass.[44]

### D.   The "Axial Seal" Limitation

The '376 Patent's "axial seal" limitation appears in independent claims 21, 38, 51, and 76 and dependent claims 7, 22-31, 33-37, 39-41, 43-50, 52-54, 58-59,

---

[43] A000044 at 1:21-23; *id*. at 1:26-29; *id*. at 1:60-2:1; A000045 at 3:19-22; *id*. at 3:24-27; A000046 at 6:21-24; *id.* at 6:64-67; A000047 at 1:1-4; A000048 at 10:12-16; *id*. at 10:18-22; A000049 at 11:1-3; *id*. at 11:7-12; *id*. at 11:26-36; A000050 at 13:56-59; *id*. at 14:41-47; A000051 at 16:35-45; *id*. at 16:58-65; A000052 at 18:16-20; *id*. at 18:40-50.

[44] *E.g.*, A000044 at 2:44-48; A000050 at 14:41-47; A000045 at 4:50-53.

77, and 81.  Claim 21 is representative of the others.  It recites a double seat valve with first and second closing elements and the flow barrier element.  Element [9] of the claim recites the axial seal that forms between these closing elements and the flow barrier element when the valve is in its common open position:

21.  A double seat valve for separating media, comprising:

[1]  a valve housing having connectors for a first pipeline and a second pipeline;

[2]  a *first closing element* and a *first closing element seat*, said first closing element being in seal-forming abutment, in a closed position of said first closing element, with said first closing element seat via at least one first sealing element;

[3]  a *second closing element* spaced apart axially from said first closing element and a *second closing element seat*, said second closing element being, in a closed position of said second closing element, in seal-forming abutment with said second closing element seat via a second sealing element;

[4]  wherein said first and second closing elements can be lifted independently of one another from said respective first and second closing element seats;

[5]  a leakage space being provided between said first and second closing elements;

[6]  a *flow barrier element* arranged between said first and second closing elements;

[7]  wherein said flow barrier element shadows at least one of said at least one first sealing element and said first closing element seat of said first closing element which is in said closed position, when said second closing element is lifted and when cleaning medium is applied to said leakage space, said flow barrier element preventing said cleaning medium which enters said leakage space from flowing directly against said at least one of said first sealing element and said first closing element seat of said first closing element; and

- 14 -

[8]    wherein said flow barrier element shadows at least one of said at least one second sealing element and said second closing element seat of said second closing element which is in said closed position, when said first closing element is lifted and when cleaning medium is applied to said leakage space, said flow barrier element preventing said cleaning medium which enters said leakage space from flowing directly against said at least one of said second sealing element and said second closing element seat of said second closing element;

[9]    wherein, in a ***common open position*** of said first and second closing elements, said flow barrier forms a ***seal axially*** against said ***first and second closing elements***.

### E.    The "Spoked Wheel" Limitation

The Patent's "spoked wheel" limitation appears in independent claim 60 and dependent claims 20, 61-63 and 65-67.  Claim 60 is representative of the others.  It also recites a double seat valve with first and second closing elements and a flow barrier element.  Element [6] of the claim recites having the flow barrier element configured as a spoked wheel:

60.    A double seat valve for separating media, comprising:

[1]    a valve housing having connectors for a first pipeline and a second pipeline;

[2]    a ***first closing element*** and a first closing element seat, said first closing element being in seal-forming abutment, in a closed position of said first closing element, with said first closing element seat via a first sealing element;

[3]    a ***second closing element*** spaced apart axially from said first closing element and a second closing element seat, said second closing element being, in a closed position of said second closing element, in seal-forming abutment with said second closing element seat via a second sealing element;

- 15 -

[4]   wherein said first and second closing elements can be lifted independently of one another from said respective first and second closing element seats;

[5]   a leakage space being provided between said first and second closing elements;

[6]   a *flow barrier element* arranged between said first and second closing elements, said flow barrier element being configured as a *spoked wheel* having a plurality of spokes with openings there between at least partially defining said leakage space;

[7]   wherein said flow barrier element shadows at least one of said first sealing element and said first closing element seat which is in said closed position, when said second closing element is lifted and when cleaning medium is applied to said leakage space, said flow barrier element preventing said cleaning medium which enters said leakage space from flowing directly against said first sealing element and said first closing element seat; and

[8]   wherein said flow barrier element shadows at least one of said second sealing element and said second closing element seat of which is in said closed position, when said first closing element is lifted and when cleaning medium is applied to said leakage space, said flow barrier element preventing said cleaning medium which enters said leakage space from flowing directly against said second sealing element and said second closing element seat.

## F.    The "At Least Movable" Limitation

The Patent's "at least movable" limitation appears in independent claims 68 and dependent claims 69-72 and 74-75. Claim 68 is representative of the others. It also recites the valve with its two closing elements, its flow barrier element, and, in element [9] of the claim, that the flow barrier element is at least movable toward the first closing element when the second closing element is lifted and cleaning medium is applied:

68.   A double seat valve for separating media, comprising:

[1]   a valve housing having connectors for a first pipeline and a second pipeline;

[2]   a *first closing element* and a first closing element seat, said first closing element being in seal-forming abutment, in a closed position of said first closing element, with said first closing element seat via a first sealing element;

[3]   a *second closing element* spaced apart axially from said first closing element and a second closing element seat, said second closing element being, in a closed position of said second closing element, in seal-forming abutment with said second closing element seat via a second sealing element;

[4]   wherein said first and second closing elements can be lifted independently of one another from said respective first and second closing element seats;

[5]   a leakage space being provided between said first and second closing elements;

[6]   a *flow barrier element* arranged between said first and second closing elements;

[7]   wherein said flow barrier element shadows at least one of said first sealing element and said first closing element seat which is in said closed position, when said second closing element is lifted and when cleaning medium is applied to said leakage space, said flow barrier element preventing said cleaning medium which enters said leakage space from flowing directly against said first sealing element and said first closing element seat;

[8]   wherein said flow barrier element shadows at least one of said second sealing element and said second closing element seat of which is in said closed position, when said first closing element is lifted and when cleaning medium is applied to said leakage space, said flow barrier element preventing said cleaning medium which enters said leakage space from flowing directly against said second sealing element and said second closing element seat; and

- 17 -

[9]    wherein said *flow barrier element is at least movable* towards the first closing element when said second closing element is lifted and when cleaning medium is applied to said leakage space.

## III.    THE PRIOR ART

Each of the following prior art references provides a double seat valve with a flow barrier element.  Each is also for use in the food processing industry.  As set forth below, this prior art invalidates the claims on appeal, including the only three terms at issue: "axial seal," "spoked wheel," and the "at least movable" requirement.

### A.    Hosokawa

Hosokawa[45] is a Japanese Patent Application published 25 years before the filing of the '376 Patent.[46]  It is entitled "Double Seal Valve."  Hosokawa discloses a double seat valve for use in the food processing industry.[47]

The Hosokawa valve includes an inner valve body (13) and an outer valve body (8) as its first and second closing elements, respectively.[48]  Located between these closing elements is a flow barrier element that Hosokawa describes as "a

---

[45] A000944-49 (translated version); A000937-43 (untranslated).

[46] A000025; A000944.

[47] A000261; A000945 at 360:22-26.  Hosokawa refers to the disclosed double seat valve as a "double seal valve."

[48] A000945 at 360:40-46 and 360:57-60.

middle valve body" (14).[49]  By having this middle valve body, Hosokawa states

that the "leakage of cleaning fluid can be doubly prevented."[50]  It also discloses

this middle valve body (14) as a structure positioned around a main valve stem (7)

that runs through the hub of this middle valve body.[51]  As Hosokawa states, its

middle valve body "slides freely" along this main valve stem (7).[52]

    In its open position, Hosokawa also has its three valve elements "connected"

with each other.[53]  Hosokawa's Figure 1 (below) shows the valve and seal in this

open position, with these three elements against each other to prevent leakage.[54]



**Hosokawa**

---

[49] A000945 at 360:62-67.

[50] A000946 at 361:79-83; *see also* A000281.

[51] *E.g.*, A000945 at 359:29-35.

[52] A000944.

[53] A000946 at 361:35-46; A000947 at Figure 1.

[54] A000947 (excerpted) (notations added); *see also* A000292.

### B.    Burmester '986

Burmester '986 is a U.S. Patent filed ten years before the filing of the '376 Patent.[55]  Burmester '986 discloses a double seat valve for use in food processing.[56] The valve includes a first valve housing element (5) and a second valve housing element (6), arranged to fit within a valve housing for two different pipelines.[57] Located between Burmester's two valve elements is a flow barrier element (7) to prevent cleaning fluid from directly impinging on a valve element.[58]  Figure 7 of Burmester '986 illustrates this:[59]



**Burmester '986**

---

[55] "Burmester '986" is U.S. Patent No. 6,178,986, A000878-91.

[56] A000884 at 1:4-7; *id*. at 2:25-32.

[57] A000887 at 8:8-30.

[58] A000098-99; A000104-05; A000882; A000888 at 10:11-35.

[59] A000098-99; A000882 (notations added).

## C.    Burmester '134

Burmester '134 is a PCT Publication filed over one and a half years before the priority date of the '376 Patent.  It too discloses a double seat valve. Specifically, Burmester '134 discloses a valve for preventing fluid overflow while allowing for the unobstructed discharge of cleaning fluids.[60]  The Burmester '134 valve has a flow barrier element (30) configured as a spoked wheel with three traverses or spokes spaced across the circumference of the wheel.[61]  Figure 6a of Burmester '134 illustrates its spoked-wheel element:[62]



**Fig. 6a**
**Burmester '134**

## IV.    THE PTO EXAMINER REJECTED THE '376 CLAIMS-AT-ISSUE.

The Examiner in the reexamination of the '376 claims concluded that: (a) Hosokawa anticipated claims 7, 20-31, 35-41, 43-45, 48-54, 58-63, 65-72, 74-77, and 81; (b) claim 20 was obvious in light of Burmester '986 and Burmester '134;

---

[60] A000833.

[61] A000853-54.

[62] A000827.

(c) claims 20, 35, 48, 53, and 75 were also obvious in light of Hosokawa and Burmester '134; (d) claims 33 and 46 were obvious in light of Hosokawa and PMO 2005[63]; and (e) claims 34 and 47 were obvious in light of Hosokawa, PMO 2005, and Deger.[64]  As further support for these conclusions, the Examiner included the invalidity charts provided during reexamination.[65]  The Examiner also rejected Sudmo's arguments that the prior art did not disclose the claim limitations of (1) an axial seal, (2) the spoked wheel, and (3) a movable flow barrier element.

The Examiner construed "axial seal" as broad enough to include valve elements that move to "connect" with or form a connection with each other in the valve's common open position.[66]  As noted above, the '376 Patent discloses forming a seal in the valve's open position by having valve elements that are "against" or that "abut" or have an "abutment" with each other.[67]  The Examiner thus determined that Hosokawa disclosed the Patent's "axial seal."  In particular,

---

[63] A000950-1087 (PMO 2005 reference).

[64] A000928-36 (Deger reference).  These Examiner rejections omitted cancelled and non-appealed claims.  A000688-92; A000009-12.

[65] A000687; A000689-90.  The relevant invalidity charts may be found at A000100-18, A000279-98, and A001141-77.

[66] A000017.

[67] *See* section II. C. 2. & note 43, *supra* (citing '376 specification passages).

the Examiner found Hosokawa discloses having an axial seal when, in the valve's open position, its valve elements connected to each other.[68]

The Examiner also found that Hosokawa met the "spoked wheel" limitation. Specifically, Hosokawa's cross-sectional drawings illustrate "holes" or spaces between the hub or inner portion of Hosokawa's "middle valve body 14" (i.e., its flow barrier element) and that middle valve body's outer portion. The Examiner determined that Hosokawa thus had a "spoked wheel" because that hub or inner part of Hosokawa's "middle valve body 14" had to have structures that bridged out between those "holes" to the middle valve body's surrounding outer portion.[69] Otherwise, without having such a wheel-like structure between this middle valve body's hub and its outer portion, that middle valve body could not "slide freely" along and function.[70]

The Examiner determined that Hosokawa's middle valve body met the "movable" claim term as well.[71] Hosokawa discloses a "freely sliding" or movable

---

[68] A000694; A000512; *see* A000947 (Hosokawa Figure 1).

[69] A000695-96; A000655-57.

[70] A000695-96; A000657; A000761; A000947-49; *accord* A000015 (Board decision recognizing that "some structure must connect the middle portion and the outer portion of the middle valve body *14* across the small hole *14'*.").

[71] A000696; A000690; A000553; *see also* A001172-73.

middle valve body.[72]  The Examiner found that the '376 claims reciting this limitation were also invalid.

## V.     THE BOARD REVERSED THE PTO EXAMINER'S REJECTIONS.

Sudmo appealed the Examiner's decision.[73]  The Board issued its decision without oral argument, which Sudmo did not request.  The Board reversed the Examiner's challenged rejections.

### A.     The Board Narrowed the Construction of the Term "Axial Seal."

The Board first overturned the Examiner's rejections of claims 7, 21-31, 33-41, 43-54, 58-59, 76-77, and 81, finding that Hosokawa did not disclose the Patent's "axial seal" limitation.[74]  In so doing, the Board rejected the Examiner's "broad[]" construction of "seal" as encompassing a "connection" and instead narrowed the term's scope based on an extrinsic handbook.[75]

Specifically, the Board relied on a 2007 handbook for mechanical engineers, holding that this extrinsic source supplied the term's ordinary meaning.  Citing that

---

[72] A000945 at 360:62-70; A000944 at 359:29-35.

[73] Sudmo did not appeal to the Board the Examiner's § 103 rejections for claims 33-34 and 46-47.  Rather, Sudmo's appeal brief to the Board grouped claims 33-34 and 46-47 based on the Examiner's anticipation rejections over Hosokawa, thereby admitting that it was not contesting that the other cited references (PMO 2005 and Deger) disclosed and rendered obvious these claims' required features.  *See* A000714; A000722.  Despite Sudmo's grouping of its arguments to the Board based on references, however, the Board's decision separated out and addressed the Examiner's various rejections based on particular claims.  A000010-11.

[74] A000018.

[75] A000017.

handbook, the Board stated the "ordinary usage of the term 'seal' denotes 'materials used to control or stop leakage of fluids … through mechanical clearances when [fluids are] under pressure or vacuum.'"[76] This handbook had never been cited by Sudmo, SPX, or the PTO examiners, and cannot be found in the PTO record.[77] In one sentence, the Board also reasoned that this handbook's "seal" description was consistent with the Patent's usage of this disputed term.[78] Nothing in the Board's analysis, however, indicates it considered the '376 valve's "common open position"—the position in which the axial seal forms—or other disclosures in the specification. Instead, the Board referenced only the Patent's description of the valve in a different position and the "overpressure" problem.[79]

The Board went on to hold that Hosokawa only described a connection between its valve elements and thus did not disclose a seal or closure "to prevent leakage."[80] In the Board's reasoning, "nothing in the definition of a 'seal' implies

---

[76] Mark's Standard Handbook for Mechanical Engineers 8-133 (McGraw-Hill Cos., Inc. 2007), cited by the Board at A000017. The Board did not include the handbook's full quote and relevant pages in the record.

[77] The full quote reads: "Packings, gaskets, and seals are materials used to control or stop leakage of fluids (liquids and/or gases) or of solid products through mechanical clearances when the contained material is under pressure or vacuum." Mark's Standard Handbook for Mechanical Engineers 8-133.

[78] A000018; A000049 at 11:22-40.

[79] A000018.

[80] A000018.

that a 'connection' alone necessarily forms a seal."[81]  On this basis, the Board reversed the Examiner's rejection of these "axial seal" claims.

### B.    The Board Added Un-recited Requirements For a Particular Structure or Shape for the "Spoked Wheel" Claims-at-Issue.

The Board also overturned the Examiner's anticipation rejections of claims 20, 60-63, and 65-67 over Hosokawa for failing to disclose a "spoked wheel."[82]  In so doing, the Board applied a Merriam-Webster dictionary definition that neither party had cited during reexamination.  The Board *sua sponte* used this extrinsic dictionary source to define "spoke" as "one of the bars that connect the center of a wheel to the rim."[83]  Citing that dictionary, the Board required a flow barrier element shaped as a wheel with spokes "or rods" between the middle portion or hub of that flow barrier element and its outer portion.[84]

Applying this definition, the Board held Hosokawa did not disclose such a spoked wheel.  It conceded, however, that Hosokawa has "[s]ome structure [that] must connect the middle portion [or hub of the middle valve body 14] and the outer portion of the middle valve body 14 across the small hole 14.'"[85]  Despite expressing agreement with the Examiner about Hosokawa's structure, the Board concluded that no Hosokawa figures show that these structures are "spokes or rods

---

[81] A000018.

[82] A000021.

[83] A000020.

[84] A000020.

connecting the [valve element's hub or] middle portion with the outer portion."[86] On this basis, the Board reversed the Examiner's rejection of claims 20, 60-63, and 65-67 as anticipated by Hosokawa.[87]

As to claim 20, the Board further noted that while Sudmo had addressed another "similar rejection," it had not appealed the Examiner's rejection based on a particular combination for obviousness.[88]  Rather than find waiver, however, the Board addressed and upheld this § 103 rejection on the merits, citing Hosokawa in view of Burmester '134.[89]  Specifically, the Board found Burmester '134 discloses spokes to secure a valve's middle and outer portions.[90]  And modifying Hosokawa to include these Burmester spokes, the Board reasoned, would "minimize any negative effects which the connection between the middle and outer portions of the valve body might have had."[91]  Given this motivation to combine, the Board stated: the "Examiner correctly concludes that it would have been obvious to use spokes to secure the middle portion and outer portion of Hosokawa's middle valve body

---

[85] A000020.

[86] A000020.

[87] A000021.

[88] A000021.

[89] A000021.

[90] A000021.

[91] A000021-22.

14, thereby embodying the middle valve body as a spoked wheel."[92]   Accordingly, the Board upheld the rejection of claim 20 and its "spoked wheel" limitation as obvious.[93]   That obviousness rejection remains final.

### C.   The Board Required Explicit Disclosure of "Movement" for the Claims' "At Least Movable" Limitation.

Last, the Board reversed the Examiner's rejections of claims 68-72 and 74-75, concluding that Hosokawa lacked a flow barrier element that met the claims' "at least movable" limitation.[94]   In so doing, the Board indicated it was requiring actual movement "when" the valve's "second closing element is lifted" and "cleaning medium is applied."[95]   Indeed, while crediting an argument about the prior art not disclosing valve elements "as either moving or capable of movement," the Board still referred to its "any movement" construction.[96]

The Board's observations on the prior art show it applied that construction. For example, the Board recognized that Hosokawa describes its flow barrier element as "capable of sliding freely along the [valve's] main valve stem."[97]   But

---

[92] A000021.

[93] A000022.

[94] A000023.

[95] A000022-23.

[96] A000023.

[97] A000023; *accord* A000944 at 359:29-36 (Hosokawa reference disclosing that its flow barrier element or "middle valve body (14) … is provided… so that it can slide freely along the main valve stem (7)"); A000945 at 360:62-67 (same).

the Board concluded that Hosokawa did not disclose when its flow barrier element "might actually slide, that is move," or whether this valve element engages in "any movement" when Hosokawa's closing element "is lifted."[98]    The Board thus reversed the Examiner's rejection of claims 68-72 and 74-75.

---

[98] A000023.

## SUMMARY OF ARGUMENT

Each of the Board's three rulings rejecting the Examiner's invalidity conclusions is reversible error.

### "Axial Seal"

In reversing the Examiner's rejections of claims 7, 21-31, 33-41, 43-54, 58-59, 76-77, and 81 based on the "axial seal" limitation, the Board disregarded fundamental tenants of claim construction.  Indeed, it found on its own and elevated an extrinsic engineering handbook over the Patent's specification.  The Board's action was contrary to *Phillips* and this Court's longstanding claim-construction principles.[99]  The Board's handbook definition is inconsistent with the Patent's disclosures of having an "axial seal" formed by valve elements that merely "abut" or are "against" one another.[100]  The Board's construction is thus irreconcilable with the Patent's specification and the controlling "broadest reasonable interpretation" standard.  And its lone citation to the Patent did not help this erroneous construction: That cited portion of the specification does not refer to an "axial seal," much less such a seal in the requisite "common open position"

The Board further erred in concluding that an "axial seal" must "prevent leakage."  This conclusion exceeded the Board's cited handbook, which states a

---

[99] *Phillips v. AWH Corp.*, 415 F.3d 1303, 1317 (Fed. Cir. 2005).

[100]  The '376 claims on appeal that include this "axial seal" limitation are claims 7, 21-31, 33-41, 43-54, 58-59, 76-77, and 81.

seal need only stop or "control leakage."   And that Board construction is inconsistent with the Patent's teaching of having seals formed via simple abutment that will control but not fully prevent leakage.

In applying this erroneous construction, the Board also failed to recognize the prior art's clear disclosures.  For example, while the Board concluded that Hosokawa does not describe forming a seal "to prevent leakage," Hosokawa describes having a seal for a valve designed to "doubly prevent[]" leakage.  And it shows that, unlike the valve's other positions, the seal formed by having its elements "connected" to one another in the valve's open position has no "gaps," further demonstrating an "axial seal."  Hosokawa itself recognized that it needed to have its valve structures "completely closed" or else it would take on "leakage." The Board's decision thus further erred in disregarding these prior-art disclosures of an axial seal.

## "Spoked Wheel"

In reversing the Examiner's invalidity rejections of claims 60-63 and 65-67, the Board erred in requiring a particular structure or shape for the "spoked wheel" limitation.   This limitation recites having the valve's "flow barrier element" configured as a "spoked wheel" with a plurality of spokes and openings between them.  But the "spoked wheel" claims-at-issue do not recite the particular "rod[]"-

shape or structure effectively imposed by the Board.[101]  Rather, only other claims in the Patent that are not at issue here recite such additional requirements for the claimed "spokes" of this flow barrier element.  The Patent's claim 19, for example, recites a flow barrier element with "a plurality of spokes which are directed obliquely with respect to a radial direction."  Accordingly, adding particular shape or structure requirements to the "spoked wheel" claims-at-issue here is likewise inconsistent with the controlling "broadest reasonable interpretation" standard and with principles of claim differentiation.[102]

Moreover, the prior art discloses and invalidates a "spoked wheel" configuration.  Hosokawa alone discloses such a "spoked wheel," as does Hosokawa in combination with the other prior art.  The Board itself concluded as much in rejecting as obvious claim 20 and its "spoked wheel" requirement.  This invalidity conclusion for claim 20 should apply to the other spoked wheel claims-at-issue (claims 60-63 and 65-67).  As the Board made clear, the invalidity of these claims turned on the presence or absence of these same particular limitations, and the parties addressed the issues that way as well.  Thus, if one of the "spoked wheel" claims at issue here is obvious, as the Board held, so are the others.

---

[101] The "spoked wheel" claims on appeal are claims 60-63 and 65-67.

[102] *See, e.g.*, *Phillips*, 415 F.3d at 1315; *Voda v. Cordis Corp.*, 536 F.3d 1311, 1319-20 (Fed. Cir. 2008).

<u>Flow Barrier Element That is "At Least Movable"</u>

In reversing the Examiner's rejections of claims 68-72 and 74-75, the Board erred when it evidently required, for the "at least movable" limitation, a flow barrier element that could "actually slide" or "move" at the claimed time.  The Board's movement requirement is narrower than the claim term itself, as "movable" denotes a structure "capable of movement."  And it is contrary to the '376 specification, which describes a flow barrier element that is "capable of moving" and "can be" moved.[103]  The Board thus erred in applying a construction that is inconsistent with the specification and this "movable" limitation's broadest reasonable interpretation.

Last, the prior art discloses a flow barrier element that meets all aspects of this "at least movable" limitation, and the Board's decision to the contrary is without basis.  As more fully explained below, Hosokawa describes the requisite valve element as capable "of sliding freely along" and being "at least movable" in the right direction "when" liquid or other cleaning medium is applied.  For these reasons as well, the Board's rejection of the Examiner's invalidity determinations is error and should be reversed.

---

[103] The "movable" claims on appeal are claims 68-72 and 74-75.

## STANDARD OF REVIEW

Claim construction is a question of law reviewed *de novo* on appeal.[104]  As with patent examination, the Board during reexamination must give claims their broadest reasonable interpretation consistent with the specification.[105]  Factual findings by the Board, such as those for determining anticipation or the subsidiary facts underlying obviousness, are reviewed for substantial evidence.[106]  Substantial evidence is something less than the weight of the evidence but more than a mere scintilla, and means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.[107]

## ARGUMENT

I. **THE PRIOR ART DISCLOSES AN "AXIAL SEAL" UNDER THE BROADEST REASONABLE INTERPRETATION OR THE BOARD'S ERRONEOUS HANDBOOK DEFINITION.**

A. **The Board Elevated Extrinsic Evidence over the Intrinsic Patent and Thus Impermissibly Narrowed the Term "Axial Seal."**

In both prosecution and reexamination, patent claims must receive "their broadest reasonable interpretation, consistent with the specification."[108]  In that

---

[104] *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1456 (Fed. Cir. 1998) (en banc).

[105] *See In re Trans Tex. Holdings Corp.*, 498 F.3d 1290, 1298 (Fed. Cir. 2007).

[106] *E.g., In re Gartside*, 203 F.3d 1305, 1314 (Fed. Cir. 2000).

[107] *See In re Suitco Surface, Inc.,* 603 F.3d 1255, 1259 (Fed. Cir. 2010).

[108] *In re Trans Tex.*, 498 F.3d at 1298 (internal citation omitted); *Phillips*, 415 F.3d at 1316; *Facebook, Inc. v. Pragmatus AV, LLC,* 2013-1350, 2013-1351, 2014 U.S.

vein, this Court has repeatedly stated that the "construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction."[109]

To reach such a construction, this Court has emphasized that the claim language and the rest of the specification remain the most important sources for construing disputed claim terms, and are more reliable than extrinsic evidence.[110] Indeed, the Court confirmed again in *Phillips* that the specification "[u]sually … is dispositive; it is the single best guide to the meaning of a disputed term."[111]  Thus, this Court has repeatedly reversed constructions that relied on or emphasized extrinsic dictionary sources rather than on the specification.[112]

---

App. LEXIS 17678, *10-*11 (Fed. Cir. Sept. 23, 2014 (reversing Board's claim construction and explaining that "[t]he broadest reasonable interpretation of a claim term may be the same as or broader than the construction of a term under the *Phillips* standard.  But it cannot be narrower") (non-precedential).

[109] *See Phillips*, 415 F.3d at 1316 (citations omitted).

[110] *See Phillips,* 415 F.3d at 1316-17.

[111] *Id*. at 1315.

[112] *E.g., Phillips*, 415 F.3d at 1320-21 (rejecting *Texas Digital* precedents that emphasized dictionaries for claim construction and relegated the specification "to serving as a check on the dictionary meaning of a claim term"); *MBO Labs., Inc. v. Becton, Dickinson & Co.*, 474 F.3d 1323, 1329 (Fed. Cir. 2007); *SkinMedica, Inc. v. Histogen Inc.*, 727 F.3d 1187, 1210 (Fed. Cir. 2013) ("[Extrinsic evidence] may not be used to vary, contradict, expand, or limit the claim language from how it is defined, even by implication, in the specification or file history."); *Verderi, LLC v. Google, Inc.*, 744 F.3d 1376, 1382 (Fed. Cir. 2014); *Tempo Lighting, Inc. v. Tivoli, LLC*, 742 F.3d 973, 977-78 (Fed. Cir. 2014) (affirming Board's reversal of examiner's construction when examiner relied on dictionary definition with

Here, the Board failed to follow these tenets of claim construction when construing the term "axial seal."

### 1.    The Claimed "Axial Seal" Covers Seals Formed by Valve Elements in Connection or "Abutment."

Claims 7, 21-31, 33-41, 43-54, 48-54, 58-59, 76-77, and 81 require the formation of an axial seal when the double seat valve is in its common open position.   The specification discloses that, in this open position, the valve's "sealing elements come into abutment in a seal-forming fashion with the flow barrier element."[113]   Indeed, in other valve positions, the specification regularly identifies having a "seal" formed by valve elements that merely "abut" or "come into abutment" with each other, or that otherwise have a "seal" end when these elements "move[] out of abutment with each other."[114]   Neither the claim text nor the rest of the specification requires a seal formed by something stronger than having valve elements that "connect" to or form a "connection" with each other.

The Examiner appreciated that the '376 specification discloses a range of "seals," including both "axial seals" formed via simple "abutment," seals made of plastic or steel, a hermetically sealed seal, and seals and sealing elements that leak

"relatively little probative value in view of the prevailing intrinsic evidence); *Advanced Fiber Techs. Trust v. J&L Fiber Servs.,* 674 F.3d 1365, 1374-76 (Fed. Cir. 2012) (reversing district court's construction of term "perforated" when it emphasized the term's dictionary definition rather than the intrinsic evidence).

[113] A000050 at 13:50-59; A000051 at 16:58-65.

[114] *See, e.g.*, section II.C.2., *supra*, and note 43, *supra*.

and allow liquid to pass.[115] These are all connections that control leakage. The Examiner thus concluded that the term "axial seal," as used in the '376 Patent, is broad enough to encompass seals formed by "connection."[116] Accordingly, the Examiner correctly applied the seal term's broadest reasonable definition.

### 2. The Board Erroneously Relied on New Extrinsic Evidence To Narrow the Scope of "Axial Seal."

The Board, however, did not correctly apply the broadest reasonable definition of "axial seal." Instead, it rejected and narrowed the Examiner's construction by relying primarily on a previously uncited extrinsic source. This is reversible error.

This Court has rejected a claim construction methodology that starts with a dictionary, whether standard or technical, and then relegates the specification to serving as merely a "check" on dictionary definitions.[117] As this Court explained in *Phillips*, "elevating [a] dictionary to such prominence" undermines the parties' expectations and the public notice function served by properly reading and understanding the claims in view of the specification, "of which [they are] a

---

[115] *See, e.g.*, A000694; A000651-52; A000044 at 2:44-48; A000045 at 4:50-53; A000046 at 5:53-62; A000048 at 10:48-52; A000050 at 13:56-59.

[116] A000018; *see also* A000557; A000549; A000694.

[117] *Phillips*, 415 F.3d at 1320-22.

part."[118]  It also erroneously "focuses the inquiry on the abstract meaning of words rather than on the meaning of claim terms within the context of the patent."[119]

Here, the Board started with and relied on an extrinsic source to reach its narrowing construction of "seal."  In so doing, the Board ignored this Court's warning in *Phillips*.    And it offered no reason to use the handbook as the foundation for construing terms in the '376 Patent.  Instead, the Board invoked select words from this source, the full and relevant passage for which reads as follows:

> **Packings,   gaskets,** and **seals** are   materials   used   to control or stop leakage of fluids (liquids and/or gases) or of  solid  dry  products  through  mechanical  clearances when  the  contained  material  is  under  pressure  or vacuum.[120]

But  the  parties  and  PTO  examiners  had  good  reason  not  to  cite  this  extrinsic source: this handbook's explanation of "[p]ackings, gaskets, and seals" is not the term's "broadest reasonable interpretation" as used within the Patent.  The Board's construction is not broad enough to include the Patent's disclosure for an "axial seal" in the valve's open position or other "seals" and sealing elements that the

---

[118] *Id.*

[119] *Id.* at 1321.

[120] Mark's  Standard  Handbook  for  Mechanical  Engineers  8-133  (McGraw-Hill Cos., Inc. 2007), cited at A000017 (emphasis in original).

Patent describes. [121]   The Board's decision thus failed to correctly apply the broadest reasonable interpretation of "axial seal."[122]

### 3.    The Board Ignored the Specification's Disclosures of Axial Seals and the Valve's "Common Open" Position.

The Board's axial seal analysis cited once to the '376 specification, indicating that this point alone confirmed its handbook-based construction of "seal."[123]  This too was incorrect.

The Board cited that one specification passage point to illustrate the "warning that direct flow of pressurized cleaning fluid against 'sealing elements' … might cause the cleaning fluid to penetrate or leak into an opposite valve housing section.'"[124]  But this specification passage does not reference the strength or formation of the "axial seal" disclosed and claimed by the Patent.  Rather, it describes the overpressure problem and the Patent's stated purpose of reducing the "direct flow of pressurized cleaning fluid."  As the Patent states, it achieves this

---

[121]  The '376 claims on appeal that include this "axial seal" limitation are claims 7, 21-31, 33-41, 43-54, 48-54, 58-59, 76-77, and 81.

[122] *See In re Trans Tex.*, 498 F.3d at 1298; *Rexnord Corp. v. Laitram Corp.,* 274 F.3d 1336, 1342 (Fed. Cir. 2001) (claim construction that ignores embodiments are rarely "if ever" correct); *Facebook,* 2014 U.S. App. LEXIS 17678, *10-11 ("The broadest reasonable interpretation of a claim term may be the same as or broader than the construction of a term under the *Phillips* standard.  But it cannot be narrower.").

[123] *See* A000017-18 (citing '376 Patent, A000049 at 11:22-40).

[124]  A000017 (citing '376 Patent, A000049 at 11:22-40).

purpose by having a "flow barrier element" that screens fluid flow.[125]  But the

Patent otherwise discloses "seals" and "axial seals" that are formed by a simple

"abutment" and seals that will leak.[126]  The claims' "axial seal" limitation requires

nothing more.

Moreover, this lone specification passage focuses on the '376 valve's

partially open position.  But the Patent's claim language and specification recite

having an "axial seal" only in a different position—namely, the valve's "common

open position.[127]  Accordingly, the Board's single reference to the specification

here cannot justify its incorrect construction of axial seal.

### 4.    The Board Further Narrowed Its Own Construction of "Seal" to Exclude Seals that Control Leaks.

The Board also did not faithfully apply its own construction.  The Board

cited to the handbook as providing the term's "ordinary usage," saying it covered

materials "used to control or stop leakage of fluids."   But in applying its

construction, the Board then required that a seal must "prevent leakage."[128]  The

Board thus discarded its own handbook definition allowing for seals that "control"

leakage.   And its "prevent leakage" construction is inconsistent with the '376

specification's disclosure of seals that control leakage, while recognizing that such

---

[125] *See, e.g.*, A000045 at 3:50-54; A000046 at 5:61-6:4.

[126] *See, e.g.*, A000044 at 2:44-48; A000045 at 4:50-53; A000046 at 5:53-62.

[127] A000053 at 19:28-29.

[128] *See* A000017-18.

seals will still have "leaks."[129]   This further narrowing of "axial seal" is also erroneous and should be reversed.

**B.    Hosokawa Discloses an "Axial Seal."**

Hosokawa meets the Patent's axial seal claim limitation under the broadest reasonable interpretation or under the Board's cited handbook definition. Hosokawa discloses the double seat valve in the common open position claimed in the '376 Patent. [130]   In that open position, Hosokawa's "outer valve body (8), middle valve body (14), and inner valve body (13) are connected."[131]   This connection of valve elements in the open position forms an axial seal, as illustrated in Hosokawa's excerpted Figure 1 (below):[132]

---

[129] *See, e.g.,* A000046 at 5:53-62; *see also* A000048 at 10:40-47 (describing how the disclosed '376 valve can "permit a leakage state to be detected when there is a leak in one or both of the [valve's] sealing elements 32, 36").

[130] A000944.

[131] A000946 at 361:40-46.

[132] A000292 (notations added); A000947 at Figure 1.



**Hosokawa Figure 1**

This open position of the Hosokawa valve forms a seal between its connected elements that does not result in any "gaps" that could permit fluid leakage, as the Examiner correctly found. [133]   The Examiner thus correctly concluded that Hosokawa discloses and invalidates the '376 claims reciting the axial seal limitation.[134]

That same conclusion holds even under the Board's cited handbook definition of a "seal."  The handbook states that "[p]ackings, gaskets and seals are materials used to control or stop leakage of fluids."[135]  At minimum, Hosokawa "control[s] … [the] leakage of fluids."  It discloses as its stated function a double

---

[133] A000694; A000946 at 361:19-27.

[134] A000651-52; A000688-90; A000694.

[135] A000017 (emphasis added).

seat valve in which "leakage of the cleaning fluid can be doubly prevented" during the cleaning of the valve's elements.[136]  It discloses that its valve "doubly block[s] the liquid flow."[137]  And it discloses that, when Hosokawa's closing elements cannot completely close, "leakage will be generated from the portion that was not completely closed."[138]  Hosokawa itself, then, was explicitly aware that it had to have its valve elements sufficiently closed in order to stop or control leakage.  And it disclosed having those valve elements sufficiently closed or "connected" for this purpose in the valve's open position.  That is why Hosokawa discloses no "gaps" in that open position.  That is an axial seal.

In addition to its erroneous claim construction, then, the Board erred in concluding that Hosokawa did not invalidate these claims based on the "axial seal" limitation.  The Board's decision should be reversed and the Examiner's rejections of claims 7, 21-31, 36-41, 43-45, 49-52,  54, 58-59, 76-77, and 81 under § 102(b), and claims 33-35, 46-48, and 53 under § 103(a), should be reinstated.[139]

---

[136] A000946 at 361:76-83

[137] A000945 at 360:21-26.

[138] A000946 at 361:19-27.

[139] For these claims, Sudmo appealed to the Board based only on the Examiner's "axial seal" construction.  A000714.  It thus waived all other arguments based on this "axial seal" term, whether the claim was rejected for anticipation or obviousness.  *See In re Enhanced Sec. Research, LLC*, 739 F.3d 1347, 1353-54 (Fed. Cir. 2014).  Accordingly, if the Court adopts the Examiner's construction, it should re-instate the Examiner's rejections.  *See, e.g., Rexnord Indus., LLC v.*

## II.    HOSOKAWA DISCLOSES A "SPOKED WHEEL" UNDER THE BROADEST REASONABLE INTERPRETATION.

### A.    The Board Introduced Particular Shape or Structure for "Spoked Wheel" Claims that are Silent about Such Requirements.

Each of claims 60-63 and 65-67 recite having the valve's flow barrier element configured as a "spoked wheel."  The Board reversed the Examiner's invalidity rejections of these claims, concluding in the process that the claims must have a particular shape or structure beyond the "spoked wheel" itself.  In particular, the Board again used extrinsic dictionary evidence to construe the "spoked wheel" and its "spokes" as further requiring "rods" that connect the center of the '376 valve's flow barrier element to its outer portion."[140]

The dictionary definition the Board used to construe and apply its requirements for a "spoked wheel" had never been cited by the parties or the Examiner.  The Board's elevation of this extrinsic source over the intrinsic evidence was again contrary to this Court's teachings in *Phillips* and its progeny, and in error.

The disputed "spoked wheel" claims do not recite the additional "rod[]"-shape or structure imposed by the Board.  By contrast, other claims not at issue here do impart additional requirements for the "spokes" for this flow barrier

---

*Kappos*, 705 F.3d 1347, 1356 (Fed. Cir. 2013) (reversing Board decision on obviousness and reinstating examiner's reexamination decision).

[140] A000020.

element. Claim 19, for example, recited that the "spokes" must also be "directed obliquely with respect to a radial direction."[141] As this Court has explained, such differences between a patent's claims are significant for determining claim construction.[142]

By imposing this additional shape or structure for the "spoked wheel" claims-at-issue, the Board failed to consider that the Patent's other claims reciting these same "spokes" already impose such additional "spoke" requirements. As just noted, claim 19 recited having a flow barrier element with not only a "plurality of spokes," but the additional requirement of having spokes "directed obliquely with respect to a radial direction."[143] Thus, unlike claim 19 (among others), the "spoked wheel" claims-at-issue should not require any additional shape or structure for the spokes or openings between them.[144] Claim differentiation principles thus further

---

[141] A000053 at 20:39-41.

[142] *Phillips*, 415 F.3d at 1314 ("Differences among claims can also be a useful guide in understanding the meaning of particular claim terms"); *Versa Corp. v. Ag-Bag Int'l, Ltd.*, 392 F.3d 1325, 1330 (Fed. Cir. 2004) (claim differentiation "creates a presumption that each claim in a patent has a different scope" and "[t]he difference in meaning and scope between claims is presumed to be significant 'to the extent that the absence of such difference in meaning and scope would make a claim superfluous'") (citations omitted).

[143] Claim 19 at A000053. Notably, the Examiner rejected this claim 19 as obvious in view of Hosokawa, PMO 2005, and Deger, as well as a combination of Burmester '986 and Deger. A000688-90. Sudmo did not appeal this rejection to the Board.

[144] *See, e.g.*, *Voda*, 536 F.3d at 1319-20 (holding differences in independent claims significant in construing scope of disputed terms); *Versa Corp.*, 392 F.3d at 1330.

support granting the "spoked wheel" claims-at-issue their broadest reasonable construction. These claims do not further require "spokes" that are necessarily thin or shaped like "rods."

To be sure, the claim text and remainder of the specification provide a sufficient basis for construing these "spoked wheel" terms. The specification describes the flow barrier element's configuration as a "spoked wheel" having "a plurality of spokes with openings lying between them."[145] Nothing in the '376 specification requires that, beyond having a "plurality of" (or two or more) "spokes," there must additionally be a particular shape, size, structure, or number of spokes for these claims-at-issue. Sudmo otherwise had multiple opportunities to amend these particular claims to be in line with a narrower construction like this. It declined to do so. Given this, the Examiner correctly rejected Sudmo's proposed narrow construction of "spoked wheel" and applied the term's broadest reasonable interpretation.[146] The Board's analysis and ruling to the contrary should be reversed.

**B.     As the Examiner Recognized, and the Board Held, the Prior Art Discloses and Invalidates Claims Reciting a "Spoked Wheel."**

Applying the broadest reasonable construction, this Court should conclude that Hosokawa discloses a "spoked wheel." From a cross-sectional view,

---

[145] A000051 at 16:51-52.

[146] A000558; A000695-96.

Hosokawa illustrates its flow barrier element—called the "middle valve body"—as having an inner portion or "hub" and an outer portion. The Board itself found as much.[147] Further, Hosokawa's cross-sectional figures disclose multiple holes 14' (highlighted in yellow below) between the middle valve body's inner and outer portions, with the holes representing open spaces between the structures or "spokes" (highlighted in red below) that connect this hub to its outer portion.[148]



The Examiner concluded that, in this way, Hosokawa depicted having its flow barrier element as a "hub with through holes therein," thus disclosing a "spoked wheel" that extends from that hub.[149] As for the "spoke" structures themselves, the Examiner correctly concluded that Hosokawa's middle valve body (14) necessarily had to be "bridged" and have such structures connecting its inner and outer portion.[150] Otherwise, as the Examiner reasoned, Hosokawa could not have this middle valve body positioned around a "main valve stem" and slide freely up and

---

[147] A000015, A000020.

[148] A000761; A000948.

[149] A000549; A000553; A000558; A000688-90; A000695-96.

[150] A000695-96; A000655-57.

down that valve stem.[151]  The Board again essentially agreed with this finding, conceding three times that Hosokawa must have "[s]ome structure [to] connect" this valve element's hub or "middle portion and the outer portion of the middle valve body *14* across the small hole *14'*."[152]  In short, the Hosokawa valve had to have a spoke-like structure connecting the inner portion or hub of its flow barrier element to its outer portion, or no such flow barrier element could function.[153]

Accordingly, under the broadest reasonable interpretation of "spoked wheel," the Examiner properly found that Hosokawa discloses this limitation and invalidates claims 60-63 and 65-67.  The Board's decision to the contrary is predicated on a faulty analysis that added particular shape or structure not required for these claims.  That decision should be reversed and the Examiner's rejections of these claims should be reinstated.[154]

### C.    The Board Should Have Found "Spoked Wheel" Claims 60-63 and 65-67 Invalid, Just as it Found Claim 20 Invalid.

The Board also erred when it failed to find that claims 60-63 and 65-67 are obvious or otherwise invalid in view of the prior art, such as the combination of

---

[151] A000657; A000947-49.

[152] A000020-21; *accord* A000015.

[153] A000657; A000947-49; A000696; A000761; *accord* A000015 (Board decision recognizing that "some structure must connect the middle portion and the outer portion of the middle valve body *14* across the small hole *14'*.").

[154] *See Rexnord*, 705 F.3d at 1356 (reversing Board decision as to obviousness and reinstating examiner's reexamination decision).

Hosokawa and Burmester '134.  Sudmo added these particular claims during the Patent's reexamination.  But in addition to the analysis above, these claims should be invalid because the Board itself found claim 20 invalid over the prior art based on this same "spoked wheel" limitation.[155]  As the Board held, "it would have been obvious to use spokes to secure the middle portion and outer portion of Hosokawa's middle valve body *14,* thereby embodying the middle valve body as a spoked wheel."[156]  This invalidity determination for claim 20 must apply to claims 60-63 and 65-67, the other "spoked wheel" claims.  After all, the Board treated these claims as all the same for purposes of its "spoked wheel" analysis.[157]  And as

---

[155] A000021-22.  The Examiner agreed with SPX that, on multiple grounds, these "spoked wheel" claims are invalid.  Of these, Sudmo did not appeal the Examiner's obviousness rejection for claim 20 based on the particular combination of Hosokawa and Burmester '134.  But the Board declined to find Sudmo had waived and instead addressed claim 20 on the merits, finding it obvious.  Nevertheless, the Board still reversed the Examiner's decision and allowed the other "spoked wheel" claims-at-issue despite knowing that they too are obvious in view of this same art.  Given this background and the public interest in not allowing invalid patent rights, the Court should similarly address the invalidity of other "spoked-wheel" claims-at-issue on the merits.  *See, e.g., Hyatt v. Dudas*, 551 F.3d 1307, 1314 (Fed. Cir. 2008) (arguments not waived on remand if they became relevant due to "actions by the Board or the examiner" and "were not previously required to have been made"); *see also In re Comiskey*, 554 F.3d 967, 973-75 (Fed. Cir. 2009) (PTO allowed to raise new § 101 rejection on appeal over *Chenery* to affirm agency invalidity rejections).

[156] A000021.  The Board also affirmed the Examiner's rejection of claim 20 over Burmester '986 and Burmester '134, insofar as it did not specifically reverse that ground of rejection.  A000022.

[157] A000019-22.

the Board repeatedly noted, Sudmo itself took that same approach, offering no arguments for differentiating claim 20 from claims 60-63 and 65-67.[158]

Under the controlling *KSR* analysis, the test for obviousness must employ an "expansive and flexible approach."[159] Given that approach, there is nothing unusual in concluding that these remaining "spoked wheel" claims are invalid. To the contrary, it is unusual to find in these circumstances that one "spoked wheel" claim is invalid as obvious (claim 20), but at the same time conclude that the other "spoked wheel" claims are not. In short, claims 60-63 and 65-67 should be invalid, just as the Board held claim 20 invalid.

Consistent with this conclusion, this Court recently ruled that the Board had erred in failing to consider obvious combinations of the prior art before it. In *In re Taylor Made Golf Company, Inc.,* the claims covered a method of shifting the center of gravity for a golf club using removable weights.[160] Several dependent claims required securing the weights via press fittings.[161] The Board found that the prior art did not disclose the claimed press fittings and affirmed the examiner's

---

[158] A000013; A000019-22; A000722-25 (addressing claims 20 and 60, 61-63, and 65-67 together based on same patentability arguments).

[159] *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 415 (2007).

[160] *In re Taylor Made Golf Company, Inc.,* 2014 U.S. App. LEXIS 18983, *1-2 (Fed. Cir. Sept. 30, 2014) (non-precedential).

[161] *Id.* at 18983, *3-*4.

claim allowance.[162]  This Court noted that the record was clear that the prior art disclosed press fittings for general use.[163]  It thus held that "given that the common knowledge of press fitting was before the Board, it was error for the Board to fail to consider whether a person of ordinary skill in the art would be motivated to combine press fitting with the prior art (which, as the Board found, disclosed every other limitation of the … patent) to arrive at the claimed invention." [164]

Here, as in *Taylor,* the "spoked wheel" configurations for a valve's flow barrier element were well-known at the time of invention—and well-known to the Board.    Indeed, rather than rejecting claim 20 based on waiver, the Board affirmatively found on the merits that Burmester '134 discloses a spoked wheel configuration. [165]    And here, as in *Taylor,* the Board erred when it did not consider—for claims 60-63 and 65-67—whether a person of ordinary skill would be motivated to use this "spoked wheel" shape in the Hosokawa valve.[166]  That the Board nevertheless conducted that very analysis for claim 20, yet stopped short of doing so for these same "spoked wheel" claims, only highlights this error.

---

[162] *Id.* at 18983, *4-*5.

[163] *Id.* at 18983, *7-*8.

[164] *Id.* at 18983, *9; *see also* 37 C.F.R. § 41.77(b) (Board authorized to enter new rejection "should the Board have knowledge of any grounds not raised in the appeal for rejecting any pending claim").

[165] A000827.

[166] *Taylor Made*, 2014 U.S. App. LEXIS 18983, *10-*11.

The Board therefore erred in not reaching and applying this same invalidity conclusion for claims 60-63 and 65-67 as it did for claim 20. The Court should reverse that error accordingly.

## III.   HOSOKAWA DISCLOSES A FLOW BARRIER ELEMENT THAT IS "AT LEAST MOVABLE."

### A.    The Board Erred in Requiring Actual Movement.

Claim 68 requires that the "flow barrier element is at least movable towards the first closing element when said second closing element is lifted and when cleaning medium is applied to said leakage space." [167]   The specification consistently explains that this flow barrier element is "capable of moving" or "can be moved."[168]  It explains that any such movement of the flow barrier element can be "a result of the pressure of the cleaning medium, towards the other closing element which is in the closed position."[169]  And it explains that the flow barrier element "can be" forced towards the valve's first closing element.[170]

---

[167] A000746-47.

[168] A000047 at 7:65-67 (flow barrier element "can even be moved further towards [valve's other closing element], which is simply brought about by the pressure of the cleaning medium"); A000050 at 14:24-27 ("flow barrier element" arranged "so as to be capable of moving"); A000051 at 15:56-60 (flow barrier element "capable of moving" toward other closing element "when the pressurized cleaning medium is applied to said flow barrier element").

[169] A000047 at 7:32-45.

[170] A000046 at 6:15-18.

Thus, the broadest reasonable interpretation for this "movable" term should be a flow barrier element that is merely "capable" of moving. The Board, however, repeatedly indicated it was instead requiring a flow barrier element that "is moving," that "might actually slide, that is move," and that does engage in "any movement" at the time ("when") recited in the claims.[171] This construction should be reversed, because it is contrary to the claim text and the specification's disclosures. The term "movable" itself denotes merely the capability to move, and the '376 specification confirms that interpretation, saying the valve's "flow barrier element" need only be "capable of moving"—not that it must be "moving" or "actually" move at a particular time.[172]

### B.    The Hosokawa Reference Discloses a Flow Barrier Element that is "Capable of Movement" and Meets this Limitation.

Hosokawa discloses this "at least movable" flow barrier element, thus rendering these claims invalid as well. Specifically, Hosokawa shows a flow barrier element (or "middle valve body 14") that "can slide freely along [up-and-down] the main valve stem (7)."[173] Hosokawa Figure 1 illustrates how this valve element can move interchangeably between the valve's common open position and

---

[171] *See* A000022-23.

[172] *See* A000047 at 7:65-67; A000050 at 14:24-27; A000051 at 15:56-60.

[173] A000944 at 359:29-35.

- 53 -

a closed position.[174]  Thus, the Board, the parties, and the Examiner agreed that Hosokawa indeed discloses a movable flow barrier element.[175]

Further, Hosokawa shows this valve element as capable of moving in the right direction and at the right time.  Specifically, the claims require that the flow barrier element be movable "towards the first closing element when said second closing element is lifted and when cleaning medium is applied to said leakage space."  In operation, Hosokawa discloses that its "freely sliding" flow barrier element (middle valve body) is capable of moving or "sliding" when cleaning medium is applied.[176]  And that movement is "towards" Hosokawa's first closing element (namely, its inner valve body) when Hosokawa's other closing element is lifted, as further shown by Hosokawa's description and drawings:[177]

---

[174] A000947.

[175] A000023; A000015.

[176] *See, e.g.*, A000945 at 360:62-67.

[177] *See* A000947 at Fig. 1; A000948 at Fig. 2; A000944 at Fig. 4 (excerpted and annotations added below).



**Hosokawa Figure 1**

As shown in Figure 4, Hosokawa further demonstrates that its flow barrier element (or middle valve body) is movable in both directions—towards the seat of the middle valve body when the spring is resting,[178] and upward "towards" the first closing element when the spring is compressed.[179] Indeed, Hosokawa states that the cleaning fluid for its valve flows "between the top surface of the outer valve body [] and bottom surface of the" valve's flow barrier element.[180] Thus, as that

---

[178] The spring acts on Hosokawa's middle valve body to provide tension "in the direction to the seat" of the middle valve body. *See* A000944.

[179] A000944; A000947 at Figure 1.

[180] A000946 at 361:65-68.

cleaning fluid presses on the "bottom surface" of Hosokawa's flow barrier element, it pushes upward on that valve element to make it movable towards Hosokawa's first closing element.[181]  Thus, the flow or pressure from the cleaning fluid can cause Hosokawa's "freely slid[ing]" flow barrier element to be "at least movable towards [its] first closing element" in the manner recited in the '376 Patent.[182]  Accordingly, Hosokawa clearly meets the entirety of this "movable" claim limitation, just as the Examiner had concluded.  The Board's decision to the contrary must be reversed.

### C.  The Board Erred in Presuming that Hosokawa Would Not Operate in its Intended Environment.

The Board, as noted, reversed the Examiner's "movable" invalidity decision, observing that Hosokawa "does not describe when the middle valve 14 [or flow barrier element] might actually slide, that is move."[183]  This observation is flawed.

The observation presumes that the Hosokawa device does not operate in its intended environment—namely, a food processing environment susceptible to overpressure due to having pressurized cleaning fluid applied.  But as Hosokawa

---

[181] *See* A000945 at 360:68-70; A00046 at 361:46-68.

[182] A000047 at 7:65-67 (flow barrier element "can even be moved further towards [valve's other closing element], which is simply brought about by the pressure of the cleaning medium"); A000050 at 14:24-27 ("flow barrier element" arranged "so as to be capable of moving"); A000051 at 15:56-60 (flow barrier element "capable of moving" toward other closing element "when the pressurized cleaning medium is applied to said flow barrier element").

[183] A000023.

itself describes it, its device is intended to accept the force of cleaning fluid and to thereby address and relieve such overpressure.[184]   Further, Hosokawa's flow barrier element is "freely" movable and thus can "slide" or move toward the first closing element above it when cleaning fluid pushes upward against that flow barrier element (i.e., Hosokawa's middle valve body).[185]   The Board's decision concluding that Hosokawa cannot function this way is contrary to Hosokawa's clear disclosures.   And it is contrary to this Court's precedents holding that disclosures in prior art publications are presumed enabled.[186]

    As with its rulings on axial seal and the spoked-wheel limitations, the Board's conclusion as to the claims reciting this movable limitation must be reversed.   As the Examiner correctly concluded, Hosokawa discloses a flow barrier element capable of movement at the right time and in the right direction.   The Examiner's invalidity rejections for claims 68-72 and 74-75 should be reinstated.[187]

---

[184] *See, e.g.*, A000946 at 361:80-83 (describing how Hosokawa's flow barrier element "doubly block[s]" and can "doubly prevent[]" the "leakage of the cleaning fluid … during the washing of the inner valve body side and washing of the outer valve body side").

[185] A000944 at 359:29-35; A000945 at 360:62-67.

[186] *See, e.g., Antor Media,* 689 F.3d at 1288.

[187] A000714.

**CONCLUSION**

Under the proper "broadest reasonable interpretation" standard, the Examiner correctly found invalid the disputed claims of the '376 Patent. Indeed, the Examiner reached this conclusion by construing the Patent and making determinations about its scope and meaning based on the single most important sources used for claim construction—the Patent itself. By contrast, the Board erred in construing three different claim limitations and applying the prior art. Unlike the Examiner, the Board's rulings were predicated on extrinsic sources that neither the Examiner nor any of the parties had ever cited—an engineering handbook that described various structures ("[p]ackings, gaskets, and seals") and a Merriam-Webster dictionary. By *sua sponte* imposing its dictionary- and handbook-based constructions for the first time on appeal to the Board, and by mis-reading the prior art that clearly invalidates these claims, the Board erroneously narrowed the disputed claim terms and reversed the Examiner's correctly made invalidity judgments. The Board's decision should be reversed and the Examiner's invalidity rejections should be reinstated.

Dated: October 14, 2014                    Respectfully submitted,


                                           /s/ Alan M. Fisch
                                           Alan M. Fisch
                                           John T. Battaglia
                                           Alicia M. Carney
                                           FISCH SIGLER LLP
                                           5335 Wisconsin Avenue NW
                                           Eighth Floor
                                           Washington, DC 20015
                                           (202) 362-3500

                                           Patrick J. Lee
                                           FISCH SIGLER LLP
                                           96 North Third Street
                                           Suite 260
                                           San Jose, CA 95112
                                           (650) 362-8200

                                           *Attorneys for Appellant SPX Corp.*

# ADDENDUM

 Uₙᵢₜₑᵈ Sₜₐₜₑₛ Pₐₜₑₙₜ ₐₙᵈ Tᵣₐᵈₑₘₐᵣₖ Offᵢ𝒸ₑ

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 95/001,797 | 10/27/2011 | Frank Neuhauser | 03749-P0004B | 6246 |

24126        7590        05/27/2014
ST. ONGE STEWARD JOHNSTON & REENS, LLC
986 BEDFORD STREET
STAMFORD, CT 06905-5619

| EXAMINER |
|---|
| KAUFMAN, JOSEPH A |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3993 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 05/27/2014 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

PTOL-90A  (Rev. 04/07)

UNITED STATES PATENT AND TRADEMARK OFFICE

————————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————————

SPX CORPORATION
Respondent, Requester

v.

SÜDMO HOLDING GMBH
Appellant, Patent Owner

————————————

Appeal: 2014-002822
Reexamination Control: 95/001,797; 95/001,834; 95/001,873
Patent No.: 7,891,376 B2[1]
Technology Center: 3900

————————————

Before STEVEN D.A. McCARTHY, DANIEL S. SONG and
MICHAEL L. HOELTER, *Administrative Patent Judges*.

McCARTHY, *Administrative Patent Judge*.

DECISION ON APPEAL

—————————

[1]     Issued February 22, 2011 to Frank Neuhauser, Stephan Franz,
Wolfgang Neumeyer and Stephan Thomaschki; and assigned to Sudmo
Holding GmbH (the "'376 patent"). The '376 patent issued from Appl.
No. 12/184,725, filed August 1, 2008.

Appeal 2014-002822
Reexamination Control 95/001,797; 95/001,834; 95/001,873
Patent No. US 7,891,376 B2

1                    STATEMENT OF THE CASE

2          This appeal arises out of the merger of three *inter partes*

3    reexamination proceedings (Reexamination Control Numbers 95/001,797;

4    95/001,834 and 95/001,873) instituted by the same Requester/Respondent,

5    SPX Corporation.  The Appellant/Patent Owner Südmo Holding GmbH

6    appeals under 35 U.S.C. §§ 134(b) (2011) and 35 U.S.C. § 315(a) (2011)

7    from the Examiner's final rejection of claims 1, 2, 4-14, 18-31, 33-41, 43-

8    54, 58-63, 65-72, 74-77 and 81.  (Right of Appeal Notice mailed

9    June 10, 2013 (hereafter "RAN"), at 1).  Claims 3 and 5-17 are not subject to

10   reexamination in the merged proceeding.  (*Id.*)  We have jurisdiction under §

11   134(b) and § 315(a).

12         Claims 21-81 were added during the course of this proceeding.

13   Claims 42, 55-57 and 78-80 subsequently were cancelled.  (*See generally*

14   "Response to Official Action" dated March 15, 2013 (hereafter "Patent

15   Owner Comments after the Action Closing Prosecution"), at 2-20).

16   Claims 32, 64 and 73 are allowable.  (RAN 1).  Claims 1-20 were original to

17   the '376 patent as issued and were not amended during the proceeding.  (*See*

18   *generally* Patent Owner Comments after the Action Closing Prosecution at

19   2-20).

20         The Patent Owner states that "claims 7, 20-31, 33-41, 43-54, 58-63,

21   65-72, 74-77 and 81 are the subject of the instant Appeal" ("Appeal Brief

22   under 37 CFR § 41.37" dated August 30, 2013 ("App. Br. PO") at 2).  We

23   understand this statement to mean that the Patent Owner does not appeal the

24   rejections of claims 1, 2, 4-6, 8-14, 18 and 19.  These claims remain finally

2

Appeal 2014-002822
Reexamination Control 95/001,797; 95/001,834; 95/001,873
Patent No. US 7,891,376 B2

1  rejected.  *See* MANUAL OF PATENT EXAMINING PROCEDURE § 2675

2  (9th edition, Mar. 2014).[2]

3      As to the claims remaining on appeal, we sustain the rejection of

4  claim 20.  We do not sustain the rejection of claims 7, 21-31, 33-41, 43-54,

5  58-63, 65-72, 74-77 and 81.

6      The decision of the Examiner is set forth in the RAN.[3]  The Patent

7  Owner relies on an "Appeal Brief under 37 CFR § 41.37 [*sic*]" dated

8  August 30, 2013 (hereafter "Appeal Brief" or "App. Br. PO") and a

9  "Rebuttal Brief under 37 CFR § 41.37 [*sic*]" dated November 25, 2013

10  (hereafter "Rebuttal Brief" or "Reb. Br. PO").  The Patent Owner

11  additionally relies on two "Declaration[s] of Paul R. Ostand Under 37 C.F.R.

12  § 1.132" executed on August 10, 2012 ("First Ostand Decl."), and

13  March 15, 2013 ("Second Ostand Decl."), respectively.  The Requester

14  relies on a "Respondent Brief by Third Party Requester in *Inter Partes*

15  Reexamination" dated September 27, 2013 (hereafter "Resp. Br. Req'r").  In

16  addition, this opinion will refer to the Requester's "Request for *Inter Partes*

17  Reexamination of U.S. Patent No. 7,891,376 Pursuant to 35 U.S.C. §§ 311-

18  318 and 37 C.F.R. § 1.915" dated January 18, 2012 (the "95/001,873

19  Request"); and to the Requester's "Third Party Comments after Patent

20  Owner Response Pursuant to 37 C.F.R. § 1.947" dated September 20, 2012

21  ("Req'r Comments").  Only those arguments actually made by the Patent

---

[2]    We note that dependent claims 7 and 20 depend from rejected and
non-appealed claim 1.

[3]    The Examiner's Answer mailed October 25, 2013, incorporates the
RAN by reference.

3

Appeal 2014-002822
Reexamination Control 95/001,797; 95/001,834; 95/001,873
Patent No. US 7,891,376 B2

1   Owner have been considered in this decision.  Arguments that the Patent

2   Owner could have made but chose not to make have not been considered and

3   are deemed to be waived.  *See* 37 C.F.R. § 41.67(c)(1)(vii) (2011); *In re*

4   *Jung*, 637 F.3d 1356, 1365 (Fed. Cir. 2011); *Ex parte Frye*, 94 USPQ2d

5   1072, 1075-76 (BPAI 2010); *In re Enhanced Security Research, LLC*, 739

6   F.3d 1347, 1353 (Fed. Cir. 2014).

7        The Patent Owner and the Requester have indicated that the

8   ′376 patent is the subject to the litigation entitled *Südmo Holding GmbH v.*

9   *SPX Corporation and SPX Flow Technology Systems, Inc.*, No. 1:11-cv-

10  00561-SLR-CJB.[4]  (App. Br. 2; Resp. Br. Req'r 1-2).  Neither the Patent

11  Owner nor the Requester has identified any other prior litigation or post-

12  grant proceeding involving the ′376 patent.

13

14                    THE ′376 PATENT

15       The claims on appeal relate to a double seat valve apparatus for

16  maintaining separation between incompatible liquids such as a comestible

17  liquid and a cleaning fluid.  (′376 patent, col. 1, ll. 12-13 and 35-37; *see also*

18  *id.*, col. 9, ll. 44-46).  As depicted in Figure 1, one such apparatus *10*

19  includes a valve housing *12* defining first and second valve housing sections

20  *14, 16* connected by a connecting section *24*.  (′376 patent, col. 9, ll. 52-54;

21  col. 9, l. 65 – col. 10, l. 3; and fig. 1).  The connecting section *24* defines a

22  leakage space *46* from which liquid may be discharged through a drainage

23  section *44*.  (′376 patent, col. 10, ll. 40-44 and fig. 1).  The housing *12*

---

[4]     The subject litigation is currently stayed in the U.S. District Court for
the District of Delaware pursuant to an Order issued by Judge Sue L.
Robinson on December 2, 2011.  (App. Br. 2; Resp. Br. Req'r 1-2).

4

Appeal 2014-002822
Reexamination Control 95/001,797; 95/001,834; 95/001,873
Patent No. US 7,891,376 B2

1    encloses a first closing element *28* embodied in the form of a valve disc; a

2    second closing element *30* embodied in the form of a closing sleeve; and a

3    flow barrier element *54* positioned between the closing elements *28, 30*.

4    ('376 patent, col. 10, ll. 7-11 and col. 11, ll. 41-43).  Figures 1 and 3b depict

5    the flow barrier element *54* is embodied as a spoked wheel including an

6    annular element *56* at its outer periphery.  ('376 patent, col. 11, ll. 58-62 and

7    col. 12, ll. 24-30).

8         The first closing element *28* is configured to seal peripherally against

9    a seat *34* defined on the inner surface of the connecting section *24* adjacent

10   the first valve housing section *14*.  The second closing element *30* is

11   configured to seal peripherally against a seat *38* defined on the inner surface

12   of the connecting section *24* adjacent the second valve housing section *16*.

13   ('376 patent, col. 10. ll. 12-22; and fig. 1).  The first and second closing

14   elements *28, 30* are each configured to axially contact and seal against

15   opposite sides of an annular element *56* of the flow barrier element *54*.  ('376

16   patent, figs. 2a-2d; *see also id.*, col. 13, ll. 50-59).

17        The first and second closing elements *28, 30* permit the valve

18   apparatus *10* to operate in four distinct operating states.  In a fully closed

19   state, as illustrated on the left side of Figure 1 and in Figure 2d, both the first

20   closing element *28* and the second closing element *30* are seated so as to

21   form peripheral seals against the inner surface of the connecting section *24*.

22   In the fully closed operating state, no flow is allowed through the connecting

23   section *24*.  In a fully open state as illustrated on the right side of Figure 1

24   and in Figure 2c, both the first and second closure members *28, 30* are

25   moved into the second valve housing section *16*.  In the fully open operating

5

Appeal 2014-002822
Reexamination Control 95/001,797; 95/001,834; 95/001,873
Patent No. US 7,891,376 B2

1   state, comestible fluid may flow between the first and second valve housing

2   sections *14, 16* through the connecting section *24*. (*See '*376 patent, col. 10,

3   ll. 48-61).

4       In a third operating state, the second closing element *30* is "lifted,"

5   that is, moved so as not to seat against the inner surface of the connecting

6   section *24*. The first closure element *28* continues to form a seal against the

7   inner surface of the connecting section *24*. ('376 patent, col. 10, l. 66 –

8   col. 11, l. 6 and fig. 2a). In this third operating state, pressurized cleaning

9   fluid may be introduced into the leakage space *46* through the second valve

10  housing section *16* and then drained through the drainage section *44* without

11  coming into contact with the first valve housing section *14*. ('376 patent,

12  col. 11, ll. 13-21). The annular element *56* remains in place to obstruct the

13  flow of pressurized cleaning fluid toward or against the seal formed between

14  the first closure element *28* and the inner surface of the connecting section

15  *24*. ('376 patent, col. 13, ll. 60-64).

16      In a fourth operating state, the first closing element *28* is "lifted." The

17  second closure element *28* continues to form a seal against the inner surface

18  of the connecting section *24*. ('376 patent, col. 11, ll. 7-12 and fig. 2b). In

19  this fourth operating state, pressurized cleaning fluid may be introduced into

20  the leakage space *46* through the first valve housing section *14* and then

21  drained through the drainage section *44* without coming into contact with the

22  second valve housing section *16*. ('376 patent, col. 11, ll. 22-40). The

23  annular element *56* remains associated with the first closure element *28* to

24  obstruct the flow of pressurized fluid toward or against the seal formed

6

Appeal 2014-002822
Reexamination Control 95/001,797; 95/001,834; 95/001,873
Patent No. US 7,891,376 B2

1  between the second closure element *30* and the inner surface of the

2  connecting section *24*. ('376 patent, col. 13, ll. 60-64).

3      Claims 21, 38, 51, 60, 68, and 76 are independent.  Claim 21 recites:

4      21.    A double seat valve for separating media,
5      comprising:

6          a valve housing having connectors for
7          a first pipeline and a second pipeline;

8          a first closing element and a first
9          closing element seat, said first closing
10         element being in seal-forming abutment, in a
11         closed position of said first closing element,
12         with said first closing element seat via a first
13         sealing element;

14         a second closing element spaced apart
15         axially from said first closing element and a
16         second closing element seat, said second
17         closing element being, in a closed position
18         of said second closing element, in seal
19         forming abutment with said second closing
20         element seat via a second sealing element;

21         wherein said first and second closing
22         elements can be lifted independently of one
23         another from said respective first and second
24         closing element seats;

25         a leakage space being provided
26         between said first and second closing
27         elements;

28         a flow barrier element arranged
29         between said first and second closing
30         elements;

31         wherein said flow barrier element
32         shadows at least one of said first sealing
33         element and said first closing element seat

7

Appeal 2014-002822
Reexamination Control 95/001,797; 95/001,834; 95/001,873
Patent No. US 7,891,376 B2

| | |
|---|---|
| 1 | which is in said closed position, when said |
| 2 | second closing element is lifted and when |
| 3 | cleaning medium is applied to said leakage |
| 4 | space, said flow barrier element preventing |
| 5 | said cleaning medium which enters said |
| 6 | leakage space from flowing directly against |
| 7 | said first sealing element and said first |
| 8 | closing element seat; and |
| 9 | wherein said flow barrier element |
| 10 | shadows at least one of said second sealing |
| 11 | element and said second closing element |
| 12 | seat of which is in said closed position, |
| 13 | when said first closing element is lifted and |
| 14 | when cleaning medium is applied to said |
| 15 | leakage space, said flow barrier element |
| 16 | preventing said cleaning medium which |
| 17 | enters said leakage space from flowing |
| 18 | directly against said second sealing element |
| 19 | and said second closing element seat; |
| 20 | wherein, in a common open position |
| 21 | of said first and second closing elements, |
| 22 | said flow barrier element forms a seal |
| 23 | axially against said first and second closing |
| 24 | elements. |
| 25 | (App. Br. PO 33-34 (Claims App'x)). |
| 26 | |
| 27 | GROUNDS OF REJECTION |
| 28 | The Examiner adopts the following grounds of rejection proposed by |
| 29 | the Requester in the Request:[5] |
| 30 | The Examiner rejects claims 7, 20-31, 35-41, 43-45, 48- |
| 31 | 54, 58-63, 65-72, 74-77 and 81 under 35 U.S.C. § 102(b) |

[5] The grounds of rejection have been revised to omit cancelled and non-appealed claims.

8

Appeal 2014-002822
Reexamination Control 95/001,797; 95/001,834; 95/001,873
Patent No. US 7,891,376 B2

1

9

A000010

Appeal 2014-002822
Reexamination Control 95/001,797; 95/001,834; 95/001,873
Patent No. US 7,891,376 B2

1      (2011) as being anticipated by Hosokawa (JP S57-154564 A,

2      published Sept. 24, 1982).[6] (RAN 4-5 and 6).

3      The Examiner rejects claim 20 under 35 U.S.C. § 103(a)

4      (2011) as being unpatentable over Burmester '986 (US

5      6,178,986 B1, issued Jan. 30, 2001) and Burmester '134

6      (WO 2007/054134 A1, publ. May 18, 2007).[7] (RAN 4).

7      The Examiner rejects claims 20, 35, 48, 53, and 75 under

8      § 103(a) as being unpatentable over Hosokawa and

9      Burmester '134. (RAN 6 and 7-8).

10      The Examiner rejects claims 33 and 46 under § 103(a) as

11      being unpatentable over Hosokawa and PMO 2005 (U.S. Food

12      & Drug Admin., GRADE "A" PASTEURIZED MILK ORDINANCE

13      § 15p.(B), para. 1b.(1) (rev. 2005)). (RAN 6-7).

---

[6]      References to "Hosokawa" will be to an English language translation attached to the 95/001,873 Request. A copy of the translation is in the file of Reexamination 95/001,873.

     The Examiner also rejects claims 1, 2 and 4-13 under § 102(b) as being anticipated by Hosokawa (RAN 4-5); claims 1, 2, 4-6, 8-14 and 18 under § 102(b) as being anticipated by Burmester '986 (US 6,178,986 B1, issued Jan. 30, 2001) (RAN 3); claim 18 under 35 U.S.C. § 103(a) as being unpatentable over Hosokawa in view of Deger (US 2007/0151611, publ. July 5, 2007) (RAN 5); and claim 19 under § 103(a) as being unpatentable over either Burmester 'and Deger (US 2007/0151611, publ. July 5, 2007) (RAN 4) or Hosokawa, PMO 2005 and Deger (RAN 5-6). The Patent Owner does not appeal the rejections of claims 1, 2, 4-6, 8-14 and 18. Therefore, these grounds of rejection need not be considered further.

[7]      References to "Burmester '134" will be to an English language translation certified by Transperfect and attached to the 95/001,873 Request. A copy of the translation is in the file of Reexamination 95/001,873.

10

A000011

Appeal 2014-002822
Reexamination Control 95/001,797; 95/001,834; 95/001,873
Patent No. US 7,891,376 B2

1          The Examiner rejects claims 34 and 47 under § 103(a) as

2              being unpatentable over Hosokawa, PMO 2005 and Deger

3              (US 2007/0151611, publ. July 5, 2007).  (RAN 7).

4

5                                    ISSUES

6      This appeal turns on four issues.

7          Claim 21 recites a double seat valve "wherein, in a common open

8  position of said first and second closing elements, said flow barrier element

9  forms a seal axially against said first and second closing elements."

10 Dependent claim 7 recites a double seat valve including the same limitation.

11 Independent claims 51 and 76 recite a double seat valve including a similar

12 limitation:  "wherein, in a common open position of said first and second

13 closing elements, . . . said flow barrier element forms a first axial seal

14 against said first closing element and a second axial seal against said second

15 closing element."  Independent claim 38 recites a double seat valve "wherein

16 said flow barrier element forms a seal axially against at least one of said first

17 and said second closing elements."

18         Both the Patent Owner and the Requester address the patentability of

19 claims 7, 21, 38, 51 and 76 together.  (*See* App. Br. PO 15-20; Resp. Br.

20 Req'r 6-8).  Therefore, this opinion will address as representative the

21 rejection of claim 21 under § 102(b) as being anticipated by Hosokawa.

22 Similar findings and reasoning will apply to the rejection of claims 7, 38, 51

23 and 76.  One issue in this appeal is:

24              *First*, has the Examiner correctly interpreted the term

25                  "seal," as used in claim 21, as being sufficiently broad to

11

Appeal 2014-002822
Reexamination Control 95/001,797; 95/001,834; 95/001,873
Patent No. US 7,891,376 B2

1          encompass the specific connection of the inner valve body *13*,
2          the middle valve body *14* and the outer valve body *8* of
3          Hosokawa's apparatus?
4     Claim 60 recites a double seat valve including a flow barrier element
5  "configured as a spoked wheel."  Addressing claims 20, 35, 48, 53, 60, 75
6  and 76 as a group, the Patent Owner argues that Hosokawa fails to describe a
7  double seat valve satisfying this limitation.  (*See* App. Br. PO 20-23; Reb.
8  Br. PO 4; *see also* Resp. Br. Req'r 8-11).  The Patent Owner separately
9  argues that a double seat valve including a flow barrier element embodied as
10  a spoked wheel as recited in claim 20 would not have been obvious from the
11  combined teachings of Burmester '986 and Burmester '134.  (App. Br. PO
12  26-28; Reb. Br. PO 6-7; *see also* Resp. Br. Req'r 13-15).  Two additional
13  issues in this appeal are:
14          *Second*, has the Examiner correctly interpreted the term
15          "a spoked wheel" as used in claim 60 to be sufficiently broad
16          to encompass the structural arrangement of a middle valve
17          body *14* of Hosokawa's apparatus?
18          *Third*, do the evidence and technical reasoning
19          underlying the rejection of claim 20 as being unpatentable over
20          Hosokawa and Burmester '134 adequately support the
21          conclusion that one of ordinary skill in the art would have had
22          reason to embody the flow barrier element of a double seat
23          valve as a spoked wheel?
24     Claim 68 recites a double seat valve including a flow barrier element,
25  "wherein said flow barrier element is at least movable towards the first

12

Appeal 2014-002822
Reexamination Control 95/001,797; 95/001,834; 95/001,873
Patent No. US 7,891,376 B2

1   closing element when said second closing element is lifted and when

2   cleaning medium is applied to said leakage space."  Addressing claims 30,

3   36, 37, 49, 50, 58, 59, 66-69, 76 and 81 as a group, the Patent Owner argues

4   that Hosokawa fails to describe a double seat valve satisfying this limitation.

5   (*See* App. Br. PO 12-15; Reb. Br. PO 1-2; *see also* Resp. Br. Req'r 4-5).  A

6   final issue in this appeal is:

7           *Fourth*, has the Examiner correctly interpreted the

8           limitation "wherein said flow barrier element is at least

9           movable towards the first closing element when said second

10          closing element is lifted" as used in claim 68 as being

11          sufficiently broad to encompass the specific cleaning operation

12          of the inner valve body *13*, the middle valve body *14* and the

13          outer valve body *8* of Hosokawa's apparatus?

14

15                          FINDINGS OF FACT

16      The record supports the following findings of fact ("FF") by a

17   preponderance of the evidence.

18      1.      Hosokawa describes a double seat valve system including an

19   outer valve body *8* seated on an outer valve seat *4*, an inner valve body *13*

20   seated on an inner valve seat *5*, and a middle valve body *14* seated on a

21   middle valve seat *6*.  (Hosokawa 359, ll. 5 and 14-28 (claim); and 360,

22   ll. 62-64).

23      2.      In Hosokawa, during operation, the valve bodies *8*, *13*, *14* can

24   be open or lifted from their respective seats *4*, *5*, *6* along a main valve stem

25   *7*. (*See generally* Hosokawa 361, ll. 19-68).  One operating state includes

13

Appeal 2014-002822
Reexamination Control 95/001,797; 95/001,834; 95/001,873
Patent No. US 7,891,376 B2

1    the valve bodies *8, 13, 14* "in an open position while the outer valve body

2    (8), and middle valve body (14) and inner valve body (13) are being

3    connected." (Hosokawa 361, ll. 35-46).

4          3.    Hosokawa further describes the middle valve body *14* with a

5    small hole *14'*, which is seated on the middle valve seat *6*. (*Id.*, pg. 360,

6    ll. 62-64). The middle valve body *14* is capable of sliding freely along the

7    main valve stem *7*. (Hosokawa 360, ll. 64-67).

8          4.    Figure 1 of Hosokawa depicts a spring *15* acting on a middle

9    portion of the middle valve body *14* to hold the outer portion of the middle

10    valve body against a valve seat *6*. (*See* Hosokawa 360, ll. 68-74).

11    Therefore, some structure must connect the middle portion and the outer

12    portion of the middle valve body *14* across the small hole *14'*. Nevertheless,

13    neither Figure 1 nor any of the other drawing figures show spokes or rods

14    connecting the middle portion with the outer portion.

15          5.    Figure 3 of Hosokawa depicts the configuration of the inner

16    valve body *13*, the middle valve body *14* and the outer valve body *8* when

17    running washing fluid to wash the side of the double seat valve near the

18    valve box *3*. In particular, Figure 3 depicts the inner valve body *13* lifted

19    (that is, slightly opened) from its valve seat *5*. The outer and middle valve

20    bodies *8, 14*, remain on their respective valve seats *4, 6*. (*See* Hosokawa

21    361, ll. 47-53). The Requester correctly states that the spring *15* as depicted

22    in Figure 3 "urges middle valve body 14 downward[ly] and onto its seat 6."

23    (Req'r Comments, Ex. A at 27; *see also id.* 33). Nevertheless, if one

24    associates the "second closing element" recited in claim 68 with the outer

25    valve body *8* as the Examiner and the Requester appear to do (*see* Req'r

14

Appeal 2014-002822
Reexamination Control 95/001,797; 95/001,834; 95/001,873
Patent No. US 7,891,376 B2

1    Comments, Ex. A at 2 and 33; *see also* RAN 6 ("The claim charts on pages

2    1-37 of Exhibit A . . . are incorporated herein by reference.")), the

3    configuration depicted in Figure 3 of Hosokawa is not achieved when the

4    *second closing element* is lifted and when cleaning medium is applied to a

5    leakage space between the outer and inner valve bodies *8, 13*.

6            6.       Burmester '134 describes a double seat valve *1*.  The valve *1*

7    includes closing elements *3, 4* independently movable by shifting rods *3a*,

8    *4a*.  (Burmester '134 at 20).  The closing elements *3, 4* form a leakage cavity

9    *5* connected to a discharge bore *3d*.  (Burmester '134 at 21).

10           7.       The double seat valve *1* includes an integral welding part *30*.

11    The integral welding part *30* is welded along an axially facing surface at its

12    outer portion to a pressure balance piston *3c*.  (Burmester '134 at 32).  The

13    integral welding part *30* also is welded along an axially facing surface at its

14    middle portion to a first shifting rod *3a*.  (*Id.*)  One of ordinary skill in the art

15    would have recognized that the spaces between such spokes connect the

16    opposite sides of the welding part *30* for flow purposes.  (*See, e.g.*,

17    Burmester '134 at 21).

18

19                              ANALYSIS

20    *First Issue*

21           Representative claim 21 recites a double seat valve "wherein, in a

22    common open position of said first and second closing elements, said flow

23    barrier element forms *a seal* axially against said first and second closing

24    elements."  (Italics added for emphasis.)  The Requester points out that

25    Hosekawa describes the outer valve body *8*, the middle valve body *14* and

15

Appeal 2014-002822
Reexamination Control 95/001,797; 95/001,834; 95/001,873
Patent No. US 7,891,376 B2

1   the inner valve body *13* of Hosekawa's apparatus as being "connected"

2   when the three valve bodies are in an open state. (Resp. Br. Req'r 6; Req'r

3   Comments 11, citing Hosokawa 361, ll. 35-46; *see also* Hosokawa, fig. 3).

4       The Examiner interprets the term "seal" as at least broad enough to

5   encompass a "connection." (*See* RAN 5 (adopting the Requester's "analysis

6   and claim charts on page 22-40 of the 95/001,873 Request")). Relying on

7   this interpretation, the Examiner concludes that, in an open position, the

8   connection among the middle valve body *14*, the outer valve body *8*, and the

9   inner valve body *13* of Hosokawa satisfies this limitation. (*Id.*) The

10   Requester supports the Examiner's claim interpretation. (*See* Resp. Br.

11   Req'r 6). The Patent Owner argues that the Examiner's interpretation is too

12   broad. (App. Br. PO 16).

13       "During reexamination, as with original examination, the PTO must

14   give claims their broadest reasonable construction consistent with the

15   specification. . . . Therefore, we look to the specification to see if it provides

16   a definition for claim terms, but otherwise apply a broad interpretation." *In*

17   *re ICON Health & Fitness, Inc.*, 496 F.3d 1374, 1379 (Fed. Cir. 2007). That

18   "broad interpretation" is limited by the ordinary usage of the term as the

19   term would have been understood by one of ordinary skill in the art. *In re*

20   *Morris*, 127 F.3d 1048, 1054 (Fed. Cir. 1997). Here, the Patent Owner does

21   not formally define the term "seal" in the Specification. The ordinary usage

22   of the term "seal" denotes "materials used to control or stop leakage of fluids

23   . . . through mechanical clearances when [fluids are] under pressure or

24   vacuum." (MARK'S STANDARD HANDBOOK FOR MECHANICAL

25   ENGINEERS 8-133 (McGraw-Hill Cos., Inc. 2007)). This ordinary usage is

16

Appeal 2014-002822
Reexamination Control 95/001,797; 95/001,834; 95/001,873
Patent No. US 7,891,376 B2

1    consistent with the usage of the term in the '376 patent.  (*See*, *e.g.*, '376

2    patent, col. 11, ll. 22-40 (warning that direct flow of pressurized cleaning

3    fluid against "sealing elements" *32*, *36* borne by the first and second closing

4    elements *28*, *30* might cause the cleaning fluid to penetrate or leak into an

5    opposite valve housing section *14*, *16*)).

6         In Hosokawa, the only arrangement described among the valves in an

7    open position is that of a "connection."  (FF3).  Nothing in Hosokawa

8    describes the connection as forming a seal or closure to prevent leakage.

9    Moreover, nothing in the definition of a "seal" implies that a "connection"

10   alone necessarily forms a seal.  Therefore, neither the Requester nor the

11   Examiner has shown that the valve connection described in Hosokawa forms

12   a seal.

13        We do not sustain the rejection of claims 21-31 and 35-37 under

14   § 102(b) as being anticipated by Hosokawa.  Independent claims 38, 51 and

15   76, as well as dependent claim 7, recite similar limitations.  We do not

16   sustain the rejection of claims 7, 38-41, 43-45, 48-54, 58, 59, 76, 77 and 81

17   under § 102(b) as being anticipated by Hoskawa, either.

18        The Examiner rejects claims 35, 48 and 53 under § 103(a) as being

19   unpatentable over Hosokawa and Burmester '134.  In support of these

20   rejections, the Examiner and the Requester cite Burmester '134 as describing

21   a spoked wheel in the form of an integral welding part *30* for connecting a

22   pressure balance piston *3c* to a first shifting rod *3a*.  (*See* RAN 7-8; Resp.

23   Br. Req'r 11-13; *see also* Burmester '134 at 32 and figs. 6a and 6b).  This

24   teaching does not remedy the deficiency in the disclosure of Hosokawa as

25   applied to parent claims 21, 38 and 51 on which claims 35, 48 and 53

17

Appeal 2014-002822
Reexamination Control 95/001,797; 95/001,834; 95/001,873
Patent No. US 7,891,376 B2

1   depend.  Therefore, we do not sustain the rejections of claims 35, 48 and 53

2   under § 103(a).

3       The Examiner rejects claims 33 and 46 under § 103(a) as being

4   unpatentable over Hosokawa and PMO 2005.  The Examiner and the

5   Requester cite PMO 2005 as teaching "details of the drainage section with

6   regard to the overall passage cross section being at least as large as the

7   opening cross section of a larger one of the connectors."  (RAN 6-7; *see also*

8   Req'r Comments, Ex. A at 13).  This teaching does not remedy the

9   deficiency in the disclosure of Hosokawa as applied to patent claims 21 and

10  38 on which claims 33 and 46 depend.  We do not sustain the rejection of

11  claims 33 and 46 under § 103(a).

12      The Examiner rejects claims 34 and 47 under § 103(a) as being

13  unpatentable over Hosokawa, PMO 2005 and Deger.  (RAN 7).  The

14  Examiner and the Requester cite Deger as describing "a drainage section 48

15  with oblique spokes 56, 58 and 60 as noted in paragraphs 66 and 67."

16  (RAN 7; *see also* Req'r Comments, Ex. A at 13-14).  This teaching does not

17  remedy the deficiency in the disclosure of Hosokawa as applied to patent

18  claims 21 and 38 on which claims 34 and 47 ultimately depend.  We do not

19  sustain the rejection of claims 34 and 47 under § 103(a).

20

21  *Second and Third Issues*

22      Claim 60 recites a double seat valve including a flow barrier element

23  "configured as *a spoked wheel* having a plurality of spokes with openings

24  therebetween at least partially defining said leakage space."  (Italics added

25  for emphasis.)  The Examiner adopts the Requester's proposed finding that

18

A000019

Appeal 2014-002822
Reexamination Control 95/001,797; 95/001,834; 95/001,873
Patent No. US 7,891,376 B2

1    "[t]he structure of [Hosokawa's] middle valve body 14, positioned around

2    main valve stem 7 as a hub and with through holes [*sic*] 14' therein, provides

3    the recited 'spoked wheel.'" (*See* RAN 6 (adopting the Requester's "claim

4    charts on pages 1-37 of Exhibit A"); *see also* Req'r Comments, Ex. A at 30;

5    Resp. Br. Req'r 8-11). The Patent Owner argues that one skilled in the art

6    would not interpret the small hole *14'* of the middle valve body *14* in

7    Hosokawa as defining spokes of a spoked wheel. (App. Br. PO 20-23).

8         The Patent Owner does not define the term "spoked wheel" formally

9    in the Specification. Turning instead to the ordinary usage of the term, the

10   term "spoke" denotes "one of the bars that connect the center of a wheel to

11   the rim." (THE FREE MERRIAM-WEBSTER DICTIONARY, http://www.merriam

12   –webster.com/dictionary/spoke (last visited May 20, 2014)("spoke,"

13   entry 2)). A "spoked wheel," then, is a wheel having spokes. This ordinary

14   usage is consistent with the "spoked wheel" depicted in Figure 3b of the

15   ′376 patent.

16        Nothing in Hosokawa describes the structural arrangement of the

17   middle valve body *14* to be that of a spoked wheel. Some structure must

18   connect the middle portion and the outer portion of the middle valve body *14*

19   across the small hole *14'*. (FF 4). Nevertheless, neither Figure 1 nor any of

20   the other drawing figures show spokes or rods connecting the middle portion

21   with the outer portion. Moreover, nothing in the depiction of the middle

22   valve body *14* necessarily requires the small hole *14'* in Figure 1 to be

23   formed or defined by spokes. Therefore, we agree with the Patent Owner's

24   expert that "one of skill in the art would not read the middle valve body . . .

19

Appeal 2014-002822
Reexamination Control 95/001,797; 95/001,834; 95/001,873
Patent No. US 7,891,376 B2

1    as disclosed in Hosokawa to be a spoked wheel." (Second Ostand Decl.,

2    para. 28). We do not sustain the rejection of claims 60-63 and 65-67 under

3    § 102(b) as being anticipated by Hosokawa.

4          The Examiner rejects claim 20 under § 102(b) as being anticipated by

5    Hosokawa or, in the alternative, under § 103(a) as being unpatentable over

6    Hosokawa and Burmester ʹ134. We do not sustain the rejection of claim 20

7    under § 102(b) for the reasons given in connection with the rejection of

8    claim 60 as anticipated by Hosokawa. On the other hand, our review of the

9    rejection of claim 20 under § 103(a) is complicated by the fact that the

10   Patent Owner has not argued the rejection. While this failure may be

11   deemed to constitute a waiver of any such argument, *see* 37 C.F.R.

12   § 41.67(c)(1)(vii) (2011), we note that the Patent Owner did address a

13   similar rejection over the same prior art at pages 23-26 of the Appeal Brief

14   and pages 11-13 of the Rebuttal Brief.

15         Nonetheless, the Patent Owner's arguments are not persuasive. Some

16   structure must connect the middle portion and the outer portion of the

17   middle valve body *14* across the small hole *14ʹ*. (FF 4). Burmester ʹ134

18   describes the use of spokes to support an annular flow control element,

19   namely, a pressure balance piston *3c*, about a middle portion, namely, a

20   shifting rod *3a*. (FF 7). The Examiner correctly concludes that it would

21   have been obvious to use spokes to secure the middle portion and outer

22   portion of Hosokawa's middle valve body *14*, thereby embodying the middle

23   valve body as a spoked wheel. It would have been obvious to one of

24   ordinary skill in the art to modify Hosokawa's middle valve body *14* in this

25   fashion to minimize any negative effects which the connection between the

20

Appeal 2014-002822
Reexamination Control 95/001,797; 95/001,834; 95/001,873
Patent No. US 7,891,376 B2

1    middle and outer portions of the middle valve body might have had on the

2    flow through the small hole *14'* such as restricted flow.  (*See* RAN 6).

3          We sustain the rejection of claim 20 under § 103(a) as being

4    unpatentable over Hosokawa and Burmester '134.  Consequently, we need

5    not address the rejection of claim 20 under § 103(a) as being unpatentable

6    over Burmester '986 and Burmester '134.  *See* 37 C.F.R. § 41.77(a)

7    (2011)("The affirmance of the rejection of a claim on any of the grounds

8    specified constitutes a general affirmance of the decision of the examiner on

9    that claim, except as to any ground specifically reversed.").

10

11    *Fourth Issue*

12          Claim 68 recites a double seat valve "wherein said flow barrier

13    element is at least movable *towards* the first closing element *when* said

14    second closing element is lifted and when cleaning medium is applied to

15    said leakage space."  (Italics added for emphasis.)  The Examiner finds that

16    this limitation is taught by Hosokawa because "[i]n FIG. 3, the top valve

17    body 13 is lifted from its seat while the bottom valve body 8 remains in its

18    seat 4.  Additionally, s[p]ring 15 urges middle valve body 14 downward and

19    onto its seat 6."  (*See* RAN 6 (adopting the Requester's "claim charts on

20    pages 1-37 of Exhibit A"); *see also* Req'r Comments, Ex. A at 33).  The

21    Patent Owner argues that although Hosokawa establishes that "the middle

22    valve body could move at some point in time," Hosokawa does not describe

23    the middle valve body moving "towards the first closing element *when said*

24    *second closing element is lifted and when cleaning medium is applied to said*

25    *leakage space*."  (App. Br. PO 14 (italics in original)).  The Requester argues

21

Appeal 2014-002822
Reexamination Control 95/001,797; 95/001,834; 95/001,873
Patent No. US 7,891,376 B2

1    that the Patent Owner is attempting to read an unclaimed structure for

2    moving the flow barrier element into the claim. (Resp. Br. Req'r 5).

3          The Patent Owner's argument is persuasive. The passage of

4    Hosokawa at page 360, lines 61-67 describes the middle valve body *14* as

5    being capable of sliding freely along a main valve stem *7* of the double seat

6    valve. (FF 3). The passage does not describe when the middle valve body

7    *14* might actually slide, that is, move. In particular, the Patent Owner

8    correctly points out that the passage does not describe the middle valve body

9    *14* as either moving or being capable of movement when the "second closure

10   element," that is, the outer valve body *8*, is lifted. (*See* App. Br. PO 14).

11   Figure 3 of Hosokawa depicts the configuration of the valve bodies *8*, *13*, *14*

12   when the first closure element, that is, the inner valve body *13*, is lifted

13   rather than when the second closure element, that is, the outer valve body *8*,

14   is lifted. Figure 4 of Hosokawa, which depicts the depicts the configuration

15   of the valve bodies *8*, *13*, *14* when the second closure element is lifted, does

16   not indicate any movement of the middle valve body *14* relative to its valve

17   seat *6*.

18         We do not sustain the rejection of claims 68-72 and 74-75 under

19   § 102(b) as being anticipated by Hosokawa. Because neither the Examiner

20   nor the Requester cites Burmester '134 for a teaching which might remedy

21   this deficiency in the disclosure of Hosokawa, we do not sustain the

22   rejection of claim 75 under § 103(a) as being unpatentable over Hosokawa

23   and Burmester '134.

24

25                         DECISION

22

Appeal 2014-002822
Reexamination Control 95/001,797; 95/001,834; 95/001,873
Patent No. US 7,891,376 B2

1       We REVERSE the rejection of claims 7, 21-31, 33-41, 43-54, 58-63,

2    65-72, 74-77 and 81.

3       WE AFFIRM the rejection of claim 20.

4       Requests for extensions of time in this *inter partes* reexamination

5    proceeding are governed by 37 C.F.R. § 1.956 (2011).

6       In the event neither party files a request for rehearing within the time

7    provided in 37 C.F.R. § 41.79, and this decision becomes final and

8    appealable under 37 C.F.R. § 41.81, a party seeking judicial review must

9    timely serve notice on the Director of the United States Patent and

10   Trademark Office.  *See* 37 C.F.R. §§ 90.1 and 1.983.

11

12                          <u>AFFIRMED-IN-PART</u>

13

14

15

16

17   Patent Owner:

18

19   ST. ONGE, STEWARD, JOHNSTON, & REENS

20   986 BEDFORD STREET

21   STAMFORD, CT 06905-5619

22

23

24   Third Party Requester:

25

26   FISCH, HOFFMAN, SIGLER LLP

27   5335 WISCONSIN AVENUE, NW

28   SUITE 830

29   WASHINGTON, DC 20015

23

A000024



US007891376B2

(12) **United States Patent**
Neuhauser et al.

(10) **Patent No.:**     **US 7,891,376 B2**
(45) **Date of Patent:**         **Feb. 22, 2011**

(54) **DOUBLE SEAT VALVE FOR SEPARATING MEDIA**

(75) Inventors: **Frank Neuhauser**, Neresheim (DE); **Stephan Franz**, Noerdlingen (DE); **Wolfgang Neumeyer**, Riesbuerg (DE); **Stephan Thomaschki**, Noerdlingen (DE)

(73) Assignee: **Südmo Holding GmbH** (DE)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 317 days.

(21) Appl. No.: **12/184,725**

(22) Filed: **Aug. 1, 2008**

(65) **Prior Publication Data**

US 2009/0065077 A1     Mar. 12, 2009

(30) **Foreign Application Priority Data**

Aug. 3, 2007     (DE)     ..................... 10 2007 038 124

(51) **Int. Cl.**
**F16K 1/44**     (2006.01)

(52) **U.S. Cl.** ................................. **137/614.18**; 137/312

(58) **Field of Classification Search** ............ 137/614.17, 137/614.18, 312, 240
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 6,009,896 | A | * | 1/2000 | Van Oosten ................. 137/240 |
| 6,098,645 | A | * | 8/2000 | Brackelmann et al. . 137/614.17 |
| 6,186,163 | B1 | * | 2/2001 | Borg ........................... 137/312 |
| 7,530,368 | B2 | * | 5/2009 | Deger ................... 137/614.18 |

| | | |
|---|---|---|
| 2007/0151611 | A1 | 7/2007 Deger |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CA | 2571244 A1 | 5/2007 |
| DE | 19608792 A1 | 9/1997 |
| DE | 102005057103 A1 | 5/2007 |
| EP | 0174384 A1 | 3/1986 |
| JP | 57154564 A | 9/1982 |
| WO | 9854494 A1 | 12/1998 |
| WO | 2007054131 A1 | 5/2007 |

OTHER PUBLICATIONS

International Search Report, Jul. 5, 2006 (2).

* cited by examiner

*Primary Examiner*—Kevin L Lee
(74) *Attorney, Agent, or Firm*—St. Onge Steward Johnston & Reens LLC

(57) **ABSTRACT**

A double seat valve includes a flow barrier element arranged between first and second closing elements. The flow barrier element shadows a first sealing element and/or a first closing element seat of the first closing element which is in a closed position, when the second closing element is lifted and when a cleaning medium is applied to a leakage space, the flow barrier element preventing the cleaning medium from flowing directly against the first sealing element and/or the first closing element seat. The flow barrier element also shadows a second sealing element and/or a second closing element seat of the second closing element which is in a closed position, when the first closing element is lifted and when a cleaning medium is applied to the leakage space, the flow barrier element preventing the cleaning medium from flowing directly against the second sealing element and/or the second closing element seat.

**20 Claims, 18 Drawing Sheets**





Fig. 1

U.S. Patent

Feb. 22, 2011

Sheet 2 of 18

US 7,891,376 B2

A000027



a)    b)    c)    d)

Fig. 2



Fig. 3 a)

Fig. 3 b)



Fig. 4



Fig. 5a

Fig. 4a



Fig. 5



Fig. 6



Fig. 7



Fig. 7a



Fig. 6a



Fig. 6b



Fig. 7b



Fig. 8

A000036



Fig. 9



Fig. 10



Fig. 11



Fig. 12



Fig. 13



Fig. 14



Fig. 15

US 7,891,376 B2

<table>
<tr><td>1</td><td>2</td></tr>
</table>

# DOUBLE SEAT VALVE FOR SEPARATING MEDIA

## CROSS-REFERENCE TO RELATED APPLICATIONS

The present application claims priority of German patent application No. 10 2007 038 124.9 filed on Aug. 3, 2007.

## FIELD OF THE INVENTION

The invention generally relates to double seat valves for separating media.

## BACKGROUND OF THE INVENTION

The invention specifically relates to a double seat valve of the type, comprising a valve housing which has connectors for a first pipeline and a second pipeline, further comprising a first closing element and a first closing element seat which is assigned to the latter, wherein the first closing element is in seal-forming abutment, in its closed position, with the first closing element seat via at least one sealing element, and a second closing element which is spaced apart axially from the first closing element and a second closing element seat which is assigned to said second closing element, wherein the second closing element is, in its closed position, in seal-forming abutment with the second closing element seat via at least one sealing element, wherein the two closing elements can be independently of one another from their respective closing element seat, and wherein a leakage space is provided between the two closing elements.

Such a double seat valve is known from DE 10 2005 057 103 A1.

Double seat valves of the type specified above are used, for example, in the foodstuff industry for manufacturing products such as UHT-milk, yoghurt and the like.

In such double seat valves, stringent requirements are made of the reliable separation of the media which are conducted through the at least two pipelines. In their closed position, the two closing elements separate the two connectors on the inside of the housing in a sealed fashion in relation to one another, and in the common open position of the two closing elements the pipelines which are connected to the two connectors can communicate with one another via the interior of the housing.

A further significant requirement which is made of such double seat valves is that the closing elements, including their closing element seats and the leakage space which is located at least partially between the closing elements, can be thoroughly cleaned.

So that it is not necessary to switch off all the processes in a processing system in which such a double seat valve is used in order to clean the closing elements and the leakage space, which would reduce the productivity of such a processing system, it is desirable if the cleaning process is carried out, for example, by means of one of the two pipelines, while a product process continues to run in the other pipeline. For this purpose, the two closing elements can be lifted from their closing element seat independently of one another. "Lifting" is to be understood in such double seat valves as meaning that one of the two closing elements is moved from its closing element seat by a small stroke to such an extent that there is no longer a seal-forming abutment between the sealing element of this closing element and the associated closing element seat. In this context, the other closing element continues to be in abutment with its closing element seat in a seal-forming

fashion. Through the pipeline and the connector which have the closing element which is lifted assigned to them it is then possible to introduce a cleaning medium, usually a cleaning fluid, between the closing element and the associated valve seat and into the leakage space so that the cleaning medium thoroughly flushes the closing element seat of the closing element which is lifted, and its sealing element and the leakage space.

The cleaning medium then runs outwards via the leakage space into the surroundings of the double seat valve.

The previously mentioned document DE 10 2005 057 103 A1 describes the problem that when the cleaning medium is introduced in accordance with the requirements of more recent standards an additional overpressure must not be formed in the leakage space, which overpressure could lead to the other closing element which is in the closed position being moved away from its closing element seat, with the result that cleaning medium could pass into the other pipeline in which a product process is currently running. In order to overcome this problem, said document proposes providing one of the closing elements with an obliquely positioned drainage section whose overall passage cross section is at least approximately as large as the opening cross section of the larger of the two connectors. This avoids the problem of the build up of overpressure in the leakage space as a result of an excessively small discharge of cleaning medium from the leakage space during cleaning.

However, this only solves the problem of avoiding an overpressure in the leakage space. A further requirement of more recent standards is that when the leakage space is acted on after one of the two closing elements has been lifted, there is no direct flow of cleaning medium against the at least one sealing element or the closing element seat of the other closing element which is in its closed position, because cleaning medium could then get into the other pipeline. The known double seat valve mentioned above does not meet this requirement. If, for example, the lower closing element of the known double seat valve is lifted and if cleaning medium under pressure is introduced into the gap between the closing element and its closing element seat and into the leakage space, the cleaning medium firstly impinges, owing to its essentially axial direction of flow at a high flow rate, on the closing element seat and the sealing element of the upper closing element which is in the closed position, as a result of which, owing to the impact pressure building up, cleaning medium can pass the sealing element of the upper closing element and penetrate the valve housing region through which a product medium is currently flowing.

In a double seat valve which is known from WO 2007/054 131 A1, the problem specified above is intended to be solved by virtue of the fact that, on the one hand, the closing element seat of one of the closing elements has a larger diameter than the closing element seat of the other closing element, with the result that the two closing element seats are offset radially from one another in a stepped fashion. Furthermore, one of the closing elements is provided, on a side facing the other closing element, with a flow-deflecting, concavely curved recess, by which the cleaning medium which penetrates the leakage space axially is deflected radially inward, with the result that the pressurized cleaning medium cannot be applied to the sealing element of the closing element which is in the closed position.

A disadvantage of this known double seat valve is, on the one hand, the complicated contouring of the inside of the housing in the region of the closing element seats and the complicated contouring of the closing elements which is intended to bring about deflection of the seat-cleaning flow of

A000044

US 7,891,376 B2

**3**

cleaning medium in order to avoid the closing sealing element being acted on directly. For this purpose, complex fluidic considerations are necessary in order to find the suitable contouring.

## SUMMARY OF THE INVENTION

The invention is based on the object of developing a double seat valve of the type mentioned at the beginning to the effect that, using structurally simple measures, the cleaning medium is prevented from flowing directly against the at least one sealing element of the closing element which is in the closed position during the lifting of the other closing element, which flow could lead to a impact pressure at the sealing element.

According to the invention, a double seat valve for separating media is provided, comprising a valve housing having connectors for a first pipeline and a second pipeline; a first closing element and a first closing element seat, the first closing element being in seal-forming abutment, in a closed position of the first closing element, with the first closing element seat via at least one first sealing element; a second closing element spaced apart axially from the first closing element and a second closing element seat, the second closing element being, in a closed position of the second closing element, in seal-forming abutment with the second closing element seat via at least one second sealing element; wherein the first and second closing elements can be lifted independently of one another from the respective first and second closing element seats; a leakage space being provided between the first and second closing elements; a flow barrier element arranged between the first and second closing elements, the flow barrier element shadows at least one of the at least one first and second sealing elements, the first or second closing element seats of one of the first or second closing elements which is in the closed position, when the other of the first or second closing elements is lifted and when cleaning medium is applied to the leakage space, the flow barrier element preventing the cleaning medium which enters the leakage space from flowing directly against the at least one of the first and second sealing elements, the first or second closing element seats of the one of the first or second closing element which is in the closed position.

In contrast to the known double seat valve specified at the beginning, in the double seat valve according to the invention a measure is taken to avoid a situation in which the cleaning medium which is flowing in axially through the gap between the closing element which is lifted and its valve seat is applied directly to the sealing element and/or the closing element seat of the respective closing element which is in the closed position, by virtue of the fact that the flow barrier element screens the flow or throws a flow shadow in which the sealing element of the closing element which is in the closed position is located. This avoids a direct flow against the sealing element and/or the closing element seat of the closing element which is in the closed position. In a processing system in which the double seat valve according to the invention is used, it is therefore possible for a product process to run in one pipeline while at the same time when the closing element is correspondingly lifted the leakage space, the closing element seat and the sealing element of the closing element which is lifted can be thoroughly cleaned by means of the other pipeline without there being the risk of cleaning medium penetrating the pipeline in which the product process is currently running.

Providing a separate flow barrier element has, compared to the double seat valve known from WO 2007/054131 A1, the advantage of a structural configuration which is significantly

**4**

simpler, in particular it is not necessary to arrange the two closing element seats with a radial offset with respect to one another in the valve housing. The double seat valve according to the invention therefore advantageously permits a configuration with two closing element seats with the same diameter, as is already the case in the double seat valve which is known from DE 10 2005 057 103 A1. The valve housing is therefore significantly easier and more cost-effective to manufacture. Complicated contouring of the sides of the two closing elements which face one another is also eliminated in the double seat valve according to the invention.

"Shadowing" is to be understood according to the invention as meaning that the cleaning medium is not applied directly, and therefore at a high flow rate, to the sealing element of the respective closing element which is in the closed position, and within the scope of the invention here it is permitted that cleaning medium passes essentially unpressurized and at a low flow rate into the region of the closing element seat or of the sealing element of the closing element which is in the closed position so that a impact pressure cannot build up there.

The further advantage of the flow barrier element provided according to the invention is that, in particular in the case of closing element seats with the same diameters, it can act on two sides, i.e. when the first closing element is lifted, the flow barrier element shadows the second closing element seat or the associated sealing element, and when the second closing element is lifted the flow barrier element shadows the first closing element seat and/or the associated sealing element.

In the simplest case, the flow barrier element can simply be embodied as an annular element which is located between the two closing element seats and has, in the radial direction, a material width which is sufficient for the previously described shadowing effect. This ensures unimpeded discharging of cleaning medium without a pressure build up in the leakage space.

In one preferred refinement, the flow barrier element bears radially on the housing between the two closing element seats at least in the lifting position of the first or second closing element.

It is advantageous here that the shadowing effect or barrier effect extends radially outwards as far as the inside of the housing on which the two closing element seats are located. The flow barrier element does not have to bear against the housing in a completely seal-forming fashion here since, as already mentioned above, it is sufficient if the flow barrier element avoids a situation in which the cleaning medium flows directly against the cleaning element seat or the sealing element of the closing element which is in the closed position. The flow barrier element can therefore be composed of plastic, for example in its housing-side edge region, but it can also be composed of metal, in which case, for example, a sliding ring is then attached to the edge of the flow barrier element.

As an alternative to the refinement mentioned above, the flow barrier element is spaced apart from the housing by a small gap.

It is not absolutely necessary for the flow barrier element to bear on the housing between the two closing element seats in order to avoid a situation in which the cleaning medium acts at a high flow rate on the sealing element and/or the closing element seat of the closing element which is in the closed position. Although cleaning medium can pass through the gap between the flow barrier element and the inside wall of the housing, the small gap reduces the flow rate of the cleaning medium to such an extent that a impact pressure cannot build up in the region of the sealing element of the closing element which is in the closed position. Providing a correspondingly

US 7,891,376 B2

5                                                                    6

small gap between the flow barrier element and the inside wall of the housing has, in the case of axial mobility of the flow barrier element, the advantage that friction does not occur between the flow barrier element and the housing.

In a further preferred refinement, the flow barrier element can be moved axially.

While axial mobility is not absolutely necessary for the purposes of lifting of the one or the other closing element, this measure has the advantage, when completely opening the two closing elements, that the flow barrier element, together with the two closing elements, can move away from the region of the two closing element seats. For axial mobility it is not necessary for the flow barrier element to be provided with its own drive because when the two closing elements move together in the same direction, the flow barrier element can be carried along by the two closing elements owing to its arrangement between said two closing elements.

The axial mobility comprises axial mobility of the flow barrier element relative to at least one of the closing elements and/or mobility together with at least one of the closing elements.

In a further preferred refinement, the flow barrier element has, radially on the outside, a sliding element which bears against the housing, or is itself composed of a slidable material radially on the outside.

It is advantageous here that when the two closing elements move into the open position, the flow barrier element does not form any increased frictional resistance with the inside of the housing, which furthermore has the advantage that after a number of opening and closing strokes the flow barrier element is not subject to any significant wear owing to increased friction.

In a further preferred refinement, in a common open position of the two closing elements, the flow barrier element forms a seal axially against the two closing elements.

In the open position of the two closing elements, i.e. in the open position of the double seat valve, the two pipelines communicate with one another so that a medium can pass from one pipeline into the other pipeline. The open position in such double seat valves is usually brought about by virtue of the fact that one of the closing elements is moved towards the other closing element, and subsequently the two closing elements are moved further in the same direction. Since the flow barrier element is now arranged between the two closing elements, the measure specified above advantageously ensures that medium cannot penetrate between the two closing elements and the flow barrier element and into the leakage space.

In a further preferred refinement, in the closed position of the two closing elements, the flow barrier element is spaced apart axially from the two closing elements by a gap.

Since the flow barrier element is located between the two closing elements, and therefore in the leakage space, this measure advantageously has the effect that when there is a leak in at least one of the sealing elements of the two closing elements, it can be detected despite the presence of the flow barrier element since the leakage can specifically penetrate through the gap between the flow barrier element and the two closing elements and into the leakage space, which can be sensed either through the discharge of the leak into the surroundings or through corresponding detectors.

In a further preferred refinement, the flow barrier element has, on at least a side facing one of the closing elements, a contour which brings about an at least partial deflection of flow of cleaning medium from an axial direction into an essentially radial direction.

Such deflection of the flow by the flow barrier element has the advantage of better flushing of the leakage space and therefore also of the closing element seat of the closing element which is lifted.

In a further preferred refinement, the flow barrier element is arranged loosely between the two closing elements.

This refinement constitutes a structurally advantageously very easy way to implement the flow barrier element between the two closing elements in the leakage space. Owing to the loose arrangement, the flow barrier element is not moved along when one of the two closing elements is lifted, however it is possible to provide that when the pressurized cleaning medium is introduced the flow barrier element has a certain degree of axial play which allows the flow barrier element to take up some of the pressure. Furthermore, the flow barrier element can be forced towards the other closing element by the cleaning medium for the sake of optimum closing of the closing element seat of the closing element which is lifted, and this also increases the effect of the flow barrier in protecting the closing element which is in the closed position. When the two closing elements are opened, the flow barrier element is then moved along between the two closing elements in a sandwich arrangement, as has already been described above.

In this context it is preferred if the flow barrier element is guided axially on a drive element of one of the two closing elements.

Given the loose arrangement of the flow barrier element between the two closing elements, this measure has the advantage that when cleaning medium is applied said flow barrier element cannot tilt in such a way that either the barrier effect is reduced or the flow barrier element cants in the leakage space.

In the context of the two previously specified refinements, the flow barrier element can be embodied as a ring or as a spoked wheel.

In the case of the refinement as a spoked wheel, said spoked wheel can be guided axially on the previously specified drive element of one of the two closing elements, while the intermediate spaces between the spokes ensure a large passage cross section for cleaning medium to be discharged through the flow barrier element.

As an alternative to the previously specified loose arrangement of the flow barrier element between the two closing elements, in one variant there is provision that the flow barrier element is attached to one of the closing elements with relative axially limited play, wherein a spring, whose effect on the flow barrier element is directed away from this closing element, is arranged between this closing element and the flow barrier element.

This refinement has the advantage that, owing to the attachment of the flow barrier element to one of the two closing elements, said flow barrier element is guided in a defined fashion during all movements of the closing elements. The relative axially limited play which is provided in this refinement between the flow barrier element and the closing element to which it is attached and the spring which is provided between this closing element and the flow barrier element have the advantage that in the closed position of this closing element the flow barrier element can be held at a distance from the closing element equivalent to the axial play, with the result that leakage between this closing element and the flow barrier element can penetrate the leakage space if the sealing effect of this closing element fails. When the double seat valve is opened completely, the closing element to which the flow barrier element is attached then moves towards the flow barrier element and in addition presses it against the other

A000046

US 7,891,376 B2

7

closing element, as a result of which, in the open position, the arrangement composed of the first closing element, flow barrier element and second closing element is completely sealed with respect to the leakage space. When pressurized cleaning medium is applied to the leakage space, the flow barrier element can be forced by the cleaning medium towards the closing element to which it is attached, which permits even more thorough cleaning of the closing element seat of the closing element which has been lifted.

In a further alternative refinement, the flow barrier element is mounted in a floating fashion between the two closing elements by means of at least springs which act in opposite directions.

This refinement differs from the previously specified refinement of a flow barrier element which is arranged loosely between the two closing elements in that the two springs which act in opposite directions to one another cause the flow barrier element to have a mechanical operative connection to each of the two closing elements, with the result that the flow barrier element is moved along when a closing element is lifted, similarly to the previously specified variant. In contrast to the previously specified variant in which the flow barrier element is attached to one of the closing elements but is not mechanically operatively connected to the other closing element, there is now the mechanical operative connection to both closing elements but without "rigid" attachment to one or the two closing elements, which brings about symmetry between the lifting processes of the two closing elements. This improves the cleaning of the two closing element seats compared to the previously specified refinement.

Furthermore, the presence of two springs which act in opposite directions has the advantage that when a closing element is lifted the flow barrier element is not moved with the closing element with the same stroke as this closing element which is lifted but rather with a stroke which is about half the lifting stroke with the result that the flow barrier element does not cover the closing element seat of the closing element which is lifted and as a result makes the cleaning of this closing element seat more difficult. Furthermore, the floating arrangement also in turn allows the flow barrier element to be moved, as a result of the pressure of the cleaning medium, towards the other closing element which is in the closed position, and this, on the one hand, increases the flow barrier effect and, on the other hand, improves the cleaning of the closing element seat of the closing element which is lifted.

In a further preferred refinement, a locking mechanism is provided which, when one of the closing elements is lifted, locks the flow barrier element to the other closing element.

This measure is advantageous in particular in conjunction with the previously specified refinement of the double seat valve because the locking mechanism has the effect that despite the mechanical operative connection of the flow barrier element to both closing elements, the flow barrier element remains in the direct vicinity of the other, closed closing element when a closing element is lifted. As a result, the closing element seat of the closing element which is lifted can be even more thoroughly cleaned.

In yet another preferred refinement of this aspect, in the position in which it is locked to the respective closing element, the flow barrier element can move axially with respect to this closing element when pressure is applied.

This permits optimum cleaning of the closing element seat of the closing element which is lifted because when a closing element is lifted, the flow barrier element remains in the direct vicinity of the other closing element and can even be moved further towards it, which is simply brought about by the pressure of the cleaning medium.

8

In one preferred refinement of the locking mechanism, the flow barrier element has a sleeve which is arranged radially between a first drive element of the first closing element and a second drive element of the second closing element and can move axially in relation to the two drive elements, wherein the locking mechanism has at least one locking element which is connected to the sleeve and which is held in such a way that it engages alternately in recesses in the first or second drive element in order to lock the sleeve to the respective closing element.

This measure has the advantage of a structurally very simple design of the locking mechanism which requires few parts in permitting the previously specified locking of the flow barrier element to the respective closing element which is in the closed position when the other closing element is lifted.

In a further preferred refinement, the flow barrier element has a drainage section whose overall passage cross section is at least as large as the opening cross section of the larger of the two connectors.

This refinement is advantageous in particular in conjunction with those refinements of the flow barrier element in which the flow barrier element is connected centrally via a connecting section to the drive of the closing elements and is guided axially in this way. In this refinement, the drainage section of the flow barrier element ensures that the requirement, mentioned in the introduction to the description, to avoid a build up of overpressure in the leakage space when cleaning medium is introduced is met by virtue of the fact that a sufficient amount of cleaning medium can be discharged through the drainage section of the flow barrier element.

In a preferred structural refinement the drainage section has a plurality of spokes which are directed obliquely with respect to the radials.

This refinement which is known per se from DE 10 2005 057 103 A1 for one of the closing elements brings about the same advantages for the flow barrier element in that the oblique position of the drainage section to be maximized without increasing the diameter of the element influenced by flow.

Further advantages and features emerge from the following description and the appended drawing.

Of course, the features which are specified above and are to be explained below can be used not only in the respectively indicated combination but also in other combinations or alone without departing from the scope of the present invention.

BRIEF DESCRIPTION OF THE DRAWINGS

Exemplary embodiments of the invention are illustrated in the drawing and will be explained in more detail below with reference thereto. In said drawing:

FIG. 1 shows a double seat valve in a detail and in longitudinal section according to a first exemplary embodiment, wherein the double seat valve is shown in a first operating state in the left-hand half of the drawing and in a second operating state in the right-hand half of the drawing;

FIGS. 2a) to d) show four detail views of the double seat valve in FIG. 1 in four different operating positions of the double seat valve;

FIGS. 3a) and b) show a flow barrier element of the double seat valve in FIG. 1 on its own and on an enlarged scale, with FIG. 3a) being a longitudinal section and FIG. 3b) being a perspective view of the flow barrier element;

US 7,891,376 B2

9                                                          10

FIG. **4** shows a detail of a double seat valve in longitudinal section according to a further exemplary embodiment in a first operating position;

FIG. **4A** shows a detail view of the double seat valve in FIG. **4**;

FIG. **5** shows the double seat valve in FIG. **4** in a second operating state;

FIG. **5A** shows a detail view of the double seat valve in the operating position according to FIG. **5** on an enlarged scale;

FIG. **6** shows the double seat valve in FIG. **4** in a third operating position;

FIG. **6A** shows a detail view of the double seat valve in the operating position according to FIG. **6**;

FIG. **6B** shows a further detail view of the double seat valve in the operating position according to FIG. **6**;

FIG. **7** shows the double seat valve in FIG. **4** in a fourth operating state;

FIG. **7A** shows a detail view of the double seat valve in the operating state according to FIG. **7**;

FIG. **7B** shows a further detail view of the double seat valve in the operating state according to FIG. **7**;

FIG. **8** shows yet another exemplary embodiment of a double seat valve (a detail thereof) in a first operating state and in longitudinal section;

FIG. **9** shows the double seat valve in FIG. **8** in a second operating state;

FIG. **10** shows yet another exemplary embodiment of a double seat valve (a detail thereof) in a first operating state and in longitudinal section;

FIG. **11** shows the double seat valve in FIG. **10** in a second operating state;

FIG. **12** shows yet another exemplary embodiment of a double seat valve (a detail thereof) in a first operating state and in longitudinal section;

FIG. **13** shows the double seat valve in FIG. **12** in a second operating state;

FIG. **14** shows the double seat valve in FIG. **12** in a third operating state; and

FIG. **15** shows the double seat valve in FIG. **12** in a fourth operating state.

DETAILED DESCRIPTION OF THE INVENTION

FIG. **1** illustrates a double seat valve which is provided with the general reference sign **10** and has the purpose of separating incompatible media. Further details of the double seat valve **10** are shown in FIGS. **2**a) to d) and in FIGS. **3**a) and b).

The double seat valve **10** is used, for example, in a food-stuff processing system which is used to manufacture food-stuffs.

The double seat valve **10** has a valve housing **12** which has a first valve housing section **14** and a second valve housing section **16**. A first connector for connecting a first pipeline (not illustrated) to the double seat valve **10** is arranged on the first valve housing section **14**, and a second connector **20** for connecting a further pipeline (not illustrated) to the double seat valve **10** is arranged on the second valve housing section **16**, the connectors **18** and **20** in the exemplary embodiment shown being arranged offset with respect to one another by 90° with respect to a longitudinal centre axis **22** of the double seat valve **10**. In the present description, the longitudinal centre axis **22** defines the axial direction of the double seat valve **10**.

Between the first valve housing section **14** and the second valve housing section **16**, the valve housing **12** has a connecting section **24** which bounds, on the inside, a connecting

opening **26** via which the interiors of the valve housing sections **14** and **16** communicate with one another in the open state of the double seat valve **10**, as will be described below.

The connecting opening **26** has a free cross section which is at least as large as the opening cross section of the largest of the connectors **18** and **20**, respectively.

A first closing element **28** and a second closing element **30** are arranged in the valve housing **12**. The first closing element **28** is, without restricting the general application, embodied in the form of a valve disc, and the second closing element **30** is embodied in the form of a closing sleeve.

The first closing element **28** has at least one, here precisely one, sealing element **32** which, in the closed position of the first closing element **28** (left-hand half of the drawing in FIG. **1**), abuts with a first closing element seat **34** in a seal-forming fashion, wherein the first closing element seat **34** is arranged on the inside of the connecting section **34** of the valve housing **12**. The second closing element **30** correspondingly has at least one, here precisely one, sealing element **36** which, in the closed position of the second closing element **36** (left-hand half of the drawing in FIG. **1**), abuts with a second closing element seat **38** in a seal-forming fashion.

Both the sealing element **32** and the sealing element **36** are radially seal-forming sealing elements. As is apparent from FIG. **1**, the first closing element seat **34** and the second closing element seat **38** are spaced apart axially from one another and both have the same diameter on the inside of the connecting section **24** of the valve housing **12**.

The first closing element **28** is connected to a drive element **40**, and the second closing element **30** is connected to a drive element **42**, and this connection can be in one piece or multiple pieces, with the drive elements **40** and **42** being connected to a control mechanism (not illustrated and known per se) for axially moving the closing elements **28** and **30**.

The second closing element **30** is connected to the drive element **42** via a drainage section **44**, which is embodied as described in DE 10 2005 057 103 A1, to which reference is made for further details and whose disclosure content is included in the present application.

Between the first closing element **28** and the second closing element **30** there is a leakage space **46** which, in the closed state of the double seat valve **10** (left-hand half of the drawing in FIG. **1**), serves to permit leakage to be discharged through the drainage section **44** of the closing element **30** into the external surroundings in order to permit a leakage state to be detected when there is a leak in one or both of the sealing elements **32**, **36**.

The left-hand half of the drawing in FIG. **1** shows the closing elements **28** and **30** in their common closed position in which the interior of the valve housing section **14** is closed off in a hermetically sealed fashion from the interior of the valve housing section **16**.

The right-hand half of the drawing in FIG. **1** shows the two closing elements **28** and **30** in their common open position in which the closing elements **28** and **30** are moved away from their respective valve seat **34**, **38** by corresponding activation of the control drive via the drive elements **40** and **42**, with the result that the connecting opening **26** between the valve housing sections **14** and **16** is opened. In this case, for example a product medium can be transferred from the connector **18** into the connector **20**.

However, the double seat valve **10** has, in addition to these two operating states shown in FIG. **1**, two further operating states which are referred to as "lifting" one of the respective two closing elements **28** or **30**.

FIG. **2**a) shows an operating state in which the second closing element **30** is lifted from its closing element seat **38**.

US 7,891,376 B2

11      12

The lifting stroke is of just such a size that the sealing element **36** of the closing element **30** moves out of abutment with the closing element seat **38**.

The closing element **28** remains in its seal-forming closed position during the lifting of the closing element **30**, as is apparent from FIG. 2*a*).

FIG. 2*b*) shows an operating state in which the first closing element **28** is lifted from its closing element seat **34**, with the result that the sealing element **32** is no longer in seal-forming abutment with the closing element seat **34**. In contrast, in this operating position the second closing element **30** is in its seal-forming closed position, as is apparent from FIG. 2*b*).

The operating state according to FIG. 2*a*) serves to introduce a cleaning medium through a gap **48** between the closing element **30** and the valve seat **38** and into the leakage space **46** according to an arrow **50**. The direction of introduction is essentially axial here. The cleaning medium is fed here via the connector **20** and the pipeline which is connected thereto. In particular the sealing element **48** and the valve seat **38** and also the interior of the leakage space **46** are thoroughly cleaned with the cleaning medium.

In the operating state according to FIG. 2*b*), a pressurized cleaning medium is fed in via the connector **18** and the pipeline connected thereto, and is fed into the leakage space **46** via a gap **52** between the closing element **28** and the valve seat **34**.

In both cases according to FIGS. 2*a*) and *b*) it is necessary to ensure that the cleaning medium which is introduced axially does not flow against the sealing element (sealing element **32** in FIG. 2*a*) and sealing element **36** in FIG. 2*b*)) which is respectively in seal-forming abutment and/or against the associated closing element seat **34** and **38**, respectively, in such a way that the cleaning medium penetrates into the respective other valve housing section **14** or **16**, respectively, between the sealing element **32** or **36**, respectively, which is in seal-forming abutment and the associated closing element seat **34** and **38**, respectively. This ensures that, by means of the respective valve housing section **14** or **16** whose associated closing element **28** or **30** is in its closed position, a product process can run without the product medium being contaminated by the cleaning medium.

In order to meet these previously specified requirements, a flow barrier element **54** is arranged between the first closing element **28** and the second closing element **30**. The flow barrier element **54** avoids a direct action on, or direct flow against, the sealing element or the associated closing element seat which is being acted upon, while the other closing element is lifted. In FIG. 2*a*), the flow barrier element **54** therefore prevents the sealing element **32** or the closing element seat **34** of the first closing element **28** from being acted on directly, and in FIG. 2*d*) the flow barrier element **54** prevents the cleaning medium being applied directly to the sealing element **36** or the closing element seat **38** of the closing element **30** by virtue of the fact that the flow barrier element **54** shadows or screens the sealing element or the closing element seat of the closing element which is in the closed position.

The flow barrier element **54** will firstly be described in more detail with reference to FIGS. 3*a*) and 3*b*). The flow barrier element **54** has an annular element **56** which extends around the entire circumference and whose outer diameter corresponds to the inner diameter of the connecting section **24** of the valve housing **12**. The annular element **56** constitutes the actual flow barrier. The annular element **56** accommodates a sliding element **58** which bears radially on the housing side in the closed position of the two closing elements **28**, **30** according to FIG. **1** (left-hand half of the drawing) and bears on the housing side in the lifting positions of

the closing element **30** according to FIG. 2*a*) or of the closing element **28** according to FIG. 2*b*). The sliding element **58** does not perform a seal-forming function here with respect to the connecting section **24** of the valve housing **12** but rather is merely intended to avoid a situation in which the cleaning medium under pressure can penetrate between the inside of the connecting section **24** and the outside of the annular element **56**.

In an alternative refinement of the flow barrier element, the sliding element **58** can also be absent, with the result that a small gap remains free between the flow barrier element **54** and the inside of the connecting section **24** of the valve housing **12**, as a result of which cleaning medium can pass through the gap but the flow rate of the cleaning medium is greatly reduced by the gap effect, with the result that impact pressure cannot build up at the closing element seat which is in the closed position or at the associated sealing element of the respective closing element.

The flow barrier element **54** has radially on the inside a connecting section **60** with which the flow barrier element **54** in the exemplary embodiment according to FIG. **1** is connected to the drive element **40** of the closing element **28** or attached thereto.

Between the annular element **56** and the connecting section **60**, the flow barrier element **54** has a drainage section **62** which has a plurality of spokes **64** between which there are correspondingly a plurality of openings **66** whose overall passage cross section is at least as large as the opening cross section of the larger of the two connectors **18** and **20**, respectively. In order to achieve this, the spokes and therefore the openings **66** are positioned obliquely with respect to the radial direction, i.e. the spokes **64** have an axial component between the annular element **56** and the connecting section **60**.

The flow barrier element **54**, to be more precise the annular element **56** of the flow barrier element, has, on the side facing the closing element **30**, a contour **68** (cf. FIG. 2*a*)) which brings about at least partial deflection of the flow of the cleaning medium from its axial direction according to the arrow **50** into an essentially radial direction, as indicated in FIG. 2*a*) with an arrow **70**. The contour **68** is embodied here in the form of a concavely curved chute.

On the side facing the closing element **28**, the flow barrier element **54**, to be more precise the annular element **56** of the flow barrier element **54**, has a contour **72** which is embodied in such a way that the side of the annular element **56** which faces the closing element **28** runs radially inward and obliquely downward. The contours **68** and **72** of the flow barrier element **54** mainly have the function of distributing satisfactorily the pressurized cleaning medium in the leakage space **46**, and do not have the primary function of preventing the closing element seat or the associated sealing element which faces away from the cleaning medium entry from being acted on directly. The presence of the flow barrier element **54** even without the contours **68** and **72** already does this.

As already mentioned above, the flow barrier element **54** in the exemplary embodiment according to FIG. **1** is attached to the first closing element **28** and as a result guided axially, and here the flow barrier element **54** still has a certain degree of axially limited play with respect to the first closing element **28**. For this purpose, the flow barrier element **54** is seated with its connecting section **60** between a first sleeve **74**, which is non-movably connected to the first closing element **28**, and a second sleeve **76**, which can move, with the axially limited play, in the axial direction in relation to the first sleeve **74**, and which presses the second sleeve **76**, and therefore the connecting section **60**, axially away from the first closing element

A000049

US 7,891,376 B2

13                                                    14

28 by means of a spring **78** which is supported at one end on the closing element **28** and at the other end on the second sleeve **74** and is embodied as a compression spring and whose effect on the flow barrier element **54** is, in other words, directed away from the closing element **28**.

The meaning of the axially limited play between the flow barrier element **54** and the closing element **28** and the pre-stress of the flow barrier element **54** in the direction away from the closing element **28** will be described below.

In the common closed position of the closing elements **28** and **30** according to FIG. **1** (left-hand half of the drawing, or FIG. 2*d*)), the flow barrier element **54**, to be more precise the annular element **56** thereof, is at an axial distance both from the closing element **28** and from the closing element **30**, which is brought about by means of the spring **78**. In this operating state, there is a gap **80** between the closing element **28** and the annular element **56** of the flow barrier element **54**, and there is a corresponding gap **82** between the annular element **56** of the flow barrier element **54** and the closing element **30**. The gaps **80** and **82** serve to ensure that, in the case of undesired leakage of the closing element **28** and/or the closing element **30**, leakage fluid runs through the gap **80** or **82** and into the leakage space **46** and is discharged into the surroundings through the drainage section **62** of the flow barrier element **54** and the drainage section **44** of the closing element **30** and can therefore be detected.

When the first closing element **28** is lifted, the flow barrier element **54** is moved axially together with the closing element **28** by virtue of its attachment to said closing element **28**.

When the double seat valve **10** is transferred from the common closed position of the closing elements **28** and **30** according to the left-hand half of the drawing in FIG. **1** into the common open position according to the right-hand half of the drawing in FIG. **1**, the closing element **28** firstly moves against the flow barrier element **54** by overcoming the axially limited play between the closing element **28** and the flow barrier element **54**, and the closing element **28** and the flow barrier element **54** then both move together against the clos-ing element **30** in order to also move it from its closing element seat **38** into the open position. The axially limited play between the closing element **28** and the flow barrier element **54** accordingly serves, inter alia, to close the gap **80** in the common open position of the closing elements **28** and **30**. The gap **82** between the annular element **56** and the closing element **30** closes here owing to the fact that the flow barrier element **54** can move relative to the closing element **30**.

In order to ensure that there is a seal between the closing elements **28**, **30** and the annular element **56** of the flow barrier element **54** in the common open position of the closing ele-ments **28** and **30**, an axially acting sealing element **84** is arranged on the closing element **28**, and an axially acting sealing element **86** is arranged on the closing element **30**, which sealing elements **84** and **86** come into abutment in a seal-forming fashion with the flow barrier element **54**, to be more precise with the annular element **56**, in the common open position of the closing elements **28** and **30**.

When the closing element **30** is lifted according to FIG. 2*a*), the flow barrier element **54** remains in its position, while maintaining the gap **80** to the closing element **28**, since it does not have any mechanical operative connection to the closing element.

FIGS. **4** to **7** illustrate a further exemplary embodiment of a double seat valve **10**a. All the elements and parts of the double seat valve **10**a which correspond to those parts or elements of the double seat valve **10** are provided with the same reference sign as in the double seat valve **10**, with an additional letter a.

In so far as certain parts, elements or aspects of the double seat valve **10**a are not described in the following description, the corresponding description of these parts, elements or aspects of the double seat valve **10** with respect to the double seat valve **10**a applies equally.

Essentially only the differences between the double seat valve **10**a and the double seat valve **10** will be described below.

In the case of the double seat valve **10**a, the flow barrier element **54**a is not attached to one of the two closing elements **28**a and **30**a, respectively, but rather is mounted in a floating fashion between these two components.

For this purpose, the flow barrier element **54**a is mounted between the closing elements **28**a and **30**a by means of two springs **90** and **92** which act in opposite directions, the spring **90** being supported between the closing element **28**a and the flow barrier element **54**a, and the spring **92** being supported between the closing element **30**a and the flow barrier element **54**a.

The flow barrier element **54**a also has a sleeve **94** which is arranged between the drive element **40**a of the closing ele-ment **28**a and the drive element **42**a of the closing element **30**a so as to be capable of moving axially in relation to the two components. The springs **90** and **92** are supported here on a headpiece **96** of the sleeve **94**. The spring **90** acts here on the sleeve **94** in the direction of the closing element **30**a, and the spring **92** acts on the sleeve **94** in the direction of the closing element **28**a.

FIG. **4** shows the double seat valve **10**a in an operating state in which the two closing elements **28**a and **30**a are in their closed position.

FIG. **4**A shows the detail A in FIG. **4** on an enlarged scale. It is again apparent that in this operating state the gap **80**a or **82**a is present between the closing elements **28**a and **30**a and the respectively facing side of the annular element **56**a of the flow barrier element **54**a.

FIG. **5** shows the double seat valve **10**a in the common open position of the closing elements **28**a and **30**a with the flow barrier element **54**a which is held here in a sandwich arrangement, and in this operating position here the leakage space **46**a is hermetically sealed with respect to the interior of the valve housing **12**a, which is ensured by the sealing ele-ments **84**a and **86**a of the closing elements **28**a and **30**a.

FIG. **5**A illustrates the detail B in FIG. **5** on an enlarged scale, with FIG. **5**A showing the axial seal of the closing elements **28**a and **30**a with respect to the annular element **56**a of the flow barrier element **54**a.

FIG. **6** shows the double seat valve **10**a in an operating state in which the closing element **28**a is lifted from its closing element seat **34**a for the purpose of introducing a pressurized cleaning medium.

In this operating state, there is now a difference from the corresponding operating position of the double seat valve **10** according to FIG. 2*b*). While in the case of the lifting of the closing element **28** of the double seat valve **10** according to FIG. 2*b*) the flow barrier element **54** follows the closing element **28** in its lifting stroke owing to the attachment of said flow barrier element **54** to the closing element **28**, the flow barrier element **54**a of the double seat valve **10**a in the oper-ating position according to FIG. **6** remains approximately in the same position as in the common closed position of the closing elements **28**a and **30**a, as is apparent from the enlarged detail C (FIG. **6**) in FIG. **6**A. This is ensured by a

A000050

US 7,891,376 B2

15

locking mechanism **98** which is described with respect to FIG. **6**B, which is an enlarged illustration of the detail E in FIG. **6**.

The locking mechanism **98** locks the flow barrier element **54**a in the case of lifting of the closing element **28**a to the closing element **30**a, and conversely the locking mechanism locks the flow barrier element **54**a to the closing element **28**a when the closing element **30**a is lifted.

The locking mechanism **98** locks the flow barrier element **54**a in the case of lifting of the closing element **28**a to the closing element **30**a, and conversely the locking mechanism locks the flow barrier element **54**a to the closing element **28**a when the closing element **30**a is lifted.

The locking mechanism **98** has one or more locking elements **100** which engages/engage with the sleeve **94** to which the flow barrier element **54**a is permanently connected. The locking elements **100** are embodied in the form of spheres which are arranged in radially open recesses in the sleeve **94**. Furthermore, the locking mechanism **98** has at least one recess **102** in the closing element **28**a or in its drive element **40**a, and at least one recess **104** in the closing element **30**a or in its drive element **42**a. The locking elements **100** are arranged so as to be radially movable in the recesses **102** and **104** in the sleeve **94**.

When the closing element **28**a is lifted, the locking elements **100** engage in the recess **104** in the drive element **42**a of the closing element **30**a and are held therein in a radially non-movable fashion, as a result of which the sleeve **94**, and therefore the flow barrier element **54**a, is connected to the drive element **42**a and therefore to the closing element **30**a in such a way that the flow barrier element **54**a cannot move axially towards the closing element **28**a.

In the converse operating state according to FIG. **7**, in which the closing element **30**a is lifted, the locking mechanism **98** brings about a situation, as in FIG. **7**B which shows the detail F in FIG. **7** on an enlarged scale, in which the flow barrier element **54**a is connected to the closing element **28**a and cannot move away from the latter in the direction of the closing element **30**a. In this case, the locking elements **100** engage in the recess or recesses **102** in the closing element **40**a and/or the closing element **28**a and are held therein in a radially non-movable fashion.

The fact that while one closing element is lifted the flow barrier element **54**a is connected to the other closing element which remains in its closed position has the advantage that the closing element seat of the closing element which is lifted is not concealed by the annular element **56**a of the flow barrier element **54**a, with the result that particularly good cleaning of the closing element seat of the closing element which is lifted is made possible.

FIG. **7**A, which shows the detail D in FIG. **7** on an enlarged scale, makes it clear that the flow barrier element **54**a is connected to the closing element **28**a, while the closing element **30**a is lifted from its closing element seat **38**a.

In the operating states according to FIGS. **6** and **7** it is clear that owing to the floating mounting of the flow barrier element **54**a, when the pressurized cleaning medium is applied to said flow barrier element **54**a, the latter continues to be capable of moving axially towards the respective closing element to which it is locked, while only the axial mobility with respect to the closing element which is lifted is locked. This can be achieved by means of corresponding axial play of the locking elements **100** in the recesses **102** and **104**, which play only permits movement in the direction of the closed closing element. As a result of the axial mobility of the flow barrier element **54**a towards the respective closing element to which it is connected, the flow barrier element **54**a, to be more

16

precise its annular element **56**a, can take up and attenuate the pressure of the injected cleaning medium.

FIGS. **8**, **9**, **10** and **11** illustrate further exemplary embodiments of a double seat valve **10**b and **10**c in the region of their closing elements **28**b, **28**c and **30**b, **30**c. The associated valve housings **12**b and **12**c are illustrated only in the region of the connecting section **24**b and **24**c.

The double seat valves **10**b and **10**c illustrate very simple refinements of the double seat valve according to the invention.

Again, identical reference signs have been used for identical or comparable parts or elements to those in the double seat valve **10**, with the additional letter b or c.

In the case of the double seat valve **10**b according to FIGS. **8** and **9**, the flow barrier element **54**b is merely formed by the annular element **56**b which is arranged between the closing elements **28**b and **30**b. FIG. **8** shows the common closed position of the closing elements **28**b and **30**b. The flow barriers **54**b are arranged loosely between the closing elements **28**b and **30**b, and they are also not guided axially on one of the drive elements **40**b or **42**b of the closing elements **28**b and **30**b, respectively.

In this particularly simple refinement, the radially inner region of the flow barrier element **54**b is embodied completely as a drainage section **62**b.

Neither closing element **28**b nor closing element **30**b when lifted moves the flow barrier element **54**b axially.

However, owing to its loose or "flapping" arrangement between the two closing elements **28**b and **30**b, said flow barrier element **54**b comes to bear against the closing element **30**b owing to the pressure of the cleaning medium when, for example, the closing element **28**b is lifted, and it prevents pressurized cleaning medium from being applied directly to the latter.

In the common open position of the closing elements **28**b and **30**b according to FIG. **9**, the closing elements **28**b and **30**b are sealed with respect to the annular element **56**b, which is made possible in the case of the embodiment of the annular element **56**b from a plastic without additional axial sealing elements in the closing elements **28**b and **30**b.

It is sufficient for this that the closing elements **28**b and **30**b have axial projections **106** and **108**, respectively, which are pressed against the annular element **56**b of the flow barrier element **54**b in the common open position of the closing elements **28**b and **30**b.

The double seat valve **10**c according to FIGS. **10** and **11** has a very similar configuration compared to the double seat valve **10**b, with the flow barrier element **54**c being also arranged loosely between the closing elements **28**c and **30**c, but being embodied, like the flow barrier element **54** or **54**a, as a spoked wheel which has a plurality of spokes with openings lying between them, in order to form the drainage section **62**c. The flow barrier element **54**c has, radially on the inside, the connecting section **60**c with which the flow barrier element **54**c is mounted on the drive element **42**c of the closing element **30**c, without, however, being connected permanently to one of the two closing elements **28**c and **30**c, respectively.

In this embodiment, the flow barrier element **54**c is also preferably constructed entirely or partially from plastic/elastomer or from a carrier material and elastomer, in which case the connecting section **60**c is compressible so that in the common open position of the closing elements **28**c and **30**c the annular element **56**c of the flow barrier element **54**c can enter into axially seal-forming abutment with the closing elements **28**c and **30**c, as illustrated in FIG. **11**.

FIGS. **12** to **15** illustrate yet another exemplary embodiment of a double seat valve which is provided with the general

US 7,891,376 B2

<table>
<tr><td>17</td><td>18</td></tr>
</table>

reference sign 10d. Such parts, elements and features which are the same as or comparable to those of the double seat valve according to FIG. 1 are provided with the same reference sign, with an additional letter d.

Unless described otherwise below, the same description as for the double seat valve 10 or the double seat valve 10a applies to the double seat valve 10d.

Similarly to the double seat valve 10a, the flow barrier element 54d is mounted in a floating fashion between the two closing elements 28d and 30d by means of two springs 110 and 112 which act in opposite directions.

Both the upper spring 110 and the lower spring 112 are embodied as compression springs.

The spring 110 is clamped in under tension in a spring housing 114, the spring housing 114 having an end side 116 against which a sleeve 118 is supported, said sleeve 118 being in turn supported against the drive element 40d of the closing element 28d. On the side opposite the end side 116, the spring housing 114 is supported on a radially inwardly directed projection on the drive element 40d of the closing element 28d. The spring housing 114 therefore compresses the spring 110 in order to obtain a certain degree of prestress of the spring 110.

The spring housing 114 is held in a non-movable fashion in relation to the closing element 28d or its drive element 40d.

The lower spring 112 is also enclosed under prestress. The spring 112 is arranged in a spring housing 122 which is formed by a sleeve 124, which is connected to the flow barrier element 54d, and a closure 126. The closure 126 is permanently connected to the sleeve 124. Opposite the closure 126, the spring 112 is supported on a disc 127.

Between the radial projection 120 on the drive element 40d of the closing element 28d and the closure 126, there is a gap 130 in the common closed position of the closing elements 28d and 30d which is shown in FIG. 12.

FIG. 13 illustrates the operating state of the double seat valve 10d in which the two closing elements 28d and 30d are moved into their open position, in which case the flow barrier element 54d is held in a sandwich arrangement between the two closing elements 28d and 30d and is sealed with respect to these two closing elements 28d and 30d.

In order to move the two closing elements 28d and 30d and entrain the flow barrier element 54d into the common open position, the drive element 40d of the closing element 28d is firstly moved downward, in which case the gap 130 is closed by means of a relative movement between the drive element 40d and the sleeve 124 according to FIG. 12. As a result, the closing element 28d is moved against the annular element 56d of the flow barrier element 54d. The upper spring 110 is compressed somewhat further here by virtue of the fact that the disc 128, which is axially movable in relation to the spring housing 114, is pressed upwards by the closure 126.

Through further axial movement of the drive element 40d in the downward direction, the radial projection 120 presses the sleeve 124 downwards, and since the sleeve 124 can move in relation to the drive element 42d of the closing element 30d, the lower spring 112 is also compressed somewhat further than in its position in FIG. 12.

The annular element 56d is moved here against the closing element 30d, and through further movement of the drive element 40d in the downward direction the entire arrangement composed of the closing element 28d, flow barrier element 54d and closing element 30d is moved into the open position shown in FIG. 13.

FIG. 14 shows the operating state of the double seat valve 12d in which the closing element 28d is lifted from its closing

element seat 34d, while the closing element 30d continues to be in abutment in a seal-forming fashion with its closing element seat 38d.

When the closing element 28d is lifted, its drive element 40d is moved upwards. The spring 110 remains here in the state as in the common closed position of the two closing elements 28d and 30d according to FIG. 12. This is due to the fact that the radially inner projection 120 moves along the spring housing 114 and the disc 128 upwards. In the process, the drive element 40d also moves relative to the closure 126 which is permanently connected to the sleeve 124. Since the drive element 40d can move axially in relation to the sleeve 124, the sleeve 124, and therefore the flow barrier element 54d, remain in their position according to FIG. 12 when the closing element 28d is lifted, as is apparent from FIG. 14.

FIG. 15 shows the converse operating state to that in FIG. 14, the closing element 30d being lifted from its closing element seat 38d here while the closing element 28d continues to be in seal-forming abutment with its closing element seat 34d.

In order to lift the closing element 30d, its drive element 42d is moved downwards. Since the drive element 42d can move axially in relation to the sleeve 124 to which the flow barrier element 54d is connected, and owing to the enclosure of spring 112, which retains its compressed state as in FIG. 12, the flow barrier element 54d also remains in its position according to FIG. 12 when the closing element 30d is lifted, as is apparent from FIG. 15. Therefore, essentially the same effect as with the double seat valve 10a is achieved, specifically when one of the closing elements 28d, 30d is lifted the flow barrier element remains essentially in its home position and is not moved along with said closing element 28d or 30d, without the need for the flow barrier element 54d to be locked to the closing elements in order to ensure this.

The invention claimed is:
1. A double seat valve for separating media, comprising:
a valve housing having connectors for a first pipeline and a second pipeline;
a first closing element and a first closing element seat, said first closing element being in seal-forming abutment, in a closed position of said first closing element, with said first closing element seat via at least one first sealing element;
a second closing element spaced apart axially from said first closing element and a second closing element seat, said second closing element being, in a closed position of said second closing element, in seal-forming abutment with said second closing element seat via at least one second sealing element;
wherein said first and second closing elements can be lifted independently of one another from said respective first and second closing element seats;
a leakage space being provided between said first and second closing elements;
a flow barrier element arranged between said first and second closing elements;
wherein said flow barrier element shadows at least one of said at least one first sealing element and said first closing element seat of said first closing element which is in said closed position, when said second closing element is lifted and when cleaning medium is applied to said leakage space, said flow barrier element preventing said cleaning medium which enters said leakage space from flowing directly against said at least one of said first sealing element and said first closing element seat of said first closing element; and

US 7,891,376 B2

19

wherein said flow barrier element shadows at least one of said at least one second sealing element and said second closing element seat of said second closing element which is in said closed position, when said first closing element is lifted and when cleaning medium is applied to said leakage space, said flow barrier element preventing said cleaning medium which enters said leakage space from flowing directly against said at least one of said second sealing element and said second closing element seat of said second closing element.

**2**. The double seat valve of claim **1**, wherein said flow barrier element bears radially on said housing between said first and second closing element seats at least when said first closing element is lifted from said first closing element seat or when said second closing element seats at least when said first closing element seat.

**3**. The double seat valve of claim **1**, wherein said flow barrier element is spaced apart from said housing by a small gap.

**4**. The double seat valve of claim **1**, wherein said flow barrier element can be moved axially.

**5**. The double seat valve of claim **2**, wherein said flow barrier element has, radially on an outside of said flow barrier element, a sliding element which bears against said housing.

**6**. The double seat valve of claim **2**, wherein said flow barrier element is composed of a slidable material radially on an outside of said flow barrier element.

7. The double seat valve of claim **1**, wherein, in a common open position of said first and second closing elements, said flow barrier element forms a seal axially against said first and second closing elements.

**8**. The double seat valve of claim **1**, wherein, in said closed position of said first and second closing elements, said flow barrier element is spaced apart axially from said first and second closing elements by a gap.

**9**. The double seat valve of claim **1**, wherein said flow barrier element has, on at least a side facing one of said first and second closing elements, a contour which brings about an at least partial deflection of flow of said cleaning medium from an axial direction into an essentially radial direction.

**10**. The double seat valve of claim **1**, wherein said flow barrier element is guided axially on a drive element of one of said first and second closing elements.

**11**. The double seat valve of claim **1**, wherein said flow barrier element is embodied as a ring.

20

**12**. The double seat valve of claim **1**, wherein said flow barrier element is arranged loosely between said first and second closing elements.

**13**. The double seat valve of claim **1**, wherein said flow barrier element is attached to one of said first and second closing elements with relative axially limited play, wherein at least one spring, whose effect on said flow barrier element is directed away from said one of said first and second closing elements, is arranged between said one of said first and second closing element and said flow barrier element.

**14**. The double seat valve of claim **1**, wherein said flow barrier element is mounted in a floating fashion between said first and second closing elements by means of at least two springs which act in opposite directions.

**15**. The double seat valve of claim **1**, wherein a locking mechanism is provided, which, when one of said first and second closing elements is lifted, locks said flow barrier element to the other of said first and second closing elements.

**16**. The double seat valve of claim **15**, wherein, in a position in which said flow barrier element is locked to a respective one of said first and second closing elements, can move axially with respect to said respective one of said first and second closing elements when pressure is applied.

**17**. The double seat valve of claim **15**, wherein said flow barrier element has a sleeve which is arranged radially between a first drive element of said first closing element and a second drive element of said second closing element and can move axially in relation to said first and second drive elements, wherein said locking mechanism has at least one locking element which is connected to said sleeve and which is held in such a way that said locking element engages alternately in recesses in said first or second drive elements in order to lock said sleeve to said respective one of said first and second closing elements.

**18**. The double seat valve of claim **1**, wherein said flow barrier element has a drainage section whose overall passage cross section is at least as large as an opening cross section of a larger one of said connectors.

**19**. The double seat valve of claim **18**, wherein said drainage section has a plurality of spokes which are directed obliquely with respect to a radial direction.

**20**. The double seat valve of claim **1**, wherein said flow barrier element is embodied as a spoked wheel.

\* \* \* \* \*

# CERTIFICATE OF SERVICE

I hereby certify that on October 14, 2014, I served two copies of the BRIEF

FOR APPELLANT SPX CORP. by electronic mail to counsel of record listed

below:

> Wesley W. Whitmyer, Jr.
> Steven B. Simonis
> Benjamin J. Lehberger
> Michael A. Lavine
> ST. ONGE STEWARD JOHSTON & REENS LLC
> 986 Bedford Street
> Stamford, CT 06905
>
> *Counsel for Appellees Sudmo Holding GMBH*

October 14, 2014                              /s/ Alan M. Fisch
                                              Alan M. Fisch

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(c), the undersigned certifies that this brief complies with the applicable type-volume limitations.

Exclusive of the portions exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Circuit Rule 32(b), this brief contains 12,422 words. This certificate was prepared in reliance on the word count of the word processing system Microsoft Word 2010 used to prepare this brief.

This brief further complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6). The brief has been prepared in a proportionally spaced typeface using Microsoft Word Version 2010 in 14 point Times New Roman font.

/s/ Alan M. Fisch
Alan M. Fisch