**2014-1716**

In The
# United States Court Of Appeals
# For The Federal Circuit

## SPX CORPORATION,
*Appellant,*

v.

## PENTAIR SÜDMO GMBH,

*Appellee.*

**Appeal from *Inter Partes* Reexamination of U.S. Patent No. 7,891,376 before the Patent Trial and Appeal Board, Appeal No. 2014-002822**
_____

**BRIEF OF APPELLEE PENTAIR SÜDMO GMBH**
_____

**Wesley W. Whitmyer, Jr.**
**Steven B. Simonis**
**Benjamin J. Lehberger**
**Michael A. Lavine**
**ST.ONGE STEWARD JOHNSTON & REENS LLC**
**986 Bedford Street**
**Stamford, Connecticut 06905**
**Telephone: (203) 324-6155**
**Facsimile: (203) 327-1096**

*Attorneys for Appellee Pentair Südmo GmbH*

## <u>CERTIFICATE OF INTEREST</u>

Pursuant to Federal Circuit Rule 47.4, the undersigned counsel for Pentair Südmo GmbH ("Südmo") hereby certifies that:

1.    The full names of every party or amicus represented by me is:

Pentair Südmo GmbH.

2.    The names of the real parties in interest (if the party named in the caption is not the real party in interest) represented by me is:

Pentair Südmo GmbH.

3.    All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

Pentair, plc, is a parent to Pentair Südmo GmbH.

4.    The names of all law firms and the partners or associates that appeared for any of the parties represented by me in the trial court or are expected to appear in this court are:

Wesley W. Whitmyer, Jr., St. Onge Steward Johnston & Reens LLC
Steven B. Simonis, St. Onge Steward Johnston & Reens LLC
Benjamin J. Lehberger, St. Onge Steward Johnston & Reens LLC
Michael A. Lavine, St. Onge Steward Johnston & Reens LLC

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST ............................................................... i

TABLE OF CONTENTS ...................................................................... ii

TABLE OF AUTHORITIES .................................................................. v

USE OF EMPHASIS IN QUOTATIONS ............................................ viii

USE OF ILLUSTRATIVE DIAGRAMS ............................................. viii

STATEMENT OF RELATED CASES ................................................ ix

STATEMENT OF THE ISSUES ........................................................... 1

STATEMENT OF THE CASE SETTING OUT FACTS RELEVANT TO THE ISSUES ........................................................................................ 2

I.     INTRODUCTION ................................................................... 2

II.    THE '376 PATENT ................................................................. 5

     A.    Overview Of The Double Seat Valve ..................................... 5

     B.    The Operating States Of The Double Seat Valve ..................... 6

     C.    The Double Seat Valve's "Flow Barrier Element" ................... 12

III.   THE PROCEEDINGS BEFORE THE EXAMINER .................... 17

     A.    Claims 7, 21-31, 35-41, 43-45, 48-54, 58-63, 65-72, 74-77 and 81 .......... 17

     B.    Claims 33-35, 46-48, 53 and 75 ........................................... 22

IV.    THE PROCEEDINGS BEFORE THE PTAB .......................... 23

V.     THE PTAB'S DECISION WAS CORRECT .......................... 24

     A.    The PTAB's Decision that Claims 7, 21-31, 35-41, 43-45, 48-54, 58-59, 76-77 and 81 are Patentable over Hosokawa Was Correct ................... 24

     B.    The PTAB's Decision that Claims 60-63 and 65-67 are Patentable over Hosokawa Was Correct ........................................................ 25

C.   The PTAB's Decision that Claims 68-72 and 74-75 are Patentable over Hosokawa Was Correct .......................................................................25

D.   The PTAB's Decision that Claims 33-35, 46-48, 53 and 75 are Patentable Was Correct ..............................................................................................26

SUMMARY OF THE ARGUMENT ....................................................................28

ARGUMENT ........................................................................................................30

I.   THE PTAB'S CONSTRUCTIONS OF THE "SEAL," "SPOKED WHEEL," AND "AT LEAST MOVABLE…" CLAIM LANGUAGE WERE CORRECT ...................................................................................................30

A.   The PTAB's Construction of "Seal" ...........................................................31

B.   The PTAB's Construction of "Spoked Wheel" ..........................................37

C.   The PTAB's Construction of "At Least Moveable . . . When Said Second Closing Element Is Lifted And When Cleaning Medium Is Applied To Said Leakage Space." ..........................................................................................40

II.   THE COURT SHOULD AFFIRM THE PTAB'S DECISION THAT CLAIMS 7, 21-31, 35-41, 43-45, 48-54, 58-63, 65-72, 74-77, and 81 ARE PATENTABLE ..............................................................................................43

A.   Hosokawa Does Not Disclose A Flow Barrier Element That Is Moved or At Least Moveable When The Second Closing Element Is Lifted And When A Cleaning Medium Is Applied To The Leakage Space ........................................43

B.   Hosokawa Does Not Disclose An Axial Seal In The Common Open Position ...........................................................................................................49

C.   Hosokawa Does Not Disclose A Spoked Wheel........................................53

III.   THE COURT SHOULD AFFIRM THE PTAB'S DECISION THAT CLAIMS 33-35, 46-48, 53, and 75 ARE PATENTABLE ............................57

A.   Claims 33-35, 46-48, and 53 ......................................................................58

B.   Claim 75 ......................................................................................................59

IV.   THE COURT SHOULD REJECT SPX'S NEW ARGUMENT THAT THE PTAB SHOULD HAVE FOUND CLAIMS 60-63 AND 65-67 UNPATENTABLE UNDER § 103 ............................................................60

V.   THE COURT SHOULD REJECT SPX'S ARGUMENTS THAT RELY ON CLAIMS AND ISSUES THAT ARE NOT SUBJECT TO THIS APPEAL.65

VI.   CONCLUSION ...............................................................................65

# TABLE OF AUTHORITIES

## Cases

*Anchor Wall Sys., Inc. v. Rockwood Retaining Walls, Inc.*,
  340 F.3d 1298 (Fed. Cir. 2003)..............................................................42

*Application of Hoeksema*,
  399 F.2d 269 (C.C.P.A. 1968) .............................................................51

*Arlington Indus., Inc. v. Bridgeport Fittings, Inc.*,
  No. 2013-1400, 2014 WL 4251552 (Fed. Cir. Aug. 29, 2014) ......................46, 61

*Bilstad v. Wakalopulos*
  386 F.3d 1116 (Fed. Cir. 2004) .............................................31, 37, 40

*Cybor Corp. v. FAS Techs., Inc.*,
  138 F.3d 1448 (Fed. Cir. 1998)..............................................................30

*Elan Pharm., Inc. v. Mayo Found. for Med. Educ. & Research*,
  346 F.3d 1051 (Fed. Cir. 2003)..............................................................51

*Graham v. John Deere Co. of Kansas City*,
  383 U.S. 1 (1966).....................................................................................57

*Hyatt v. Dudas*,
  551 F.3d 1307 (Fed. Cir. 2008)..............................................................61

*In re Alonso*,
  545 F.3d 1015 (Fed. Cir. 2008)......................................................46, 61

*In re Am. Acad. Of Sci. Tech. Ctr.*,
  367 F.3d 1359 (Fed. Cir. 2004)..............................................................30

*In re Comiskey*,
  554 F.3d 967 (Fed. Cir. 2009)................................................................61

*In re Gartside*,
  203 F.3d 1305 (Fed. Cir. 2000)..............................................................57

*In re Gleave*,
    560 F.3d 1331 (Fed. Cir. 2009)................................................................43

*In re Hyatt*
    211 F.3d 1367 (Fed. Cir. 2000)...............................................................43

*In re ICON Health & Fitness, Inc.*,
    496 F.3d 1374 (Fed. Cir. 2007)...............................................................30

*In re Johannes*,
    566 F. App'x 923 (Fed. Cir. 2014).........................................................43

*In re Katz Interactive Call Processing Patent Litig.*,
    639 F.3d 1303 (Fed. Cir. 2011)...............................................................65

*In re Montgomery*,
    677 F.3d 1375 (Fed. Cir. 2012)...............................................................43

*In re Morris*,
    127 F.3d 1048 (Fed. Cir. 1997).......................................................30, 31

*In re Morris*,
    127 F.3d 1048 (Fed. Cir. 1997).......................................................30, 31

*In re Taylor Made Golf Co., Inc.*,
    No. 2013-1552, 2014 WL 4812686 (Fed. Cir. Sept. 30, 2014)...............61, 62, 63

*Lighting Ballast Control LLC v. Philips Elecs. N. Am. Corp.*,
    744 F.3d 1272 (Fed. Cir. 2014)...............................................................30

*Pause Tech., LLC v. TiVo, Inc.*,
    419 F.3d 1326 (Fed. Cir. 2005)...............................................................42

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005)........................................................passim

*SCA Hygiene Products Aktiebolag v. First Quality Baby Products, LLC*,
    767 F.3d 1339 (Fed. Cir. 2014).......................................................46, 61

*Südmo Holding GmbH v. SPX Corporation et al.*,
  No. 11- 561 (D.Del.) ................................................................................ix

*Telemac Cellular Corp. v. Topp Telecom, Inc.*,
  247 F.3d 1316 (Fed. Cir. 2001) ..............................................................42

## <u>Statutes</u>

35 U.S.C. § 102(b) ............................................................................passim

35 U.S.C. § 103(a) ............................................................................passim

35 U.S.C. § 112 ......................................................................................62

35 U.S.C. § 305 ......................................................................................62

## <u>USE OF EMPHASIS IN QUOTATIONS</u>

All emphasis in quotations and record citations has been added, unless otherwise indicated.


## <u>USE OF ILLUSTRATIVE DIAGRAMS</u>

In the brief, Südmo has provided illustrative diagrams to assist the Court in understanding the issues that are subject to this appeal.

## STATEMENT OF RELATED CASES

U.S. Patent No. 7,891,376 ("the '376 patent") is the subject of the litigation entitled *Südmo Holding GmbH v. SPX Corporation et al.*, Case No. 1:11-cv-00561-SLR-CJB, which is currently stayed in the United States District Court for the District of Delaware pursuant to an Order issued by Judge Sue L. Robinson on December 2, 2011.[1] There are no other pending cases in this or any other court that will directly affect or be directly affected by this Court's decision in the pending appeal. No other appeal in or from the district court litigation or the proceedings before Patent Trial and Appeal Board (PTAB) involving the '376 patent was previously before this or any other appellate court.

---

[1] A01088; A01135-40.

## **STATEMENT OF THE ISSUES**

1. In construing the terms "seal", "spoked wheel", and "wherein said flow barrier element is at least moveable towards the first closing element when said second closing element is lifted and when cleaning medium is applied to said leakage space", the PTAB correctly relied primarily on the claim language and the specification of the '376 patent, and referred to a mechanical handbook and a dictionary as secondary references to help determine the ordinary usage of the "seal" and "spoked wheel" terms. Should the PTAB's claim constructions that are supported by the claim language and the specification and consistent with this Court's claim construction precedent be sustained?

2. Applying the constructions of "seal", "spoked wheel", and "wherein said flow barrier element is at least moveable towards the first closing element when said second closing element is lifted and when cleaning medium is applied to said leakage space" to the prior art, the PTAB correctly determined that claims 7, 21-31, 33-41, 43-54, 58-63, 65-72, 74-77, and 81 are patentable. Should the PTAB's decision be affirmed because the PTAB's factual determinations underlying the decision are supported by substantial evidence?

1

## STATEMENT OF THE CASE SETTING OUT FACTS RELEVANT TO THE ISSUES

## I.  INTRODUCTION

For the reasons discussed herein, the Court should affirm the PTAB's decision that claims 7, 21-31, 33-41, 43-54, 58-63, 65-72, 74-77, and 81 of  the '376 patent are patentable.

The '376 patent is directed to a double seat valve for separating incompatible media such as a comestible liquid and a cleaning fluid.[2]  On June 22, 2011, Pentair Südmo GmbH ("Südmo") filed a Complaint for infringement of the '376 patent against SPX Corporation ("SPX") and SPX Flow Technology Systems, Inc. in the United States District Court for the District of Delaware.[3]  SPX subsequently filed three requests for *inter partes* reexamination of the '376 patent.[4] The Patent Office granted all three requests and subsequently merged them into one proceeding.[5]  Claims 1-20 of the '376 patent were original as issued, and claims 21-81 were added during the course of the reexamination.[6]

---

[2] A00044 at 1:12-13, *id.* at 1:35-37; A00048 at 9:44-51; A00026.

[3] A01090-94.  Südmo was formerly known as Südmo Holding GmbH.

[4] A00079-152; A00171-247; A00254-369.

[5] A00370-80; A00381-91; A00392-405; A00406-12.

[6] A00430-53.

The only claims that are at issue in the instant appeal are claims 7, 21-31, 33-41, 43-54, 58-63, 65-72, 74-77, and 81.[7]  The PTAB correctly construed the terms 1) an axial seal, 2) a spoked wheel, and 3) a flow barrier element that is moved or at least moveable towards the first closing element when the second closing element is lifted and cleaning medium is applied to the leakage space[8] by relying primarily on the claim language and the specification of the '376 patent, and by referring to a mechanical handbook and a dictionary to help determine the ordinary usage of the "seal" and "spoked wheel" terms consistent with the claim language and the specification.[9]  Applying those constructions, the PTAB correctly determined that claims 7, 21-31, 33-41, 43-54, 58-63, 65-72, 74-77, and 81 are patentable over the prior art.[10]  As explained herein, substantial evidence supports the factual determinations underlying the PTAB's decision.

Here, SPX asks the Court to reverse the PTAB's decision that claims 7, 21-31, 33-41, 43-54, 58-63, 65-72, 74-77, and 81 are patentable.[11]  Specifically, SPX's challenge of the PTAB's decision is based exclusively on the PTAB's findings that

---

[7] SPX Br. at 3.

[8] A00714 – 25; A00777-81.

[9] A00017-18; A00020; A00022-23.

[10] A00002-24.

[11] SPX Br. at 3.

Hosokawa failed to disclose an axial "seal," a "spoked wheel," and a flow barrier element that is moved or at least moveable towards the first closing element when the second closing element is lifted and cleaning fluid is applied to the leakage space.[12]

SPX has also, for the first time on appeal, introduced a new argument that the PTAB should have found claims 60-63 and 65-67 invalid under §103(a) for similar reasons argued in connection with claim 20.[13] While SPX makes reference to claim 20, it should be noted that *claim 20 is not at issue* in this appeal.[14] Also, SPX has never previously argued that claims 60-63 and 65-67 should be invalidated under § 103(a), despite having the opportunity to do so in each of its Third Party Comments and accompanying claim charts,[15] and in its response to Südmo's appeal brief before the PTAB.[16] Finally, SPX describes Burmester '986 as a prior art reference,[17] but again, none of the PTAB's findings that SPX seeks to

_____

[12] *See, e.g.*, SPX Br. at 30-33.

[13] *See, e.g.*, SPX Br. at 31-32, 48-52.

[14] *See, e.g.*, SPX Br. at 3.

[15] A00499-541; A00634-681; A01141-77.

[16] A00753-71.

[17] SPX Br. at 20.

reverse are based on the Burmester '986 reference.[18]  The Court should therefore reject SPX's arguments and affirm the PTAB's decision.

## II.  THE '376 PATENT

### A.    Overview Of The Double Seat Valve

Referring to Figure 1 of the '376 patent (reproduced below), the double seat valve apparatus (10) includes a valve housing (12) defining first and second valve housing sections (14, 16) that are connected by a connecting section (24).[19]  The connecting section (24) also defines a leakage space (46) from which liquid may be discharged through a drainage section (44).[20]  The valve housing (12) encloses a first closing element (28) embodied in the form of a valve disc, a second closing element (30) embodied in the form of a closing sleeve, and a flow barrier element (54) positioned between the closing elements (28, 30).[21]

---

[18]  A00022 ("[W]e need not address the rejection of claim 20 under § 103(a) as being unpatentable over Burmester '986 and Burmester '134.").  As mentioned above, claim 20 is not at issue in this appeal.

[19]  A00048 at 9:52-54; A00048 at 9:65 – 10:3; A00026.

[20]  A00048 at 10:40-47; A00026.

[21]  A00048 at 10:7-11; A00049 at 11:41-43.



Fig. 1

### B.    The Operating States Of The Double Seat Valve

The '376 patent's double seat valve operates in four distinct operating states:[22]

### 1. First Operating State – Both Closing Elements in "Common Closed Position"

In the first operating state, the valve is fully closed.  As illustrated on the left side of Figure 1 and in Figure 2d, in this state the valve's closing elements (28, 30)

are in their "common closed position."[23]  In this position, both closing elements

(28, 30) are seated so as to form peripheral seals against seats (34, 38) on the inner

surface of the connecting section 24, closing off the interior of the valve housing

section (14) from the interior of the valve housing section (16).[24]  Specifically, first

closing element (28) has a sealing element (32) that, in the common closed

position, abuts with first closing element seat (34) in a seal-forming fashion.[25]

Likewise, second closing element (30) has a sealing element (36) that, in the

common closed position, abuts with second closing element seat (38) in a seal-

forming fashion.[26]  In the common closed position, no flow is allowed through the

connecting section (24).

---

[22] A00027; A00047 at 8:61-63.

[23] A00026-27.

[24] *Id.*; A00048 at 10:48-52.

[25] A00048 at 10:12-18; A00026-27.

[26] A00048 at 10:18-22; A00026-27.



<u>Figure 2d</u>

### 2. Second Operating State - First Closing element is "Lifted"

In the second operating state, as illustrated in Figure 2b, the first closing element (28) is lifted from its closing element seat (34) on the inner surface of connection section (24), so that its sealing element (32) moves out of seal-forming abutment with the closing element seat (34).[27] The second closing element (30) remains in its seal-forming closed position against the inner surface of the connecting section (24).[28] Specifically, the sealing element (36) of second closing

---

[27] A00049 at 11:7-10; A00027.

[28] A00049 at 11:10-12; A00027.

element (30) remains in seal-forming abutment with closing element seat (38).[29]  In

this second operating state, pressurized cleaning fluid may be introduced through a

gap (52) between the first closing element (28) and the closing element seat (34)

into the leakage space (46).[30]



Figure 2b

### 3.  Third Operating State - Second Closing Element is "Lifted"

In the third operating state, as illustrated in Figure 2a, the second closing

element (30) is "lifted" from its closing element seat (38) on the inner surface of

connecting section (24), so that its sealing element (36) moves out of seal-forming

---

[29] A00049 at 11:26-36; A00027.

[30] A00049 at 11:22-25; A00027.

abutment with the closing element seat (38).[31]   The first closing element (28) remains in its seal-forming closed position against the inner surface of the connecting section (24).[32]   Specifically, the sealing element (32) of first closing element (28) remains in seal-forming abutment with closing element seat (34).[33]   In this third operating state, pressurized cleaning fluid may be introduced through a gap (48) between the second closing element (30) and the closing element seat (38) into the leakage space (46).[34]



Figure 2a

---

[31] A00027; A00048 at 10:66- A00049 at 11:3.

[32] A00049 at 11:4-6; A00027.

[33] A00049 at 11:26-36; A00027.

[34] A00049 at 11:13-21.

### 4. Fourth Operating State – Both Closing Elements in "Common Open Position"

In the fourth operating state, the valve is fully open.  As illustrated on the right side of Figure 1 and in Figure 2c, in this state the valve's closing elements (28, 30) are in their "common open position."[35]  In this position, the valve's closing elements (28, 30) are moved away from their respective seats (34, 38) into the second valve housing section (16), thereby opening the connecting opening (26) between the valve housing sections (14, 16).[36]  The connecting opening (26) is defined by the inside surface of the connecting section (24).[37]  The fully open state permits, for example, a product medium to flow between the first and second valve housing sections (14, 16) through the connecting opening (26).[38]

---

[35] A00026-27.

[36] A00026; A00048 at 10:53-59.

[37] A00048 at 9:65-10:3; A00026.

[38] A00048 at 10:59-61; A00026.



Figure 2c

## C.    The Double Seat Valve's "Flow Barrier Element"

The relevant features and functionality of the flow barrier element (54) are described below.

### 1. The Functionality of the Flow Barrier Element in the Valve's Four Operating States

When the valve is in its first operating state (i.e., the common closed position), the flow barrier element (54) prevents fluid from being applied directly to the sealing element (32) or the closing element seat (34) of the first closing element (28).[39]  Likewise, the flow barrier element (54) prevents fluid from being applied directly to the sealing element (36) or the closing element seat (38) of the

second closing element (30).[40]  The flow barrier element (54) includes an annular element (56) that extends around the entire circumference of the flow barrier element (54) and constitutes the actual flow barrier.[41]  In the first operating state, there are gaps (80, 82) between the annular element (56) of the flow barrier element (54) and the first and second closing elements (28, 30).[42]  In this state, if there is leakage of fluid via the first closing element (28) or the second closing element (30), the leakage fluid will run through the gaps (80, 82) into the leakage space (46) and will be discharged into drainage sections where the leakage fluid can be detected.[43]

When the valve is in its second operating state (i.e. the first closing element (28) is lifted), the flow barrier element (54) screens the sealing element (36) and the closing element seat (38) of second closing element (30) against a direct flow of pressurized cleaning fluid.[44]  When the valve is in its third operating state (i.e. the second closing element (30) is lifted), the flow barrier element (54) screens the

---

[39]A00026; A00027 at Figure 2d; A00049 at 11:50-56.

[40] *Id.*

[41] A00049 at 11:57-63, *id.* at 12:24-30; A00026; A00028.

[42] A00050 at 13:10-21; A00026; A00027 at Figure 2d.

[43] A00050 at 13:21-27; A00026; A00027 at Figure 2d.

[44] A00049 at 11:26-47; A00027 at Figure 2b.

sealing element (32) and the closing element seat (34) of first closing element (28) against a direct flow of pressurized cleaning fluid.[45]   Preventing direct flow of pressurized cleaning fluid against the sealing elements (32, 36) and closing element seats (34, 48) in the second and third operating states ensures that comestible fluid that is running on one side of the valve is not contaminated by cleaning fluids that are running on the other side of the valve.[46]

When the valve is in its fourth operating state (i.e. the common open position), the gaps (80, 82) between the annular element (56) of the flow barrier element (54) and the first and second closing elements (28, 30) are closed.[47]   To ensure that there is a seal between the first and second closing elements (28, 30) and the annular element (56) of the flow barrier element (54) in this fourth operating state, the axially acting sealing elements (84, 86) of the first and second closing elements (28, 30) come into seal-forming abutment with the annular element (56) of the flow barrier element (54).[48]   In another embodiment of the

---

[45] A00049 at 11:26-47; A00027 at Figure 2a.

[46] A00049 at 11:26-40.

[47] A00050 at 13:31-48; A00026; A00027 at Figure 2c.

[48] A00046 at 6:64-7:4; A00050 at 13:49-59; A00026; A00027 at Figure 2c.

valve in its common open position, axial projections of the first and second closing elements come into seal-forming abutment with the flow barrier element.[49]

### 2. The Seals Formed in the '376 Patent's Double Seat Valve

In the '376 patent, seals are formed when "sealing elements" or "axial projections" come into seal-forming abutment with other structures such as the closing element seats on the inner surface of the connecting section (24), or the annular element (56) of the flow barrier element.[50]

In the first operating state (common closed position), second operating state (first closing element is lifted) and the third operating state (second closing element is lifted), seals are formed between the first closing element (28) and the inner surface of the connecting section (24) and/or between the second closing element (30) and the inner surface of the connecting section (24), and those seals prevent leakage of fluid from one side of the valve to the other side.[51]   If the valve's seals happen to leak in these operating states, the leakage fluid is

---

[49] A00051 at 16:35-65.

[50] A00044 at 1:17-29; A00045 at 3:16-27; A00046 at 5:34-36; A00046 at 6:64-7:4; A00048 at 10:12-22; A00048 at 10:48-52; A00049 at 11:26-40; A00050 at 13:49-59; A00050 at 14:41-51; A00051 at 16:35-65; A00052 at 17:36-41.

[51] A00048 at 10:12-24, 48-52; A00049 at 11:26-40; A00026; A00027 at Figures 2a, 2b, and 2d.

discharged into the leakage space and can be detected.[52]   In the fourth operating state (the common open position), an axial seal is formed between the flow barrier element and the first and second closing elements, which seals the leakage space.[53]

### 3.  The Flow Barrier Element's Spoked Wheel Embodiment

Figures 1 and 3b depict the flow barrier element (54) as a spoked wheel.[54]  The inside of the flow barrier element has a connecting section (60) which connects it to the drive element (40) of first closing element (28).[55]  The drainage section (62) between the annular element (56) and connecting section (60) of the flow barrier element (54) has a plurality of spokes with openings between them.[56]   The openings between the spokes comprise a relatively large overall passage cross section for discharging cleaning fluid through the flow barrier element.[57]   The

---

[52] A00046 at 5:53-62; A00048 at 10:40-47; A00050 at 13:11-27; *see also* A00044 at 2:28-48 (discussing a problem in the prior art where direct pressure against a sealing element resulted undesirably in cleaning fluid passing a sealing element and entering a product pipeline).

[53]  A00046 at 6:64 - A00047 at 7:4; A00050 at 13:49-59; A00050 at 14:41-51; A00051 at 16:35-65; A00052 at 17:36-41; A00026; A00027 at Figure 2c.

[54] A00026; A00028.

[55] A00049 at 12:19-23; A00026.

[56] A00049 at 12:24-30; A00026; A00028; A00051 at 16:46-53.

[57] A00046 at 6:37-42; A00049 at 12:24-30; A00026; A00028.

overall passage cross section is at least as large as the opening cross section of the larger of the two connectors (18) and (20).[58]

### 4. Movement of the Flow Barrier Element In the Valve's Third Operating State

In the third operating state, when the valve's second closing element (30) is lifted and pressurized cleaning medium is applied to the leakage space (46), the flow barrier element (54) can be moved by the cleaning medium towards the first closing element (28).[59]  This permits thorough cleaning of the closing element seat (38) of the second closing element (30).[60]

## III.  THE PROCEEDINGS BEFORE THE EXAMINER

Claims 7, 21-31, 33-41, 43-54, 58-63, 65-72, 74-77 and 81 are the only claims at issue in this appeal.  The following are the only grounds relevant to this appeal:

### A.    Claims 7, 21-31, 35-41, 43-45, 48-54, 58-63, 65-72, 74-77 and 81

Hosokawa is directed to a double seal valve having an inner valve body (13), a middle valve body (14) having two small holes (14'), an outer valve body (8), a

---

[58] *See, e.g.*, A00047 at 8:17-20; A00049 at 12:24-30.

[59] A00047 at 7:4-9, 7:31-45, 7:58-67; A00051 at 15: 51-61.

[60] *Id.*

valve box (3) and a two-way pipe (30).[61]  The features and function of the valve permit cleaning of the two-way pipe, the valve box, the surfaces of the valve bodies, and the spaces between the valve bodies using a limited amount of cleaning fluid.[62]  When only the valve box (3) side or only the two-way pipe (30) is being cleaned, the middle valve body (14) remains seated on its seat (6) and helps to prevent leakage of cleaning fluid from one side of the valve to the other.[63]

Claims 7, 21-31, 35-37, 51-54, 58-59, 76-77 and 81 each require the flow barrier element to form a "seal" axially against the first and second closing elements when the double seat valve is in its common open position.  Claims 38-41, 43-45, and 48-50 each require the flow barrier element to form a "seal" axially against at least one of the first and second closing elements.[64]  During reexamination, the Examiner incorporated by reference the analysis and claim charts on pages 22-40 of SPX's 95/001,873 Request, and the claim charts on pages

---

[61] A00944-49.

[62] A00946 at 361:69-85.

[63] *Id.*; A00946 at 361:87-96; A00948 at Figure 3; A00949 at Figure 4.

[64] A00733; A00735-37; A00739; A00742-44; A00748-50.  Claims 33-34 depend from claim 21 and therefore include the axial "seal" limitation of claim 21.  A00739.  Claims 46-47 depend from claim 38 and therefore include the axial "seal" limitation of claim 38.  A00742.

1-37 of Exhibit A to SPX's Third Party Comments.[65]  The incorporated analysis and claim charts rely on Figure 1 of Hosokawa to satisfy the axial "seal" limitation.[66]  Figure 1 of Hosokawa depicts a valve in its open position, and in that open position the valve's outer, middle, and inner valve bodies are described as being "connected."[67]  In its Third Party Comments, SPX argued that Hosokawa discloses the required axial seal because when the Hosokawa valve is in its open position, the outer valve body, middle valve body, and inner valve body are "connected."[68]

Claims 60-63 and 65-67 each require the flow barrier element to be "configured as a spoked wheel having a plurality of spokes with openings therebetween at least partially defining said leakage space."[69]  During reexamination, the Examiner incorporated by reference the claim charts on pages

---

[65] A00688-89; A00690.

[66] A00292; A01145-46; A01158; A01160; A01164-65; A01172; A01174; A01176.

[67] A00947; A00946 at 361:35-46.

[68] A00512; A00649.

[69] A00744 – 46.  Claims 53 and 76 also require the flow barrier element to be configured as a spoked wheel having a plurality of spokes with openings therebetween at least partially defining said leakage space.  A00744; A00748-49. Claims 77 and 81 depend from claim 76, and therefore include the "spoked wheel" limitation of claim 76.  A00750.  Claims 35, 48 and 75 also require the flow barrier element to be "embodied as a spoked wheel."  A00739; A00742; A00748.

19

1-37 of Exhibit A to SPX's Third Party Comments.[70]  The incorporated claim charts cite the structure of Hosokawa's middle valve body, which includes two small holes and is positioned around a main valve stem, as satisfying the claimed "spoked wheel."[71]  Even though the Examiner acknowledged that Hosokawa "lacks the structure as a spoked wheel,"[72] the Examiner improperly accepted SPX's argument that Hosokawa's middle valve body meets the claimed "spoked wheel" limitation.[73]

Claims 68, 70-72, and 74-75 require the flow barrier element to be "at least moveable towards the first closing element when said second closing element is lifted and when cleaning medium is applied to said leakage space."[74]  Claim 69 requires the flow barrier element to be "moved towards the first closing element when said second closing element is lifted and when cleaning medium is applied to

---

[70] A00690.

[71] A01170 – 72.

[72] *See, e.g.*, A00691.

[73] *See, e.g.*, A00690.

[74] A00746-48.  Claims 36, 49, 58, 66, and 76 each also recite the same "at least moveable…" limitation.  A00739; A00742; A00744; A00746; A00750.  Claim 77 depends from claim 76 and therefore requires the same "at least moveable…" limitation.  A00750.

said leakage space."[75]    During reexamination, the Examiner incorporated by reference the claim charts on pages 1-37 of Exhibit A to SPX's Third Party Comments.[76]    In those claim charts, SPX associates Hosokawa's inner valve body (13) with the claimed "first closing element," its outer valve body (8) with the claimed "second closing element," and its middle valve body (14) with the claimed "flow barrier element."[77]    SPX argued that Hosokawa discloses a flow barrier element that is moved or at least moveable towards the first closing element when the second closing element is lifted and when cleaning fluid is applied to the leakage space because Hosokawa's middle valve body 14 can slide freely and "[i]n FIG. 3, the top valve body 13 is lifted from its seat while the bottom valve body 8 remains in its seat 4.    Additionally, s[p]ring 15 urges middle valve body 14 downward onto its seat."[78]    On this basis, SPX argued that when the outer valve

---

[75] A00747.  Claims 30, 37, 50, 59, 67 and 81 each also recite the same limitation. A00737; A00739; A00742; A00744; A00746; A00750.

[76]A00690.

[77]  *See, e.g.*, A01172-73 (referring to 21.3, 21.4 and 21.7 for the limitations regarding the first closing element, the second closing elements, and the flow barrier element respectively); A01141 (21.3 referring to top valve body 13 as the first closing element); A01142 (21.4 referring to the bottom valve body 8 as the second closing element); A01144 (21.7 referring to the middle valve body 14 as the flow barrier element).

[78]A01173 at 68.10 (referring to 58.2 for the "at least moveable. . ." limitation); A01167 – 68 (58.2 referring to the situation where the first closing element (top

body (8) is lifted, the middle valve body (14) is moved or moveable towards the inner valve body (13).[79]

**B.    Claims 33-35, 46-48, 53 and 75**

Each of claims 33-35, 46-48, and 53 ultimately depend from independent claims 21, 38 and 51, which require the axial seal limitation.[80]  Claim 75 depends from claim 68, which requires a flow barrier element that is at least moveable towards the first closing element when the second closing element is lifted and when cleaning medium is applied to the leakage space.[81]

On appeal, SPX challenges the PTAB's decision that claims 33-35, 46-48, and 53 are patentable <u>only</u> with respect to the PTAB's finding that Hosokawa does not disclose an axial seal.[82]  Likewise, SPX challenges the PTAB's decision that claim 75 is patentable <u>only</u> with respect to the PTAB's finding that Hosokawa does not disclose a flow barrier element that is at least moveable towards the first

---

valve body 13) is lifted, rather than the situation where the second closing element (outer valve body 8) is lifted as required by the claims); A00658 – 59; A00015 – 16 at para. 5; A00022.

[79] *Id.*

[80] A00739; A00742; A00744.

[81] A00746-48.

[82] SPX Br. at 30-31, 36-43.

closing element when the second closing element is lifted and when cleaning medium is applied to the leakage space.[83]

## IV.  THE PROCEEDINGS BEFORE THE PTAB

The appeal in the proceedings before the PTAB is discussed below to the extent that it relates to the claims at issue:

First, Südmo appealed with respect to claims 7, 21-31, 33-41, 43-54, 58-63, 65-72, 74-77, and 81 under 102(b) as being anticipated by Hosokawa.[84]  Südmo argued that Hosokawa failed to anticipate these claims because it did not variously disclose 1) an axial seal, 2) a spoked wheel, or 3) a flow barrier element that is moved or at least moveable towards the first closing element when the second closing element is lifted and cleaning medium is applied to the leakage space.[85]

Second, Südmo appealed with respect to claims 35, 48, 53, and 75 under 35 U.S.C. §103(a) as being unpatentable over Hosokawa in view of Burmester '134.[86] Südmo argued that these claims are not obvious because neither Hosokawa nor Burmester '134 disclosed the claimed spoked wheel and a person of ordinary skill

---

[83] SPX Br. at 52-57.

[84] A00714.

[85] A00714 – 25; A00777-81.

[86] A00714.

in the art would not have modified Hosokawa to incorporate the teachings of Burmester '134 in order to meet the spoked wheel limitation.[87]

## V.  THE PTAB'S DECISION WAS CORRECT

The PTAB's decision is discussed below to the extent that it relates to the claims at issue here.

### A.    The PTAB's Decision that Claims 7, 21-31, 35-41, 43-45, 48-54, 58-59, 76-77 and 81 are Patentable over Hosokawa Was Correct

On appeal, the PTAB rejected SPX's interpretation that the term "seal" encompasses a "connection."  Relying on the specification of the '376 patent and the ordinary usage of the term "seal," the PTAB construed "seal" as "materials used to control or stop leakage of fluids . . . through mechanical clearances when [fluids are] under pressure or vacuum."[88]  Applying this construction, the PTAB found that Hosokawa does not disclose an axial "seal" between its inner valve body, outer valve body, and middle valve body when the valve is in its common open position.[89]  On this basis the PTAB determined that claims 7, 21-31, 35-41, 43-45, 48-54, 58-59, 76-77, and 81 were patentable over Hosokawa.[90]

---

[87] A00725-28; A00781-82.

[88] A00016-18.

[89] A00014-18.

[90] A00018.

**B.    The PTAB's Decision that Claims 60-63 and 65-67 are Patentable over Hosokawa Was Correct**

Relying on the specification of the '376 patent and the ordinary usage of the term "spoke," on appeal the PTAB construed the term "spoked wheel" as "a wheel having spokes," where a spoke is "one of the bars that connect the center of a wheel to the rim."[91]  Applying this construction, the PTAB found that "nothing in Hosokawa describes the structural arrangement of the middle valve body *14* to be that of a spoked wheel," and that nothing in the depiction of Hosokawa's middle valve body necessarily requires the middle valve body's small holes *14'* to be formed or defined by spokes.[92]  The PTAB also agreed with Südmo's expert that one of skill in the art would not read the middle valve body as disclosed in Hosokawa to be a spoked wheel.[93]  On this basis, the PTAB determined that claims 60-63 and 65-67 were patentable over Hosokawa.[94]

**C.    The PTAB's Decision that Claims 68-72 and 74-75 are Patentable over Hosokawa Was Correct**

Relying on the plain language of the claims, on appeal the PTAB considered the entirety of the limitation "wherein said flow barrier element is at least

---

[91] A00019-20.

[92] A00020.

[93] A00015 at para. 4; A00020-21.

[94] A00021.

moveable towards the first closing element when said second closing element is lifted and when cleaning medium is applied to said leakage space" and determined that it required the flow barrier element to move or be capable of moving at a <u>particular time</u>—that is, when said second closing element is lifted and when cleaning medium is applied to said leakage space.[95]  Applying this interpretation, the PTAB found that Hosokawa does not describe its middle valve body as either moving or capable of moving when its alleged "second closing element" (i.e. its outer valve body (8)) is lifted.[96]  On this basis, the PTAB determined that claims 68-72 and 74-75 were patentable over Hosokawa.[97]

**D.    The PTAB's Decision that Claims 33-35, 46-48, 53 and 75 are Patentable Was Correct**

As previously discussed, each of claims 33-35, 46-48, and 53 ultimately depend from independent claims 21, 38 or 51, which recite the axial "seal" limitation.  On appeal, the PTAB determined that claims 33-35, 46-48, and 53 were patentable based on its factual finding that the Examiner's cited teachings from

---

[95] A00022-23.

[96] A00023; A00015 -16 at para. 5.

[97] A00023.

Burmester '134, PMO 2005, and Deger do not disclose the axial "seal" that is missing from Hosokawa's disclosures.[98]

Claim 75 depends from claim 68, which requires a flow barrier element that is at least moveable towards the first closing element when the second closing element is lifted and when cleaning medium is applied to the leakage space. On appeal, the PTAB determined that claim 75 was patentable because SPX's cited teachings from Burmester '134 do not remedy Hosokawa's failure to disclose this element.[99]

---

[98] A00018 – 19.

[99] A00023.

## SUMMARY OF THE ARGUMENT

This appeal is centered on the correct construction of the three terms 1) "seal"; 2) "spoked wheel"; and 3) "wherein said flow barrier element is at least moveable towards the first closing element when said second closing element is lifted and when cleaning medium is applied to said leakage space." The PTAB's constructions of these terms should be sustained because they are consistent with, and supported by, the claim language and specification of the '376 patent and the ordinary usage of these terms. The PTAB's constructions are also consistent with this Court's precedent permitting the use of dictionaries and treatises to determine the ordinary usage of claim terms.

In addition, the record contains substantial evidence supporting the PTAB's factual findings that Hosokawa does not disclose an axial "seal," a "spoked wheel," and a flow barrier element that is at least moveable towards the first closing element when the second closing element is lifted and when cleaning medium is applied to the leakage space. Substantial evidence also supports the PTAB's factual findings that the other prior art disclosures cited by SPX and the Examiner do not remedy Hosokawa's deficiencies regarding the above claim limitations.

The Court should also reject SPX's new argument that the PTAB should have rejected claims 60-63 and 65-67 as obvious under § 103 based on Hosokowa

and Burmester '134 because SPX waived this argument when it failed to present it to the PTAB despite numerous opportunities to do so while reexamination was pending before the Patent Office for two years.  Additionally, SPX's references to arguments and claims that are not at issue here on appeal should be rejected as beyond the scope of the appeal.

For the above reasons, which are discussed in more detail herein, the Court should affirm the PTAB's decision that claims 7, 21-31, 33-41, 43-54, 58-63, 65-72, 74-77, and 81 are patentable over the prior art.

# ARGUMENT

## I. THE PTAB'S CONSTRUCTIONS OF THE "SEAL," "SPOKED WHEEL," AND "AT LEAST MOVABLE…" CLAIM LANGUAGE WERE CORRECT

The central issue on appeal is whether the PTAB correctly construed the terms" "seal," "spoked wheel," and "at least moveable…" language in the claims at issue.

In reexamination proceedings, claims must be given their broadest reasonable interpretation consistent with the specification, and the claim language should be read in light of the specification as it would be interpreted by one of ordinary skill in the art. *In re Trans Texas Holdings Corp.*, 498 F.3d 1290, 1298-99 (Fed. Cir. 2007); *In re ICON Health & Fitness, Inc.*, 496 F.3d 1374, 1378-79 (Fed. Cir. 2007); *Phillips v. AWH Corp.*, 415 F.3d 1303, 1316-17 (Fed. Cir. 2005); *In re Am. Acad. Of Sci. Tech. Ctr.*, 367 F.3d 1359, 1364 (Fed. Cir. 2004).

Claim construction is a question of law that is reviewed *de novo* on appeal. *Lighting Ballast Control LLC v. Philips Elecs. N. Am. Corp.*, 744 F.3d 1272, 1292 (Fed.Cir.2014) (en banc); *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1454–55 (Fed.Cir.1998) (en banc). When reviewing the PTAB's claim constructions *de novo*, this Court looks to the words of the claims themselves, the specification, the prosecution history, and relevant extrinsic evidence to determine whether the PTAB's claim constructions were reasonable. *Phillips*, 415 F.3d at 1315-17; *In re*

*Morris*, 127 F.3d 1048, 1055 (Fed. Cir. 1997). "Within the class of extrinsic evidence, [this] Court has observed that dictionaries and treatises can be useful in claim construction." *Phillips*, 415 F.3d at 1318,1322; *In re Trans Texas Holdings Corp.*, 498 F.3d at 1299 ("Under *Philips*, dictionary definitions are also pertinent."); *Bilstad v. Wakalopulos*, 386 F.3d 1116, 1121-23 (Fed. Cir. 2004) (affirming Board's construction that relied on dictionary definitions to ascertain the ordinary meaning of a disputed claim term).

On appeal, SPX challenges the PTAB's claim constructions of the claim terms at issue while at the same time proposing no alternative constructions of its own. SPX also takes issue with the PTAB's use of a handbook and a dictionary that neither party cited during reexamination, but SPX identifies no authority that precludes the PTAB from doing so. Indeed, the PTAB's reliance on previously un-cited dictionaries is consistent with this Court's precedent. *See, e.g.*, *Bilstad*, 386 F.3d at 1121-23.

In any event, as explained below, the PTAB's constructions are supported by the claim language and the specification of the '376 patent and by definitions from relevant secondary references, and should therefore be sustained.

### A.    The PTAB's Construction of "Seal"

Claims 7, 21-31, 33-37, 51-54, 58-59, 76-77 and 81 each require the flow barrier element to form a "seal" axially against the first and second closing

31

elements when the double seat valve is in its common open position.  Claims 38-41, 43-50, and 53 each require the flow barrier element to form a "seal" axially against at least one of the first and second closing elements.[100]  The PTAB construed "seal" as "materials used to control or stop leakage of fluids . . . through mechanical clearances when [fluids are] under pressure or vacuum."[101]

Contrary to SPX's arguments, the PTAB's claim construction of "seal" has significant support in the specification of the '376 patent and encompasses the seals that are formed in each of the valve's operating positions, including the axial "seal" that is formed when the double seat valve is in its common open position. The PTAB relied on a part of the specification which warned that the direct flow of cleaning fluid against the "sealing elements" of the first and second closing elements might cause the cleaning fluid to penetrate or leak into an opposite valve housing section.[102]  This part of the specification supports the PTAB's construction because it indicates that the "sealing elements" are used to control or stop leakage of fluids between valve housings, and that the direct flow of pressurized cleaning fluid against the sealing elements (which the '376 patent seeks to avoid) may cause such undesired leakage.

---

[100] A00733; A00735-37; A00739; A00742-44; A00748-50.

[101] A00017-18.

Several other parts of the specification are likewise supportive. For example, the specification states that the first and second closing elements each have a "sealing element" which abuts with their closing element seats in a "seal-forming fashion" when the first and second closing elements are in their closed positions.[103] In addition, when the valve is in its common closed position, these sealing elements close off one valve housing from the other in a "hermetically sealed fashion."[104] If either of the sealing elements leak, the leakage is discharged into an area where it can be detected.[105]

In another example, the specification states that gaps (which are used for leakage discharge) between the first and second closing elements and the flow barrier element are closed when the valve is being moved into its common open position.[106] The specification further states that "in order to ensure that there is a seal" between the first and second closing elements and the flow barrier element in the valve's common open position, axially acting "sealing elements" on the first and second closing elements abut with the flow barrier element in a "seal-forming

---

[102] A00017-18; A00049 at 11:22-40.

[103] A00048 at 10:12-22; A00026; A00027 at Figures 2a, 2b and 2d.

[104] A00048 at 10:48-52; A00027 at Figure 2d.

[105] *See, e.g.*, A00046 at 5:53-62; A00048 at 10:40-47; A00050 at 13:11-27.

[106] A00050 at 13:31-49.

fashion."[107]   As a result of this seal formation in the common open position, the arrangement composed of the first and second closing elements and the flow barrier element is "completely sealed with respect to the [valve's] leakage space,"[108] and the leakage space is "hermetically sealed with respect to the interior of the valve housing."[109]   In yet another example, the specification states that in the common open position, the first and second closing elements are sealed with respect to the flow barrier element when "axial projections" on the first and closing elements are pressed against the flow barrier element in an "axially seal-forming abutment."[110]

Each of the above examples from the specification supports the PTAB's construction because they describe seals that are formed via the use of "sealing elements" or "axial projections" that control or stop leakage of fluids (e.g., cleaning fluids) when such fluids are under pressure.  Indeed, the whole point of the patent is to provide a double seat valve for separating media, which would be impossible without valve seals that control or stop leakage of fluids.   Südmo

---

[107] A00050 at 13:49-59; A00026; A00027 at Figure 2c.

[108] A00046 at 6:64 – A00047 at 7:4; A00026; A00027 at Figure 2c.

[109] A00050 at 14:41-51; A00030 at Figure 5a.

[110] A00051 at 16:35-65; A00052 at 17:36-41; A00037; A00041.

therefore submits that the PTAB's construction of "seal" is the broadest reasonable interpretation in light of the specification of the '376 patent.

SPX's arguments that the patent describes seals that are formed by "simple abutment" and "seals that will leak" mischaracterize the clear language of the specification.[111]  First, as discussed above, the patent describes the formation of seals (including "axial" seals) when sealing elements and axial projections abut in a "seal-forming" fashion with other structures, but the patent nowhere discloses that seals are formed from nothing more than "simple abutment."   Second, the patent discloses that leaks in the sealing elements of the first and second closing elements can be detected.[112]  SPX characterizes such leaks as if they are intentional features of the claimed valve, but the '376 patent actually discloses such leaks as being the undesired, but possible, result of pressurized cleaning fluid flowing directly against the sealing elements.[113]  In fact, this undesired result was identified as a prior art problem that the '376 patent aims to solve through use of the flow barrier element.[114]  The concept that the '376 patent teaches "seals that will leak" would render the valve unusable for the purpose for which it was created, namely,

---

[111] SPX Br. at 31, 36, 40.

[112] *See, e.g.*, A00046 at 5:53-62; A00048 at 10:40-47; A00050 at 13:11-27.

[113] *See, e.g.*, A00049 at 11:26-40; A00050 at 13:21-27.

to provide for a comestible liquid (e.g., milk) to flow through one pipe and for a cleaning fluid to be simultaneously applied to the other pipe and valve elements without the cleaning fluid contaminating the comestible liquid.

SPX also argues that the PTAB's construction of "seal" should be reversed because the PTAB relied primarily on Mark's Standard Handbook for Mechanical Engineers 8-133 (McGraw-Hill Cos., Inc. 2007) as the foundation for the construction in violation of the *Phillips* framework.[115]  SPX is incorrect because the PTAB relied on the specification of the '376 patent as the foundation for its construction.  In particular, the PTAB looked to the specification for a definition and usage of "seal."[116]  Consistent with this Court's precedent permitting the use of dictionaries and treatises in claim construction analyses, the PTAB consulted Marks Standard Handbook to determine the ordinary usage of the term "seal," and found that the handbook's definition of seal was consistent with the usage of the term in the '376 Patent.[117]  Therefore, contrary to SPX's arguments, the PTAB's claim construction methodology was consistent with this Court's claim construction guidelines.  Moreover, as explained above, the specification of the

---

[114] *See, e.g.*, A00044 at 2:28-48; A00045 at 3:8-15; A00049 at 11:26-56.

[115] SPX Br. at 37-38.

[116] A00017-18 (citing to A00049 at 11:22-40).

'376 patent contains support for the PTAB's construction above and beyond what was cited by the PTAB in its decision.

For the above reasons, the Court should sustain the PTAB's construction of "seal."

**B.     The PTAB's Construction of "Spoked Wheel"**

Claims 60-63 and 65-67 each require the flow barrier element to be "configured as a spoked wheel having a plurality of spokes with openings therebetween at least partially defining said leakage space."[118]     The PTAB construed the term "spoked wheel" as "a wheel having spokes," where a spoke is "one of the bars that connect the center of a wheel to the rim."[119]

The PTAB's claim construction of "spoked wheel" has significant support in the specification of the '376 patent.  The PTAB relied on Figure 3b of the '376 patent, which shows the flow barrier element (54) configured as a wheel having

---

[117] A00017-18; *Phillips*, 415 F.3d at 1318, 1322; *Bilstad*, 386 F.3d at 1121-23.

[118] A00744-46; Claims 53 and 76 also require the flow barrier element to be configured as a spoked wheel having a plurality of spokes with openings therebetween at least partially defining said leakage space.  A00744; A00748-49. Claims 77 and 81 depend from claim 76, and therefore includes the "spoked wheel" limitation of claim 76.  A00750.  Claims 35, 48 and 75 also require the flow barrier element to be "embodied as a spoked wheel."  A00739; A00742, A00748.  Accordingly, the following analysis also applies to each of these claims. A00722-25; A00013.

[119] A00020-21.

spokes (64) that connect the center (i.e. connection section (60)) of the flow barrier element to the rim (i.e. annular element (56)).[120]  The specification also provides additional support in Figures 1 and 3a, which show spokes connecting the center of the flow barrier element to its rim.[121]  In addition, the specification describes the flow barrier element as "a spoked wheel which has a plurality of spokes with openings lying between them."[122]

SPX does not dispute that the PTAB's construction is adequately supported by the specification of the '376 patent.[123]  Rather, SPX takes issue with the PTAB's use of the word "rod" to describe the spokes of the flow barrier element, arguing that the PTAB's use of the word "rod" imparts additional structural requirements for the "spokes" and violates the principles of claim differentiation.[124]  However, the word "rod" is synonymous with "bar," which the PTAB used to define the term "spoke."[125]  Therefore, when viewed in light of the PTAB's construction, it is clear that rather than imparting additional structural

---

[120] A00028 at Figure 3b.

[121] A00026; A00028 at Figure 3a.

[122] A00051 at 16:46-53.

[123] SPX Br. at 44-46.

[124] SPX Br. at 44-46; A00020.

[125] A00020.

elements, the PTAB used the word "rod" synonymously with the word "spoke." Moreover, the PTAB's use of the word "rod" to describe the spokes is supported by Figures 1, 3a, and 3b of the '376 patent, which depict the spokes of the flow barrier element as elongated pieces of material or rods.[126]   Second, SPX's claim differentiation argument is inapposite as it relies on a claim whose scope is unaffected by the shape or structure of the spoke.[127]

SPX also argues that the PTAB elevated a definition of "spoke" from The Free Merriam-Webster Dictionary over intrinsic evidence,[128] but this argument should be rejected because the specification of the '376 patent was the PTAB's primary source for the construction.   In particular, the PTAB looked to the specification for a definition and usage of the term "spoked wheel."[129]   Consistent with this Court's precedent permitting the use of dictionaries in claim construction analyses, the PTAB consulted The Free Merriam-Webster Dictionary to determine

---

[126] A00026; A00028.

[127] SPX Br. at 45 (citing to claim 19 which recites the angular positioning of the spoke).

[128] *See, e.g.*, SPX Br. at 2, 44.

[129] A00020.

the ordinary usage of the term "spoke," and found that the dictionary's definition was consistent with the usage of the term "spoked wheel" in the '376 patent.[130]

For the above reasons, the Court should sustain the Board's construction of the term "spoked wheel."

### C.    The PTAB's Construction of "At Least Moveable . . . When Said Second Closing Element Is Lifted And When Cleaning Medium Is Applied To Said Leakage Space."

Claims 68, 70-72, and 74-75 require the flow barrier element to be "at least moveable towards the first closing element when said second closing element is lifted and when cleaning medium is applied to said leakage space."  Claim 69 requires the flow barrier element to be "moved towards the first closing element when said second closing element is lifted and when cleaning medium is applied to said leakage space."[131]

Using claim 68 as a representative, the PTAB considered the following limitation in its entirety to determine its meaning: "wherein said flow barrier

---

[130] A00020; *Phillips*, 415 F.3d at 1318, 1322; *Bilstad*, 386 F.3d at 1121-23.

[131] A00746-48.  Claims 36, 49, 58, 66, and 76 each also recite the same "at least moveable…" limitation.  A00739; A00742; A00744; A00746; A00750.  Claim 77 depends from claim 76 and therefore requires the "at least moveable…" limitation. A00750.  Like claim 69, claims 30, 37, 50, 59, 67 and 81 each also recite that the flow barrier element is "moved towards the first closing element when said second closing element is lifted and when cleaning medium is applied to said leakage space."  A00737; A00739; A00742; A00744; A00746; A00750.  Accordingly, the following analysis also applies to each of these claims.  A00714-17; A00014.

element is at least moveable towards the first closing element when said closing element is lifted and when cleaning medium is applied to said leakage space."[132] Based on the plain language of the claim, the PTAB construed this limitation as not just requiring the flow barrier element to move or be capable of moving, but to move or be capable of moving <u>at a particular time</u>—that is, *when said second closing element is lifted and when cleaning medium is applied to said leakage space.*[133] This interpretation is therefore consistent with the clear language of the claims themselves, and it is also supported by the specification. For example, the specification states that when the second closing element (30a) is lifted and "when pressurized cleaning medium is applied to said flow barrier element (54a), [the flow barrier element] continues to be capable of moving axially towards [the first closing element (28a)]."[134]

SPX argues that the Board's construction here should be reversed because it requires the term "moveable" to mean actual movement at a particular time, so as to be inconsistent with the claim text and specification of the '376 patent. This argument is without merit. As explained above, the PTAB's interpretation required the flow barrier element to be "capable of moving" at a particular time,

---

[132] A00022-23.

[133] A00022-23.

which is consistent with the claim text and specification. Even SPX agrees that "capable of moving" is the broadest reasonable construction of the term "moveable."[135] Second, SPX improperly limits its analysis to a single term "moveable" and ignores the part of the limitation that requires movement at a particular time. *Anchor Wall Sys., Inc. v. Rockwood Retaining Walls, Inc.*, 340 F.3d 1298, 1311 (Fed. Cir. 2003) ("It is the claim limitation, as a whole, that must be considered in claim construction."); *Pause Tech., LLC v. TiVo, Inc.*, 419 F.3d 1326, 1331 (Fed. Cir. 2005) ("Proper claim construction ... demands interpretation of the entire claim in context, not a single element in isolation.") (internal quotations omitted); *Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1325 (Fed. Cir. 2001) (rejecting claim construction that ignored relevant claim language).

For at least the above reasons, the Court should sustain the PTAB's interpretation of the limitation "wherein said flow barrier element is at least moveable towards the first closing element when said second closing element is lifted and when cleaning medium is applied to said leakage space."

---

[134] A00051 at 15:33-61.

[135] SPX Br. at 52-53; A00023.

## II. THE COURT SHOULD AFFIRM THE PTAB'S DECISION THAT CLAIMS 7, 21-31, 35-41, 43-45, 48-54, 58-63, 65-72, 74-77, and 81 ARE PATENTABLE

Anticipation is question of fact, and the PTAB's factual determinations regarding anticipation are reviewed by this Court for substantial evidence. *In re Gleave,* 560 F.3d 1331, 1335-36 (Fed. Cir. 2009); *In re Montgomery*, 677 F.3d 1375, 1379 (Fed. Cir. 2012). "[This Court] uphold[s] decisions of the Board on factual matters if there is substantial evidence in the record to support the Board's findings." *In re Hyatt*, 211 F.3d 1367, 1372 (Fed. Cir. 2000); *In re Johannes*, 566 F. App'x 923, 925 (Fed. Cir. 2014). "A finding is supported by substantial evidence if a reasonable mind might accept that evidence as adequate to support a conclusion." *In re Johannes*, 566 F. App'x at 925. Here, the PTAB determined that claims 7, 21-31, 35-41, 43-45, 48-54, 58-63, 65-72, 74-77, and 81 were patentable over Hosokawa. As explained below, substantial evidence supports the PTAB's decision.

### A. Hosokawa Does Not Disclose A Flow Barrier Element That Is Moved or At Least Moveable When The Second Closing Element Is Lifted And When A Cleaning Medium Is Applied To The Leakage Space

The PTAB found that although Hosokawa's middle valve body (14) is capable of sliding freely along a main valve stem (7), Hosokawa does not describe its middle valve body as either moving or capable of moving when its alleged

43

"second closure element" (i.e. its outer valve body (8)) is lifted.[136]  On this basis, the PTAB determined that claims 68-72 and 74-75 are patentable over Hosokawa.[137]  The PTAB's finding is supported by substantial evidence.

First, Hosokawa discloses that its middle valve body (14) (i.e. the alleged flow barrier element) is seated on the middle valve seat (6) and is biased onto the middle valve seat (6) by means of a spring (15).[138]  Hosokawa states that the tension for the spring (15) is "given in the direction to the seat[.]"[139]  In FIG. 3 of Hosokawa, in order to apply cleaning fluid to the valve box (3) side, the inner valve body (13) (i.e., the alleged first closing element) is lifted from its valve seat (5).[140]  When the inner valve body (13) is lifted, the outer valve body (8) (i.e., the alleged second closing element) and the middle valve body (14) remain seated on their respective valve seats (4) and (6).[141]  In particular, the spring (15) ensures that

---

[136] A00023; A00015 -16 at para. 5.

[137] A00023.

[138] A00944 at 359:29-38; A00945 at 360: 61-70; A00947at FIG 1; A00715.

[139] A00944 at 359:29-38; A00945 at 360: 61-70.

[140] A00948 at Figure 3; A00946 at 361:47-53; A00715; A00015.

[141] A00944 at 359:29-38; A00945 at 360:61-70; A00946 at 361:47-53; A00948 at Figure 3; A00015; A00715.

the middle valve body (14) remains seated on its seat (6).[142]  Therefore, Hosokawa

discloses that the middle valve body (14) <u>remains seated</u> and is not moved or

moveable towards the outer valve body (8) when the inner valve body (13) is lifted

and when cleaning medium is applied to the leakage space.[143]

Second, the claims require a configuration where the *second* closing element

is lifted, but FIG. 3 of Hosokawa depicts a configuration where the *first* closing

element (i.e., inner valve body (13)) is lifted, so FIG. 3 of Hosokawa is ultimately

inapplicable here.[144]  FIG. 4 of Hosokawa depicts a configuration where the second

closing element (outer valve body (8)) is lifted in order to apply cleaning fluid to

the two-way pipe (30) side, but like FIG. 3 it depicts the middle valve body (14) as

<u>remaining seated</u> on its seat (6) when cleaning fluid is applied to the leakage

space.[145]

SPX nevertheless argues, for the first time, that when Hosokawa's outer

valve body (8) is lifted as shown in Figure 4, the cleaning fluid flowing between

---

[142] *Id.*

[143] In Figure 3 of Hosokawa, the leakage space includes the space between the
inner valve body (13) and the middle valve body (14), the gap (31), and the small
holes (14') of the middle valve body (14).  A00946 at 361:47-57.

[144] A00948 at Figure 3; A00716; A00015-16; A00023.

the top surface of the outer valve body (8) and the bottom surface of the middle valve body (14) pushes up on the middle valve body (14) to make it moveable towards the inner valve body (13).[146]  This argument should be rejected as waived because it was never raised in any of the proceedings below.  *In re Alonso*, 545 F.3d 1015, 1022 (Fed. Cir. 2008) (declining to consider newly minted argument on appeal) (citation and internal quotation omitted); *Arlington Indus., Inc. v. Bridgeport Fittings, Inc.*, No. 2013-1400, 2014 WL 4251552, at *5 (Fed. Cir. Aug. 29, 2014) ("We generally do not consider arguments that the applicant failed to present to the Board.") (internal quotation omitted); *SCA Hygiene Products Aktiebolag v. First Quality Baby Products, LLC*, 767 F.3d 1339, 1348 (Fed. Cir. 2014) ("As a general rule, a federal appellate court does not consider an issue not passed upon below.") (internal quotation omitted).

SPX's new argument should also be rejected because it is inconsistent with Hosokawa's disclosures so as to render Hosokawa's valve unusable for the purpose for which it was created.  Specifically, Figure 4 of Hosokawa applies "[w]hen running washing fluid in order to wash <u>only</u> the two-way pipe (30) side," and in

---

[145] A00949; A00946 at 361:58-68; A00023.  In Figure 4 of Hosokawa, the leakage space includes the gap (32) and the space between the middle valve body (14) and the outer valve body (8).  A00946 at 361:58-68.

[146] SPX Br. at 55-56.

this configuration, the first closing element (i.e. the inner valve body (13)) is closed to prevent leakage of cleaning fluid to the valve box (3) side.[147]  In addition, Hosokawa discloses that the spring (15) biases the middle valve body (14) towards its seat, and that the middle valve body (14) helps to prevent leakage of cleaning fluid to the inner valve body side when outer valve body side is being washed.[148] For the cleaning fluid to push up the middle valve body as SPX contends, the cleaning fluid would have to overcome the bias of the spring (15) and separate the middle valve body (14) from its seat, which would allow the cleaning fluid to (i) flow around the middle valve body (14), (ii) directly impinge on the inner valve body (13) (possibly causing a leakage to the valve box (3) side), and (iii) flow between the inner valve body (13) and the middle valve body (14).  This, however, is in stark contrast to Hosokawa's disclosures regarding Figure 4, wherein the middle valve body is depicted as being seated and the cleaning fluid flows "between the top surface of the outer valve body (8) and the bottom surface of the middle valve body (14)."[149]  Indeed, in order for the cleaning fluid to be discharged between the middle valve body and the outer valve body consistent with

---

[147] A00946 at 361:58-62; A00949.

[148] A00944 at 359:36-38; A00945 at 360:68-70; A00946 at 361:69-83.

[149] A00946 at 361:58-68; A00949.

Hosokawa's disclosures regarding Figure 4, the middle valve body (14) has to remain seated when the outer valve body (8) is lifted.

Moreover, although Hosokawa discloses that the middle valve body (14) can slide freely along the main stem,[150] it does not disclose that it is slid or is capable of sliding towards the inner valve body (13) *when the outer valve body (8) is lifted and cleaning medium is applied to the leakage space*.[151]   Accordingly, there is no disclosure in Hosokawa that the middle valve body (14) is moved or moveable toward the inner valve body (13) when the outer valve body (8) is lifted and when cleaning medium is applied to the leakage space.[152]

In light of the substantial evidence discussed above, the Court should reject SPX's arguments and affirm the PTAB's decision regarding claims 68-72 and 74-75.[153]

---

[150] A00944 at 359:29-35; A00945 at 360:63-67.

[151] A00716-17; A00023.

[152] A00023; A00715-17.

[153] Claims 36, 49, 58, 66, and 76 each also recite the same "at least moveable…" limitation.  A00739; A00742; A00744; A00746; A00750.  Claim 77 depends from claim 76 and therefore requires the "at least moveable…" limitation.   A00750. Like claim 69, claims 30, 37, 50, 59, 67 and 81 each also recite that the flow barrier element is "moved towards the first closing element when said second closing element is lifted and when cleaning medium is applied to said leakage space."  A00737; A00739; A00742; A00744; A00746; A00750.  Accordingly, the preceding analysis regarding claims 68-72 and 74-75 also applies to claims 30, 36-

**B.**     <u>**Hosokawa Does Not Disclose An Axial Seal In The Common Open Position**</u>

The PTAB rejected SPX's and Examiner's argument that term "seal" encompasses a "connection."  Relying on the specification of the '376 patent and the ordinary usage of the term "seal," the PTAB construed "seal" as "materials used to control or stop leakage of fluids . . . through mechanical clearances when [fluids are] under pressure or vacuum."[154]  Applying this construction, the PTAB found that Hosokawa does not disclose an axial "seal" between its inner valve body, outer valve body, and middle valve body when the valve is in its common open position.[155]  On this basis the PTAB determined that claims 7, 21-31, 35-41, 43-45, 48-54, 76-77, and 81 were patentable over Hosokawa.[156]  The PTAB's claim construction of the term "seal" is the broadest reasonable interpretation for the reasons discussed *supra*.  Also, as explained below, the PTAB's factual finding that Hosokawa does not disclose the claimed axial seal is supported by substantial evidence.

---

37, 49-50, 58-59, 66-67, 76-77 and 81, and the Court should therefore affirm the PTAB's decision that these claims are patentable for the same reasons discussed above regarding claims 68-72 and 74-75.  A00714-17; A00014.

[154] A00016 – 18.

[155] A00013-14; A00018.

[156] A00018.

First, when Hosokawa's valve is in the configuration shown in Figure 1 (i.e. the "common open position"), "processing fluid" (e.g., comestible fluid) is running and the valve's inner valve body (13), middle valve body (14), and outer valve body (8) are described as being "connected."[157]   However, Hosokawa nowhere discloses that the connection between the three valves forms a seal that controls or stops leakage of fluids.[158]   Rather, Hosokawa discloses the exact opposite via its description of Figure 4.  Figure 4 shows the valve in a position for cleaning the outer valve body (8) whereas Figure 1 shows the valve in the common open position, but they both show the same valve structure where the outer valve body (8) and the middle valve body (14) are "connected."[159]   Referring to Figure 4, Hosokawa discloses that "leakage is discharged . . . between the top surface of the outer valve body (8) and the bottom surface of the middle valve body (14)" when the outer valve body and the middle valve body are in contact with each other.[160] There can be no axial seal between the valve bodies in Figure 4 because Hosokawa *requires* leakage of cleaning fluid to be discharged between the valve bodies when

---

[157] A00947 at Figure 1; A00946 at 361:35-46.

[158] A00018; A00717-22; A00566-67 at paras. 21-27.

[159] A00947; A00949; A00946 at 361:35-46, 58-65; A00718-20.

[160] A00949; A00946 at 361:65-68.

they are in contact with each other.[161]  Indeed, if an axial seal was present, it would

render Hosokawa's valve inoperable because the top surface of the outer valve

body (8) and the bottom surface of the middle valve body (14) could never be

cleaned as described in the specification.[162]  In other words, the valve would not be

enabled, and thus could not anticipate the claims of the '376 patent.  *Elan Pharm.,*

*Inc. v. Mayo Found. for Med. Educ. & Research*, 346 F.3d 1051, 1054 (Fed. Cir.

2003) ("To serve as an anticipating reference, the reference must enable that which

it is asserted to anticipate."); *Application of Hoeksema*, 399 F.2d 269, 273

(C.C.P.A. 1968).

As Figure 1 is the same valve with the same structure as shown in Figure 4

and described in the written specification of Hosokawa, there is likewise no axial

seal between the valve bodies in Figure 1.[163]  SPX nevertheless argues that when

Hosokawa's valve is in its common open position (*see* Figure 1 of Hosokawa),

Hosokawa discloses the formation of a seal between the connecting valves that

does not result in any "gaps" that would permit leakage.[164]  Not only is this

argument inconsistent with Hosokawa's disclosures as discussed above, but it

---

[161] *Id.*; A00566-67 at paras. 21-27; A00719.

[162] A00566-67 at paras. 21-27; A00721-22.

[163] *Id.*; A00947; A00949.

relies on an irrelevant disclosure in Hosokawa. Specifically, SPX relies on Hosokawa's disclosure that when either the inner valve body (13) or the outer valve body (8) is *unable to close against its respective seat*, leakage is discharged between the valve body that is unable to close and the middle valve body.[165] Contrary to SPX's argument, this disclosure does not describe connecting Hosokawa's outer, inner, and middle valve bodies against *each other* to prevent leakage.[166] In any event, Hosokawa nowhere discloses that leakage of the cleaning fluid is prevented by the connection between its valve bodies when the valve is in its common open position.[167]

Accordingly, substantial evidence supports the PTAB's finding that Hosokawa does not disclose the formation of an axial seal when its valve is in the common open position shown in Figure 1. Therefore, the Court should reject SPX's arguments and affirm the PTAB's decision regarding claims 7, 21-31, 35-41, 43-45, 48-54, 58-59, 76-77, and 81.[168]

---

[164] SPX Br. at 42-43.

[165] SPX Br. at 42 n. 133 (citing to A00946 at 361:19-27).

[166] *Id.*

[167] A00566-67 at paras. 21-27.

[168] Claims 33-34 depend from claim 21 and therefore include the axial "seal" limitation of claim 21. A00739. Claims 46-47 depend from claim 38 and therefore include the axial "seal" limitation of claim 38. A00742. Accordingly,

### C.    Hosokawa Does Not Disclose A Spoked Wheel

The PTAB construed the term "spoked wheel" as "a wheel having spokes," where a spoke is "one of the bars that connect the center of a wheel to the rim."[169] Applying this construction, the PTAB found that "nothing in Hosokawa describes the structural arrangement of the middle valve body *14* to be that of a spoked wheel," and that nothing in the depiction of the middle valve body necessarily requires its small holes to be formed or defined by spokes.[170]   The PTAB also agreed with Südmo's expert that one of skill in the art would not read the middle valve body as disclosed in Hosokawa to be a spoked wheel.[171]   On this basis, the PTAB determined that claims 60-63 and 65-67 were patentable over Hosokawa.[172] The PTAB's claim construction of the term "spoked wheel" is the broadest reasonable interpretation for the reasons discussed *supra*.   Also, as explained below, the PTAB's factual finding that Hosokawa does not disclose a spoked wheel is supported by substantial evidence.

---

the preceding analysis regarding claims 7, 21-31, 35-41, 43-45, 48-54, 58-59, 76-77, and 81 also applies to claims 33-34 and 46-47.  A00717-22.

[169] A00019-20.

[170] A00015; A00020.

[171] A00015 at para. 4; A00020-21.

[172] A00021.

First, Hosokawa never refers to its middle valve body as having spokes. Rather, Hosokawa only refers to its middle valve body as having two small holes (14'), and those small holes are not depicted as being defined by spokes.[173] Even the Examiner agrees that Hosokawa "lacks the structure as a spoked wheel."[174] Moreover, each of Hosokawa's figures depicts the middle valve body's cross section as uninterrupted except for the two small holes (14') and the valve stem (7),[175] and a person of ordinary skill in the art would consider this structure to be a *disk* having two small holes, not a spoked wheel.[176] When considering a plan view illustration of the middle valve body (shown below), its disk-like structure becomes even more apparent.

---

[173] A00947 at Fig. 1; A00944 at 359:29-30; A00945 at 360:62-63; A00946 at 361:31-32, 56-57; A00723; A00428 at para. 29.

[174] A00690-91.

[175] A00947-49.

[176] A00947-49; A00567 at para. 28.

*Annotated cross-section of Hosokawa's middle valve body (red) having two small holes (yellow)*



*Illustrative Plan View of Hosokawa's middle valve body.*



Second, the '376 patent states that the spaces between the spokes comprise a large passage cross section for discharging cleaning medium, and the overall passage cross section is at least as large as the opening cross section of the larger of the two connectors (18 and 20).[177]  The cross sections of the "small holes" in Hosokawa's middle valve body do not have these features,[178] and therefore Hosokawa's middle valve body could not comprise the claimed "spoked wheel."[179]

SPX contends that Hosokawa's middle valve body is a spoked wheel because of the Board's finding that "some structure must connect the middle portion and the outer portion of the middle valve body (14) across the small hole (14')."[180]  However, contrary to SPX's arguments, there is no disclosure in Hosokawa to support a conclusion that such a connecting "structure" is necessarily a spoke.[181]

---

[177] A00046 at 6:37-42; A00049 at 12:24-29; A00028 at Figure 3b.

[178] A00690-91 (Hosokawa "lacks the details of the drainage section with regard to the overall passage cross section being at least as large as an opening cross section of a larger one of the connectors.").

[179] A00947-49; A00428 at paras. 29-31; A00724.

[180] SPX Br. at 47-48.

[181] A00021.

Accordingly, substantial evidence supports the PTAB's finding that Hosokawa does not disclose a "spoked wheel." Therefore, the Court should reject SPX's arguments and affirm the PTAB's decision regarding claims 60-63 and 65-67.[182]

## III. THE COURT SHOULD AFFIRM THE PTAB'S DECISION THAT CLAIMS 33-35, 46-48, 53, and 75 ARE PATENTABLE

Obviousness presents a question of law based on underlying findings of fact about, for example, the scope and content of the prior art, the level of ordinary skill in the art, and the differences between the prior art and the claims at issue. *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 17 (1966). This Court reviews the PTAB's legal conclusion of obviousness *de novo* and its underlying findings of fact for substantial evidence. *In re Gartside*, 203 F.3d 1305, 1316, 1318-22 (Fed. Cir. 2000). As explained below, substantial evidence supports the

---

[182] Claims 53 and 76 also require the flow barrier element to be configured as a spoked wheel having a plurality of spokes with openings therebetween at least partially defining said leakage space. A00744; A00748-49. Claims 77 and 81 depend from claim 76, and therefore include the "spoked wheel" limitation of claim 76. A00750. Claims 35, 48 and 75 also require the flow barrier element to be "embodied as a spoked wheel." A00739; A00742; A00748. Accordingly, the preceding analysis regarding claims 60-63 and 65-67 also applies to claims 35, 48, 53, 75-77, and 81, and the Court should therefore affirm the PTAB's decision that these claims are patentable for the same reasons discussed above regarding claims 60-63 and 65-67. A00722-25.

PTAB's factual determinations and the PTAB correctly determined that claims 33-35, 46-48, 53 and 75 were patentable.

### A.    <u>Claims 33-35, 46-48, and 53</u>

Each of claims 33-35, 46-48, and 53 ultimately depend from independent claims 21, 38 and 51, which require the axial seal limitation. The PTAB determined that claims 33-35, 46-48, and 53 were patentable based on its factual finding that the Examiner's cited teachings from Burmester '134, PMO 2005, and Deger do not disclose the axial seal that is missing from Hosokawa's disclosures.[183] The Court should affirm the PTAB's decision.

First, here SPX challenges the PTAB's decision that claims 33-35, 46-48, and 53 are patentable <u>only</u> with respect to the PTAB's finding that Hosokawa does not disclose an axial seal.[184] As explained *supra*, substantial evidence supports the PTAB's factual finding that Hosokawa does not disclose an axial seal. Second, neither the Examiner nor SPX cited Burmester '134, PMO 2005, or Deger as disclosing an axial seal.[185] Rather, they cited portions of Burmester '134, PMO 2005, and Deger that disclosed structures allegedly meeting limitations related to

---

[183] A00018-19.

[184] SPX Br. at 30-31, 36-43.

[185] A00691-92; A00018-19; A00763-65; A01155; A01162; A01166; A01175.

the size of the drainage passage cross section (claims 33 and 46), obliquely directed spokes (claims 34 and 47), and a spoked wheel (claims 35, 48, 53, and 75).[186]   SPX does not contend otherwise.   Accordingly, substantial evidence supports the PTAB's factual findings, and the PTAB correctly determined that claims 33-35, 46-48, and 53 are patentable.

### B.    Claim 75

Claim 75 requires a flow barrier element that is at least moveable towards the first closing element when the second closing element is lifted and when cleaning fluid is applied to the leakage space.  The PTAB determined that claim 75 is patentable because SPX's cited teachings from Burmester '134 do not remedy Hosokawa's failure to disclose this element.[187]   The Court should also affirm the PTAB's decision.

First, here SPX challenges the PTAB's decision that claim 75 is patentable only with respect to the PTAB's finding that Hosokawa does not disclose a flow barrier element that is at least moveable towards the first closing element when the second closing element is lifted and cleaning medium is applied to the leakage

---

[186] *Id.*

[187] A00023.

space.[188]    As explained *supra*, substantial evidence supports the PTAB's factual finding that Hosokawa does not disclose a flow barrier element that is at least moveable towards the first closing element when the second closing element is lifted and cleaning fluid is applied to the leakage space.    Second, neither the Examiner nor SPX cited Burmester '134 as disclosing that limitation.[189]    Rather, they cited portions of Burmester '134 that allegedly disclosed a spoked wheel.[190] SPX does not contend otherwise.    Accordingly, substantial evidence supports the PTAB's factual findings, and the PTAB correctly determined that claim 75 is patentable.

## IV.    THE COURT SHOULD REJECT SPX'S NEW ARGUMENT THAT THE PTAB SHOULD HAVE FOUND CLAIMS 60-63 AND 65-67 UNPATENTABLE UNDER § 103

SPX argues for the first time on appeal that the PTAB should have found claims 60-63 and 65-67 obvious in view of Hosokawa and Burmester '134.[191] SPX failed to raise this new legal theory in the proceedings before the PTAB despite having ample opportunity to do so in its numerous Third Party Comments

---

[188] SPX Br. at 52-57.

[189] A00691-92; A00023; A00763-65; A01155; A01172-73; A01175.

[190] *Id.*

[191] SPX Br. at 48-52.

with accompanying claim charts,[192] and in its response to Südmo's appeal before the PTAB.[193]  "Failure to advance legal theories before the Board constitutes a failure to make a complete presentation of the issues, and permitting a party to raise those theories for the first time after the agency has rendered its final decision would be both inefficient and wasteful of administrative and judicial resources." *In re Alonso*, 545 F.3d at 1022; *Arlington Indus., Inc.*, 2014 WL 4251552, at *5; *SCA Hygiene Products Aktiebolag*, 767 F.3d at 1348.  The Court should therefore reject SPX's new argument regarding the alleged obviousness of claims 60-63 and 65-67 as waived.[194]

SPX cites to this Court's decision in *In re Taylor Made Golf Company, Inc.* to support its argument that claims 60-63 and 65-67 should be found invalid under § 103 because the PTAB found claim 20 invalid under § 103.  This argument is meritless for many reasons.  First, claim 20 is not at issue on appeal, so the PTAB's findings regarding that claim are not at issue here.  Second, in *Taylor* the

---

[192] A00634-81; A01141-77.

[193] A00753-71.

[194] SPX relies on *Hyatt v. Dudas*, 551 F.3d 1307, 1314 (Fed. Cir. 2008) to avoid waiver here, but *Hyatt* is inapplicable here because it addressed waiver of issues on remand, not issues raised for the first time before this Court.  551 F.3d 1307, 1314 (Fed. Cir. 2008).  *In re Comiskey* is also inapplicable because there, unlike here, the patentability of the claims did not turn on any subsidiary factual issues.  554 F.3d 967, 974-75 (Fed. Cir. 2009).

PTO was asked to reexamine the claims at issue under §103.  *In re Taylor Made Golf Co., Inc.*, No. 2013-1552, 2014 WL 4812686, at *2 (Fed. Cir. Sept. 30, 2014). In contrast, even though Südmo added claims 60-63 and 65-67 in its response to the very first office action in the merged reexamination proceeding,[195] SPX *never requested re-examination claims 60-63 and 65-67 under §103 based on the combination of Hosokawa and Burmester '134* despite having ample opportunity to do so in its Third Party Comments, and in the claim charts attached to those comments.[196]

Third, SPX faults the PTAB for addressing claim 20 based on the combination of Hosokawa and Burmester '134 and not claims 60-63 and 65-67.[197] However, unlike claim 20, claims 60-63 and 65-67 were *never* challenged by SPX or the Examiner under §103 based on the combination of Hosokawa and Burmester '134.  Rather, throughout the reexamination and the appeal proceedings before the PTAB, the Examiner and SPX specifically limited their challenge of claims 60-63 and 65-67 to arguments under ***§102, §112, and §305***.[198]  As such, a §103(a)

---

[195] A00430; A00443-44.

[196] A00499-541; A00634-81; A01169-72.

[197] SPX Br. at 48-51.

[198] A00537-38; A01169-72; A00652-53; A00655-A00660; A00760-63; A00551-55; A00561; A00687-92.

challenge against claims 60-63 and 65-67 was *never* at issue in the appeal proceedings before the PTAB.[199]  Thus, unlike the situation in *In re Taylor Made Golf Co.*, here the PTAB did not erroneously fail to consider the general knowledge of one skilled in the art in applying the obviousness standard to claims 60-63 and 65-57 because the obviousness issue was never before the PTAB with respect to these claims in the first place.

In other words, and as explained above, here SPX waived this new challenge in the proceedings before the PTAB, and the PTAB was not required to manufacture it for SPX's benefit.  Therefore, the PTAB did not err by not considering claims 60-63 and 65-67 based on the combination of Hosokawa and Burmester '134.

In the event that the Court decides to address the validity of claims 60-63 and 65-67 based on the newly raised combination of Hosokawa and Burmester '134, Südmo contends that this combination fails to disclose the claimed spoked wheel for the same reasons discussed in Südmo's appeal to the PTAB with respect to different claims.[200]  In particular, and as the Examiner acknowledges, neither

---

[199] A00714; A00687-92.

[200] A00725-28; A00426 at para. 17; A00428 at paras. 29-31, 34-37.

reference discloses a spoked *wheel*.[201]    Further, the actual flow barrier in Burmester '134 is not configured as a spoked wheel, and it is not moveable and has no moving parts.  Rather, it comprises of two different elements (2e and K) which a person of ordinary skill in the art would not combine with the teachings of Hosokawa to meet the required flow barrier element.[202]    Next, replacing Hosokawa's middle valve body with the alleged spoked valve in Burmester '134 would likely render Hosokawa's valve non-functional.  For example, modifying Hosokawa to use the valve in Burmester '134 would result in an increased flow of cleaning fluid in direct contradiction to the teachings of Hosokawa, which requires cleaning fluid to be discharged "a small amount at a time" and "limited to a minimum."[203]    Due to the functional issues likely to ensue from such a modification, a person of ordinary skill in the art would not modify Hosokawa in this fashion.[204]

---

[201] A00690-91.

[202] A00428 at paras. 34-37.

[203] A00428 at paras. 29-31; A00946 at 361:65-66, 79-85.

[204] A00727-28; A00428 at paras. 29-31.

## V.  THE COURT SHOULD REJECT SPX'S ARGUMENTS THAT RELY ON CLAIMS AND ISSUES THAT ARE NOT SUBJECT TO THIS APPEAL

Throughout its opening brief, SPX makes references and arguments related to claims and prior art references that are not subject to this appeal, including claims 19-20, and Burmester '986.[205]  The Court should therefore reject those references and arguments as outside the scope of this appeal.  *See, e.g.*, *In re Katz Interactive Call Processing Patent Litig.*, 639 F.3d 1303, 1328 (Fed. Cir. 2011) (refusing to address arguments related to claims that were not at issue in the appeal).

## VI.  CONCLUSION

As explained above, the PTAB's constructions of the claim limitations at issue are consistent with this Court's precedent and they are the broadest reasonable interpretations in light of the specification of the '376 patent.  In addition, the factual findings underlying the PTAB's decision are supported by substantial evidence in the record.  This Court should therefore sustain the PTAB's claim constructions and affirm its decision that claims 7, 21-31, 33-41, 43-54, 58-63, 65-72, 74-77, and 81 of the '376 patent are patentable.

---

[205] *See, e.g.*, SPX Br. at 44-45 (discussing claim 19); *id. at* 2, 27-28, 32, 48-52 (discussing claim 20); *id* at 20, 21, 45, 49 (discussing Burmester '986).

Respectfully submitted,

December 1, 2014

*/s/ Wesley W. Whitmyer, Jr.*
Wesley W. Whitmyer, Jr.
Steven B. Simonis
Benjamin J. Lehberger
Michael A. Lavine
ST.ONGE STEWARD JOHNSTON &
REENS LLC
986 Bedford Street
Stamford, Connecticut 06905
Telephone: (203) 324-6155
Facsimile: (203) 327-1096

*Attorneys for Appellee Pentair Südmo
GmbH*

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that this BRIEF OF APPELLEE PENTAIR SÜDMO

GMBH complies with the type volume limitation of Rule 32(a)(7)(B), Fed. R.

App. P. and contains 12,599 words in compliance with Rule 32(a)(7)(C).


Date: December 1, 2014            */s/ Wesley W. Whitmyer, Jr.*
                                  Wesley W. Whitmyer, Jr.
                                  Steven B. Simonis
                                  Benjamin J. Lehberger
                                  Michael A. Lavine
                                  ST. ONGE STEWARD JOHNSTON &
                                  REENS LLC
                                  986 Bedford Street
                                  Stamford, Connecticut 06905
                                  Telephone: (203) 324-6155
                                  Facsimile: (203) 327-1096

**FORM 30. Certificate of Service**

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

# CERTIFICATE OF SERVICE

I certify that I served a copy on counsel of record on by:

Dec 1, 2014

☐ US mail
☐ Fax
☐ Hand
☒ Electronic Means
   (by email or CM/ECF)

| Wesley W. Whitmyer, Jr. | /s/ Wesley W. Whitmyer, Jr. |
|---|---|
| Name of Counsel | Signature of Counsel |

Law Firm      St. Onge Steward Johnston & Reens LLC

Address      986 Bedford Street

City, State, ZIP      Stamford, CT 06905

Telephone Number      (203) 324-6155

FAX Number      (203) 327-1096

E-mail Address      litigation@ssjr.com

NOTE: For attorneys filing documents electronically, the name of the filer under whose log-in and password a document is submitted must be preceded by an "/s/" and typed in the space where the signature would otherwise appear. Graphic and other electronic signatures are discouraged.